SLR:CMI
USAO#: 2004V00300

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

PHILIP MESSINA, GEORGE DEMTRIOU,
individually and on behalf of all others similarly
situated, and derivatively on behalf of the
AMERICAN SOCIETY OF LAW ENFORCEMENT
TRAINERS, INC.,

                              Plaintiffs,

            v.

FRANK HACKETT, JR., et. al.

                              Defendants.

and AMERICAN SOCIETY OF LAW
ENFORCEMENT TRAINERS, INC.

                              Nominal Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.
CV 04-170

(Platt, J.)
(Lindsay, M.J.)

MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' ORDER TO SHOW CAUSE
FOR A PRELIMINARY INJUNCTION

                              ROSLYNN R. MAUSKOPF
                              United States Attorney
                              Eastern District of New York
                              Attorney for Defendant Young
                              One Pierrepont Plaza, 14th Floor
                              Brooklyn, New York 11201
                              (718) 254-6055

CATHERINE M. MIRABILE
Assistant United States Attorney
      (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.  Plaintiffs' Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B.  Defendant Glenn Young . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

C.  Plaintiffs' Purported Facts in Support of
    Plaintiffs' Order to Show Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    1.  Messina Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    2.  Kennedy Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    3.  Czarnecki Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    4.  Mandelbaum Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    5.  Nadeau Declaration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    6.  Plaintiff George Demtriou . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    7.  Internet Website Publication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9


ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

POINT I
THIS COURT SHOULD DISREGARD PLAINTIFFS'
SUPPORTING DECLARATIONS IN THEIR ENTIRETY . . . . . . . . . . . . . . . . . . . . . 10

POINT II
PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION SHOULD BE DENIED . . . . . . . . . . . . . . . . . . . . . . . 11

A.  Plaintiffs Have Offered No Evidence Of Irreparable Harm . . . . . . . . . . . . . . . . 12

    1.  The Legal Standard For Irreparable Harm . . . . . . . . . . . . . . . . . . . . . . . . . 12

2.    Plaintiffs Have Not Been Irreparably Harmed .......................... 13

   a.    Plaintiffs Have Failed To Identify Any Alleged Witness Tampering ... 14

   b.    Plaintiffs Have Failed To Identify Any Destruction Of Evidence ..... 14

   c.    Plaintiffs Fail To Demonstrate Any Constitutional Violations ........ 15

3.    Plaintiffs' Delay Demonstrates The Absence Of Irreparable Harm ........ 15

4.    In Sum, Plaintiffs Have Failed To Demonstrate Any Irreparable Injury .... 16

C.   Plaintiffs Have Failed To Demonstrate That They Are Likely To
     Succeed On Their Claim Or That There Exists A Serious Question
     As To The Merits In Conjunction With A Balancing Of Hardships
     Tipping In Plaintiffs' Favor ......................................... 17

POINT III
THIS COURT SHOULD DENY PLAINTIFFS'
REQUEST FOR AN EVIDENTIARY HEARING ............................. 19

POINT IV
PLAINTIFFS' REQUEST FOR AN ORDER
PROHIBITING FURTHER WITNESS TAMPERING AND
EVIDENCE DESTRUCTION SHOULD BE DENIED ......................... 20

CONCLUSION ...................................................... 21

## PRELIMINARY STATEMENT

Defendant Glenn Young, by his attorney, Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Catherine M. Mirabile, Assistant United States Attorney, of counsel, respectfully submits this memorandum of law in support of his opposition to the Order to Show Cause for Preliminary Injunction by plaintiffs Philip Messina and George Demtriou.

On or about January 16, 2004, plaintiffs commenced this action by filing a complaint which alleges, inter alia, civil Racketeering Influenced and Corrupt Organizations Act ("RICO") claims against defendants. See Complaint ("Compl."). Defendant Young's time to answer, move or otherwise respond to the complaint has been extended by this Court until June 2, 2004. The remaining defendants have moved to dismiss the complaint in its entirety and said motion is currently pending before the Court. See co-defendants' Notice of Motion and Memorandum of Law in Support of Defendants' Motion to Dismiss, dated February 20, 2004 ("Co-defendants' Motion to Dismiss"). Defendant Young intends to join his co-defendants' motion and will seek dismissal of this action in its entirety pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, pursuant to Fed. R. Civ. P. 56.

Plaintiffs' Order to Show Cause seeks "to halt the [alleged] ongoing retaliation and continuing scheme aimed at keeping the Plaintiffs and witnesses quiet." See plaintiff's Memorandum of Law in Support of Preliminary Injunction, dated April 8, 2004 ("Plaintiff's Memorandum of Law"), p. 3. In support of their request for immediate relief, plaintiffs claim that defendants Young and Meyer have "succeeded in destroying evidence and silencing witnesses." Id. Plaintiffs request that this Court grant judgment in their favor or, in the alternative, plaintiffs seek a preliminary injunction "restraining and enjoining" defendants Meyer and Young "from harassing and/or intimidating witnesses in this action" or an Order "prohibiting further witness tampering and

evidence destruction." <u>See</u> Order to Show Cause, p. 2; plaintiff's Memorandum of Law, pp. 3, 6-10.

This Court should deny plaintiffs' Order to Show Cause in its entirety. As demonstrated below, plaintiffs are not entitled to injunctive relief, let alone judgment in their favor, because they have utterly failed to demonstrate any showing of witness tampering or destruction of evidence. Indeed, plaintiffs' application consists of nothing more than speculation and allegations supported by vague references and hearsay within hearsay. Further, plaintiffs have completely failed to carry their burden of proving that they will suffer irreparable harm and that they are likely to succeed on the merits of their claims or that there is a sufficiently serious question going to the merits of this action, combined with a balance of hardships tipping decidedly in plaintiffs' favor. Further, as plaintiffs' request for a preliminary injunction can be fully evaluated upon the written submissions, defendant Young objects to plaintiffs' request for an evidentiary hearing. Finally, plaintiffs' request for an Order prohibiting witness tampering and the destruction of evidence must, likewise, be denied. Any Order from the Court instructing defendant Young to refrain from engaging in illegal activity, particularly when there is no support for this allegation, is profoundly prejudicial to Young. Accordingly, this Court should deny plaintiffs' Order to Show Cause in its entirety.

2

## STATEMENT OF FACTS

**A.    Plaintiffs' Complaint.**

Plaintiffs bring this underlying action alleging, inter alia, civil RICO violations against all defendants. See Compl. These claims concern the management of a non-profit private organization known as the American Society of Law Enforcement Trainers, Inc. ("ASLET"), which is dedicated to enhancing and promoting excellence in law enforcement training. Id., ¶¶ 2, 25, 55. Plaintiffs' claims allege racketeering and racketeering conspiracy, fraud, corporate waste, breach of contract, and a breach of fiduciary duty and the duty of loyalty. See Compl., ¶¶ 1, 197-244. Plaintiffs assert mail and wire fraud as two predicate acts supporting their civil RICO claims. As against defendant Young, plaintiffs assert claims of RICO violations, fraud, and aiding and abetting. Id. Plaintiffs do not assert any claims of constitutional violations against defendant Young. Id.

**B.    Defendant Glenn Young.**

Defendant Glenn Young is employed by the National Geospatial-Intelligence Agency ("NGA") in St. Louis, Missouri. See Declaration of Glenn Young, dated May 12, 2004 ("Young Decl."), ¶ 1. Young has been employed by NGA and its predecessor organizations, the National Imagery & Mapping Agency ("NIMA") and the Defense Mapping Agency ("DMA"), since approximately 1996. Id. Young is, currently, the NGA Chief of Law Enforcement and Security Training. Id.

Young has been a member of ASLET for the past four years. Id., ¶ 2. He is not a member of the ASLET Board of Directors nor has he ever held any formal management position at ASLET. Id., ¶ 3. NGA sponsored and funded Young's participation in ASLET and various training conferences. Id., ¶ 4. At no time, after being served with the underlying complaint, did Young speak

3


with Messina, Kennedy, Czarnecki, Mandelbaum, Nadeau, Wright or Bragg regarding plaintiff Messina or plaintiffs' complaint. Id., ¶ 5. At no time did Young threaten plaintiffs, plaintiffs' business, any witness, or any witnesses' business. Id., ¶ 6.

**C.    Plaintiffs' Purported Facts In Support of Plaintiffs' Order To Show Cause.[1]**

In support of plaintiffs' Order to Show Cause, plaintiffs have submitted declarations from the following individuals: plaintiff Philip Messina; and non-party witnesses Elizabeth Kennedy, Fabrice Czarnecki, Ed Mandelbaum, and Lawrence Nadeau.

**1.    Messina Declaration.**

According to plaintiff Philip Messina's Declaration, undated ("Messina Decl."), on January 21, 2004, Messina and his wife, Kennedy, were approached at the Adam's Mark Hotel in St. Louis, Missouri by Nadeau and Kathy Wright. See Messina Decl., p. 2. According to the Messina Decl., Nadeau and Wright told plaintiff and Kennedy that ASLET directors Robert Bragg (a non-party witness) and Tim Dees (a non-federal defendant) told them that certain unnamed ASLET directors were going to use their contacts at various federal agencies to retaliate against plaintiff and plaintiff's business as a result of the within lawsuit. Id. According to the Messina Decl., on January 24, 2005, at the Adam's Mark Hotel, Bragg approached Messina and Kennedy and said "Run, the Feds are after you." Id., p. 3.

The Messina Decl. further states that, on January 26, 2004 and January 27, 2004, Messina received telephone calls from non-party witness Czarnecki. Id., p. 3. Messina asserts that Czarnecki told Messina that Bragg had told him that plaintiff had "angered the Feds" by filing his complaint

---

[1] Defendant Young does not concede the truth of any of the facts set forth in plaintiffs' supporting declarations. The facts, as outlined in these declarations, are merely summarized herein for the Court's convenience.

4

and that a "Task Force" had been assembled with members of the FBI, CIA and IRS to investigate plaintiff. Id.

According to the Messina Decl., on January 27, 2004, Messina spoke to Wright on the telephone and Wright confirmed that it was her opinion that she (Wright) had been told that a federal task force had been put together so that she (Wright) would repeat this information to Messina. Id., pp. 3-5. The Messina Decl. is silent as on what grounds Wright made this assumption. Id.

There is nothing in the Messina Decl. that even implies, let alone evidences, any conduct by defendant Young. The Messina Decl. does not even imply that any individual ever actually spoke with defendant Young or overheard defendant Young make any relevant statements. Id., pp. 1-4. In fact, the Messina Decl. is completely silent as to the actual source of the alleged investigatory threats and through whom the alleged investigatory threats were channeled. Id.

Additionally, there are absolutely no facts contained in the Messina Decl. to indicate that defendant Young spoke to or attempted to intimidate plaintiff or any specific witness in retaliation for the filing of this action. Id. In fact, it is clear from the Messina Decl. that defendant Young had no personal threatening contact with plaintiff pertaining to plaintiffs' allegations of witness tampering and destruction of evidence. Id.

Moreover, the Messina Decl. makes no allegations regarding specifically who, if anyone, has been silenced in connection with this matter and further fails to indicate what, if any, evidence has allegedly been destroyed as a result of defendant Young's alleged conduct. Id. The Messina Decl. further fails to state what, if any, impact defendant Young's alleged conduct has had on plaintiff's place of business and fails to attach any documentation supporting such allegations.

## 2.    Kennedy Declaration.

Elizabeth Kennedy is the wife of plaintiff Philip Messina. See Messina Decl., p. 2. The Declaration of Elizabeth Kennedy, dated February 11, 2004 ("Kennedy Decl."), merely reiterates the events of January 21, 2004 and January 24, 2004, as outlined in the Messina Decl. Compare Kennedy Decl., pp. 2-3 with Messina Decl., pp. 2-3.

The Kennedy Decl. does not even imply, let alone evidences, that any individual ever actually spoke with defendant Young or overheard defendant Young make any relevant statements. Id. As with the Messina Decl., the Kennedy Decl. is completely silent as to the actual source of the alleged investigatory threats and through whom the alleged investigatory threats were channeled. Id.

Additionally, the Kennedy Decl. contains no statement that defendant Young spoke to Kennedy or attempted to intimidate Kennedy nor does it indicate anything pertaining to any alleged destruction of evidence. Id.. In fact, it is clear from the Kennedy Decl. that defendant Young had no personal threatening contact with Kennedy pertaining to plaintiffs' allegations of witness tampering and destruction of evidence. Moreover, the Kennedy Decl. makes no allegations of Kennedy's unwillingness to testify in this action or that Kennedy is aware of any witness who has been silenced in connection with this matter. Id.

## 3.    Czarnecki Declaration.

According to the Declaration of Dr. Fabrice Czarnecki, dated February 10, 2004 ("Czarnecki Decl."), on January 26, 2004 and January 27, 2004, he received telephone calls from Bragg. See Czarnecki Decl., p. 2-3. Czarnecki states that Bragg told him that an "Advanced Tactical Team," composed of "lawyers from the FBI, CIA and IRS [were] being sent to investigate" plaintiff Messina's business and non-party witness Mandelbaum's business. Id. Czarnecki further states that

Bragg told him that defendant Young "had made the original statement about the federal investigation" into plaintiff's business and Mandelbaum's business. Id.

There is, however, not even an assertion in Czarnecki's declaration that Bragg actually heard defendant Young make any statements. Id. Further, there is no indication as to when or where Bragg allegedly learned that defendant Young had made investigatory threats or if anyone else was present to confirm the allegation that defendant Young made investigatory threats. Id. The Czarnecki Decl. is completely silent as to the actual source of the allegation against defendant Young. Id.

Additionally, the Czarnecki Decl. contains no statement that defendant Young spoke to Czarnecki or attempted to intimidate Czarnecki. Nor does the Czarnecki Decl. refer to any alleged destruction of evidence. Id.. In fact, it is clear from the Czarnecki Decl. that defendant Young had no personal threatening contact with Czarnecki pertaining to plaintiffs' allegations of witness tampering and destruction of evidence. Moreover, the Czarnecki Decl. makes no allegations of Czarnecki's unwillingness to testify in this action or that Czarnecki is aware of any individual's unwillingness to testify. Id. While Czarnecki asserts that Bragg was unwilling to telephone Messina himself, and so Czarnecki relayed this information to Messina, there is no indication whatsoever that Bragg, himself, would not testify in this litigation. Id. Compare the Declaration of Ed Mandelbaum, dated March 10, 2004 ("Mandelbaum Decl."), p. 5.

### 4.    Mandelbaum Declaration.

According to the Mandelbaum Decl., on or about January 21, 2004, Mandelbaum states that he received a telephone call from Czarnecki wherein Czarnecki stated that he (Czarnecki) had received a telephone call from "a highly respected ASLET member" [Bragg] who stated that defendants Meyer and Young were "making a concerted effort to destroy" plaintiff Messina's

7

business and Mandelbaum's business." See Mandelbaum Decl., p. 2; see also Czarnecki Decl., pp. 2-3. According to Mandelbaum, Czarnecki also told him that "defendants" were using defendant Young's contacts at various federal agencies. See Mandelbaum Decl., p. 2.

The Mandelbaum Decl. contains no statement that defendant Young spoke to Mandelbaum or attempted to intimidate Mandelbaum in any way. Nor does the Mandelbaum Decl. refer to any alleged destruction of evidence. Id., pp. 1-6. In fact, it is clear from the Mandelbaum Decl. that defendant Young had no personal threatening contact with Mandelbaum pertaining to plaintiffs' allegations of witness tampering and destruction of evidence. Moreover, the Mandelbaum Decl. makes no allegations of Mandelbaum's unwillingness to testify in this action or that Mandelbaum is aware of any individual's unwillingness to testify. Id. In fact, Mandelbaum states that, while Bragg allegedly fears harassment and retaliation from defendants, he would voluntarily submit a Declaration to this Court and would also testify pursuant to a subpoena.[2] Id., p. 5.

Further, while Mandelbaum recites various allegations pertaining to conduct by defendant Meyer and ASLET attorney Michele Bimson, Mandelbaum does not assert any allegation regarding defendant Young's conduct in relation to Mandelbaum's business nor is it supported by any documentation that Mandelbaum's business has suffered, in any way, by the alleged conduct of either defendant Young or Meyer.

### 5.    Nadeau Declaration.

According to the Declaration of Lawrence Nadeau, dated February 23, 2004 ("Nadeau Decl."), on January 24, 2004, while at the Adam's Mark Hotel in St. Louis, Missouri, Nadeau spoke

---

[2] Despite Bragg's willingness to submit a Declaration attesting to the alleged harassment and intimidation, plaintiffs have not submitted a declaration by Bragg in support of their request for a preliminary injunction.

8

with Bragg, who allegedly stated that "the employers of [the] Federal Agents were very upset with [plaintiff Messina] and that they were going to come after [Messina] and that they had the resources to do so pretty hard." See Nadeau Decl., p. 2. The Nadeau Decl. is silent as to where Bragg got this alleged information or as to how Bragg developed such an opinion. Id.

The Nadeau Decl. contains no statement that defendant Young spoke to Nadeau or attempted to intimidate Nadeau or any witness. Nor does the Nadeau Decl. refer to any alleged destruction of evidence. Id., pp. 1-6. In fact, it is clear from the Nadeau Decl. that defendant Young had no personal threatening contact with Nadeau pertaining to plaintiffs' allegations of witness tampering and destruction of evidence. Moreover, the Nadeau Decl. makes no allegations of Nadeau's unwillingness to testify or that Nadeau is aware of any individual's unwillingness to testify. Id.

### 6.    Plaintiff George Demtriou.

Plaintiff Demtriou did not submit a declaration in support of the instant application and the declarations of plaintiff Messina and the non-party witnesses fail to address any harm allegedly suffered by Demtriou; nor do any of the declarations aver that Demtriou is unwilling to testify.

### 7.    Internet Website Publication.

In addition to plaintiffs' declarations, which do not indicate any person's unwillingness to testify, plaintiffs, or individuals on their behalf, have also posted these declarations on the internet. All of plaintiffs' submissions in this action, including plaintiffs' complaint, plaintiffs' opposition to co-defendants' motion to dismiss, and the within Order to Show Cause and supporting declarations, combined with commentary on ASLET and each stage of this litigation, have been posted on an internet website at asletupdates.com. See Declaration of AUSA Catherine M. Mirabile, dated May 12, 2004 ("Mirabile Decl."), Exhibit A.

9

## ARGUMENT

### POINT I

### THIS COURT SHOULD DISREGARD PLAINTIFFS' SUPPORTING DECLARATIONS IN THEIR ENTIRETY

Defendant Young objects to plaintiffs' submission of the declarations of Messina, Kennedy, Czarnecki, Mandelbaum and Nadeau in support of the within motion. These five declarations are self-serving, unsupported, hearsay declarations which contain nothing more than conjecture and speculation. Defendant Young respectfully requests this Court disregard the declarations submitted by plaintiffs in their entirety and not consider this alleged "evidence" in determining plaintiffs' request for injunctive relief.

While the Federal Rules of Evidence do not strictly apply to requests for preliminary injunctions, the rules of evidence may be used to determine the weight given to items of evidence. See Zeneca, Inc. v. Eli Lilly, 1999 U.S. Dist. LEXIS 10852, * 4-5 (S.D.N.Y. Jul. 19, 1999) (evaluating hearsay submissions for potential admissibility under the Federal Rules of Evidence) (copies of unpublished decisions are annexed hereto as Exhibit A). See also Johnson v. Newport Lorillard, 2003 U.S. Dist. LEXIS 939 (S.D.N.Y. Jan. 23, 2003) (noting that, while a court may consider affidavits and other hearsay evidence, preliminary injunctions are extraordinary measures that should not be routinely granted).

Here, this Court should disregard plaintiffs' supporting declarations in their entirety. Plaintiffs' declarations are not just hearsay evidence, they are double, triple, and quadruple hearsay statements. Plaintiffs' five proffered declarations constitute hearsay upon hearsay upon hearsay. No hearsay exception is applicable to the numerous hearsay statements contained within the declarations

10



and none of this alleged testimony would be admissible under the Federal Rules of Evidence.

Importantly, plaintiffs' declarations provide no evidentiary value regarding the issues raised in plaintiffs' instant application. None of the declarants aver that he or she actually heard defendant Young make any allegedly threatening comments. See plaintiffs' declarations, supra at Statement of Facts. In fact, plaintiffs' recitations of alleged threats, witness tampering and destruction of evidence are completely unsupported by any factual basis or documentation. Id. Given the declarations' obvious unreliability, this Court should disregard each declaration in its entirety.

## POINT II

### PLAINTIFFS' MOTION FOR A PRELIMINARY
### INJUNCTION SHOULD BE DENIED[3]

"The purpose of a preliminary injunction is to prevent irreparable injury and preserve a court's ability to render a meaningful decision on the merits." Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F. Supp. 2d 586, 597 (S.D.N.Y. 2001) (citations omitted). The award of preliminary injunctive relief "is an extraordinary and drastic remedy which should not be routinely granted." Medical Society of the State of New York v. Toia, 560 F.2d 535, 538 (2d Cir. 1977) (citations omitted); see also JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 80 (2d Cir. 1990); Hanson

---

[3] Plaintiffs' Memorandum of Law in Support of their Order to Show Cause for a Preliminary Injunction indicates that the Order to Show Cause is brought on behalf of plaintiffs Philip Messina and George Demtriou as well as non-party witnesses, known and unknown, including Elizabeth Kennedy, Dr. Fabrice Czarnecki, and Edward Mandelbaum. In addition to the objections set forth herein, defendant Young objects to this application being brought on behalf of individuals other than plaintiffs Messina and Demtriou. As these witnesses are not currently a party to this litigation, they lack standing to bring any application in the context of this action. While plaintiffs' complaint seeks class-action status, said status has not been conferred nor is there any indication that these witnesses are potential members of an alleged class. Further, as non-parties to this litigation, these witnesses are entirely unable to demonstrate irreparable harm and either a likelihood of success on the merits or a sufficiently serious question going to the merits.

Trust PLC v. LC SCM Acquisition, Inc., 781 F.2d 264, 273 (2d Cir. 1986) (preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies); Wandyful Stadium, Inc. v. Town of Hempstead, 959 F. Supp. 585, 591 (E.D.N.Y. 1997) (Spatt, J.) (accord).

The general standard used by courts within the Second Circuit for granting preliminary injunctive relief is well-settled.  Under the general standard, "[a] party seeking a preliminary injunction must demonstrate (1) that it will be irreparably harmed in the absence of an injunction, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and a balance of hardships tipping decidedly in its favor." Forest City Daly Housing, Inc. v. Town of North Hempstead, 175 F.3d 144, 149 (2d Cir. 1999) (citations omitted).  See also Alliance Bond Fund, Inc. v. Grupo Mexicano de Desarrollo, S.A., 143 F.3d 688. 696 (2d Cir. 1998); Maryland Cas. Co. v. Realty Advisory Bd on Labor Relations, 107 F.3d 979, 984 (2d Cir. 1997); Able v. United States, 44 F.3d 128, 130 (2d Cir. 1995) (quoting Resolution Trust Corp. v. Elman, 949 F.2d 624, 626 (2d Cir. 1991)).  The burden of proving that a preliminary injunction should be issued rests entirely on the movant. Fisher, 981 F. Supp. at 167.

**A.     Plaintiffs Have Offered No Evidence Of Irreparable Harm.**

**1.     The Legal Standard For Irreparable Harm.**

A showing of irreparable harm is considered the "single most important prerequisite" in satisfying the standard. See Rodriguez v. DeBuono, 175 F.3d 227, 233-34 (2d Cir. 1999). See also Alliance Bond Fund, Inc., 143 F.3d at 696; Reuters Ltd. v. United Press Int'l Inc., 903 F.2d 904, 907 (2d Cir. 1990) (recognizing that "irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction"); United States Postal Service v. Brennan, 579 F.2d 188, 191

12

(2d Cir. 1978) (citations omitted) (showing of irreparable harm is "the *sine qua non* for the grant of injunctive relief"). The irreparable harm prong of the test for a motion for a preliminary injunction is "critical to plaintiff's application and therefore, warrants close and careful scrutiny by the Court." See Consolidated Brands, Inc. v. Mondi, 638 F. Supp. 152, 155 (E.D.N.Y. 1986) (Platt, J.).

In order to succeed on a motion for a preliminary injunction, the moving party "must demonstrate an injury that is neither remote nor speculative and that cannot be remedied by an award of monetary damages." Rodriguez, 162 F.3d at 61; NAACP v. Town of East Haven, 70 F.3d 219, 224 (2d Cir. 1995) (movant must show "injury it will suffer is likely and imminent, not remote or speculative" and "not capable of being fully remedied by money damages"); Reuters, 903 F.2d at 970. "In the absence of a showing of irreparable harm, a motion for preliminary injunction should be denied." Rodriguez, 162 F.3d at 61 (citations omitted).

Further, if there is an adequate remedy at law, for example, money damages, the injunction may not issue. Consolidated Brands, Inc., 638 F. Supp. at 155; see also Butcher v. Gerber Products Co., 8 F. Supp. 2d 307, 312-13 (S.D.N.Y. 1998) ("[i]rreparable injury is one that cannot be redressed through a monetary award"). Monetary loss alone cannot constitute irreparable harm which would serve as the basis for the drastic remedy of a preliminary injunction. See Malkentzos v. DeBuono, 102 F.3d 50, 54-55 (2d Cir. 1996); Boray v. National Union Fire Ins. Co. of Pittsburgh, 934 F.2d 30, 34 (2d Cir. 1991). The movant, rather, must demonstrate damage "that cannot be rectified by financial compensation." Butcher, 8 F. Supp. 2d at 312-13.

## 2. Plaintiffs Have Not Been Irreparably Harmed.

In the within matter, plaintiffs' request for injunctive relief should be denied. Plaintiffs contend vaguely that they will suffer irreparable harm in the deprivation of their constitutional rights,

specifically, the deprivation of plaintiff's First and Seventh Amendment rights.[4] Plaintiffs offer nothing more than mere speculation based upon numerous levels of hearsay in support of their claims of alleged witness tampering and destruction of evidence.

### a.     Plaintiffs Have Failed To Identify Any Alleged Witness Tampering.

With respect to plaintiffs' bald claim of witness tampering, plaintiffs' submissions fail to identify a single witness who has been "silenced" in connection with this action. On the contrary, plaintiffs secured the cooperation of five declarants in connection with the instant application. This undermines any claim that witnesses are being silenced. Not one of plaintiffs' declarants have indicated that they, or any other potential witness, will not cooperate in the litigation of this matter due to defendant Young's alleged conduct. See Messina Decl., Kennedy Decl., Czarnecki Decl., Mandelbaum Decl. and Nadeau Decl. Further, plaintiffs have not identified the evidence that would be lost by the alleged witness tampering or how any such evidence bears on this case. Thus, plaintiffs have offered no evidence of an actual, let alone irreparable, injury from witness tampering.

### b.     Plaintiffs Have Failed To Identify Any Destruction Of Evidence.

With respect to the destruction of evidence claim, plaintiffs have failed to identify any such destruction. Plaintiffs assert that "one defendant" has ordered "the destruction of potential electronic and documentary evidence." See plaintiff's Memorandum of Law, p. 7. Plaintiffs have failed to identify this "one defendant," they have failed to identify what evidence they claim has been ordered destroyed, and they have failed to set forth any factual basis supporting this allegation. None of plaintiffs' supporting declarations lend any support to the allegation of destruction of evidence.

---

[4] In the complaint filed in the within action, plaintiffs do not allege any constitutional violations, including violations of the First and Seventh Amendments.

14

Importantly, there is nothing in this record even remotely supporting the contention that defendant Young had any involvement in any alleged destruction of evidence.  Because plaintiffs have not identified any documentary or electronic evidence allegedly compromised by the defendants, plaintiffs have failed to demonstrate actual injury from destruction of evidence.

### c.    Plaintiffs Fail To Demonstrate Any Constitutional Violations.

With respect to plaintiffs' allegations of constitutional violations, plaintiffs' allegations that they are suffering, or will suffer, violations of the First and Seventh Amendments in the absence of injunctive relief is also without support.  There is no evidence that plaintiffs have been unable, or will be unable, to exercise their right to free speech.  In fact, not only have plaintiffs continuously exercised this right, they, or individuals on their behalf, have posted all allegations submitted by plaintiffs in the within action, combined with commentary on ASLET and on each stage of this litigation, on an internet website for public view.  See Mirabile Decl., Exhibit A.  Additionally, there is no evidence that plaintiffs have been, or will be, denied their right to a trial by jury under the Seventh Amendment.  Plaintiffs have not identified any constitutional harm that they will suffer, or have suffered, if injunctive relief is denied.

### 3.    Plaintiffs' Delay Demonstrates The Absence Of Irreparable Harm.

As preliminary injunctions are granted under the theory that speedy action is necessary to protect a party's rights, "a district court should generally consider delay in assessing irreparable harm."  Shady v. Tyson, 5. F. Supp. 2d 102, 108, 109 (E.D.N.Y. 1998) (Spatt, J.).  See also Majorica v. R.H. Macy & Co., 762 F.2d 7, 8 (2d Cir. 1985); Citibank N.A. v. Citytrust, 756 F.2d 273 (2d Cir. 1985) (noting that delay in seeking enforcement of rights "tends to indicate at least a reduced need for such drastic speedy action" that is a prerequisite for the issuance of a preliminary injunction).

As this Court discussed in Shady v. Tyson, 5 F. Supp. 2d 102

> The Second Circuit has observed that '[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action . . . Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction.' . . . The Second Circuit [has] further held that '[l]ack of diligence, standing alone, may . . .' preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm . . .

Shady, 5 F. Supp. 2d at 108 (citations omitted). Accordingly, a district court should weigh plaintiffs' delay in its consideration of a claim of irreparable injury.

Here, plaintiffs' request for injunctive relief is undermined by their delay in making the instant application. Plaintiffs claim the alleged threats and intimidation occurred in late January 2004. Plaintiffs waited, however, until April 2004 in which to bring the within Order to Show Cause. Plaintiffs' delay in seeking injunctive relief demonstrates that plaintiffs' harm is neither actual nor imminent. Accordingly, plaintiffs' delay indicates an absence of the kind of irreparable harm required to support a preliminary injunction and mandates denial of plaintiffs' motion.

### 4. In Sum, Plaintiffs Have Failed To Demonstrate Any Irreparable Harm.

In sum, plaintiffs have failed to demonstrate any irreparable harm stemming from alleged witness tampering and destruction of evidence. Plaintiffs' submissions contain wholly uncorroborated allegations based on hearsay, surmise and conjecture. As previously noted, plaintiffs must demonstrate that the alleged harm is "likely and imminent," as opposed to being "remote or speculative." See Rodriguez, 162 F.3d at 61; NAACP, 70 F.3d at 224 (movant must show "injury it will suffer is likely and imminent, not remote or speculative"); Reuters, 903 F.2d at 970.

16



Moreover, defendant Young denies plaintiffs' allegations. See Young Decl. This court should place greater weight to the evidence of Young's denial over plaintiffs' hearsay upon hearsay allegations. See Fisher v. Goord, 981 F. Supp. 140, 173 n.38 (W.D.N.Y. 1997) (courts considered affidavits of denial by defendant correction officers in evaluating and denying plaintiffs' request for preliminary injunction).

Accordingly, as plaintiffs have failed to demonstrate any irreparable harm, this Court must deny plaintiffs' request for injunctive relief in its entirety.

**C.    Plaintiffs Have Failed To Demonstrate That They Are Likely To Succeed On Their Claim Or That There Exists A Serious Question As To The Merits In Conjunction With A Balancing Of Hardships Tipping In Plaintiffs' Favor.**

Even if plaintiffs could identify and establish irreparable harm, for which defendant Young contends plaintiffs cannot, plaintiffs cannot demonstrate a likelihood of success on the merits nor can plaintiffs establish a serious question as to the merits in conjunction with a balance of hardships tipping in plaintiffs' favor.[5]

Defendant Young's co-defendants have submitted a motion to dismiss this action in its entirety for failure to state a claim and that motion is currently pending before the Court. See Co-defendants' Motion to Dismiss. Defendant Young joins his co-defendants' motion to dismiss the complaint in its entirety. That motion establishes that plaintiffs have not, and cannot, make a claim for RICO violations.

Moreover, the plaintiffs' RICO claims made against defendant Young fail as a matter of law. Federal courts routinely dismiss cases alleging that a federal employee who, while acting within the

---

[5] The merits of plaintiffs' underlying action are wholly unrelated to the constitutional claims plaintiffs seek to raise in this Order to Show Cause. Plaintiffs cannot succeed on the merits of either the underlying action or the current constitutional claims.

17

scope of their employment, entered into a racketeering enterprise so as to give rise to a personal-liability civil RICO claim.  Courts have repeatedly declined to permit plaintiffs to use RICO claims to challenge actions taken by federal employees.  See National Commodity and Barter Exchange Assoc. v. Gibbs, 886 F.2d 1240, 1249 (10th Cir. 1989) (noting "we are unable to discern the basis of [plaintiffs'] RICO claim"); Hefti v. McGrath, 784 F. Supp. 1326, 1433 (E.D. Mo. 1992) (dismissed civil RICO claim against individual federal defendants, noting "plaintiffs have failed to provide authority for the proposition that a RICO claim may lie against a group of federal officials on account of their alleged official misconduct").  See also McNeily v. United States, 6 F.3d 343, 350 (5th Cir. 1993) (upholding dismissal of civil RICO claim against the FDIC arising out of regulatory activities); Berger v. Pierce, 933 F.2d 393, 397 (6th Cir. 1991) (upholding dismissal of civil RICO claim against the United States and two government contractors arising out of denial of federal flood insurance coverage); Wiley v. Federal Land Bank, 657 F. Supp. 964, 965 (S.D. Ind. 1987) (dismissing civil RICO claim against federal land banks and production credit associations arising out of loan foreclosures).

Here, defendant Young is not a member of the ASLET Board of Directors nor has he ever held any formal management position at ASLET.  Id., ¶ 3.  Young's participation in ASLET was funded and sponsored by NGA as part of his duties and responsibilities as Chief of Guard Training.  See Young Declaration, ¶ 4.  Young's actions with respect to ASLET were taken in the scope of his employment with NGA.  As federal courts have repeatedly declined to permit plaintiffs to use RICO claims to challenge actions taken by federal employees, plaintiffs cannot demonstrate their likelihood of success in the within merit.  As such, defendant Young will seek dismissal of this action in its entirety.

18

Further, the balancing of hardships tips decidedly in defendant Young's favor and requires this Court to deny plaintiffs' instant application. Plaintiffs will exploit any injunction or order issued by this Court. Plaintiffs, without offering any evidence of actual harm or likelihood of success on the merits, have already exploited their claims on the internet. See Mirabile Decl., Exhibit A. Plaintiffs have posted statements implying that this Court has accorded merit to their claims and that an order has already been issued against the interest of the defendants. Id. The issuance of a preliminary injunction would undoubtedly result in further public postings and mischaraterizations of the Court's intentions, compounding the prejudice to defendants. Accordingly, a balancing of hardships requires denial of plaintiffs' application.

## POINT III

### THIS COURT SHOULD DENY PLAINTIFFS'
### REQUEST FOR AN EVIDENTIARY HEARING

Defendant Young further objects to plaintiffs' request for an evidentiary hearing. "There is no doubt that a preliminary injunction may 'denied without a hearing . . . when the written evidence shows the lack of a right so clearly that receiving further evidence would be manifestly pointless.'" McKenna v. Wright, 2002 U.S. Dist. LEXIS 3489 (S.D.N.Y. Mar. 4, 2002) (quoting Larouche v. Webster, 566 F. Supp. 415, 419 n.5 (S.D.N.Y. 1983)). See also Johnson, 2003 U.S. Dist. LEXIS at *3, n.5. A request for a preliminary injunction may be decided upon the parties' submissions, thus obviating the need for an evidentiary hearing. See Johnson, 2003 U.S. Dist. LEXIS at *3, n.5; Drywall Tapers and Pointers of Greater N.Y. v. Local 530 of Operative Plasterers and Cement Masons Int'l Ass'n, 954 F.2d 69, 76 (2d Cir. 1992) (district court was justified in granting injunction without a hearing because affidavits provided basis for court's decision).

19

Here, as demonstrated below, plaintiffs have set forth insufficient evidence to support the issuance of a preliminary injunction with, or without, consideration of plaintiffs' declarations. Plaintiffs have not, and cannot, meet the requirements for a preliminary injunction. Plaintiffs' submissions are replete with unsupported allegations based upon speculation and conjecture and fail to put forth any basis to warrant such a hearing. In sum, nothing contained in plaintiffs' submissions justifies an evidentiary hearing. Accordingly, this Court should deny plaintiffs' request for an evidentiary hearing.

**POINT IV**

**PLAINTIFFS' REQUEST FOR AN ORDER
PROHIBITING FURTHER WITNESS TAMPERING
AND EVIDENCE DESTRUCTION SHOULD BE DENIED**

Plaintiffs' request for an Order prohibiting further witness tampering and evidence destruction should, likewise, be denied. Plaintiffs' request assumes that defendant Young has engaged, or will engage, in unlawful conduct, including threatening witnesses, destroying evidence and obstructing justice. As demonstrated above, there is no evidence of any such activity. Thus, there is no need for any such Order by the Court. Any Order from the Court instructing defendant Young to refrain from engaging in illegal activity, particularly when there is no support for this allegation, is profoundly prejudicial to Young. Accordingly, this Court should deny plaintiffs' request in its entirety.

## CONCLUSION

For all the foregoing reasons, defendant Glenn Young respectfully requests that the Court

deny plaintiffs' Order to Show Cause in its entirety together with such other and further relief as this

Court may deem just and proper.

Dated: Brooklyn, New York
      May 13, 2004

                Respectfully submitted,

                ROSLYNN R. MAUSKOPF
                United States Attorney
                Eastern District of New York
                Attorney for Defendant Young
                One Pierrepont Plaza, 14th Fl.
                Brooklyn, New York  11201

By:                _____

                CATHERINE M. MIRABILE (CM 1290)
                Assistant U.S. Attorney
                (718) 254-6055

21



ZENECA INC., Plaintiff, and BARR LABORATORIES, INC.,Plaintiff-Intervenor, - AGAINST - ELI LILLY
AND COMPANY, Defendant.
99 CIV. 1452 (JGK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OFNEW YORK

1999 U.S. Dist. LEXIS 10852; 1999-2 Trade Cas. (CCH) P72,603

July 15, 1999, Decided
July 19, 1999, Filed

DISPOSITION: [*1] Motion of Zeneca and Barr for preliminary injunction with respect to establishment and comparative establishment claims granted and denied with respect to indication claim.

CASE SUMMARY:

PROCEDURAL POSTURE: Plaintiff drug marketer and plaintiff-intervenor drug laboratory sued defendant rival drug company for violating unfair competition and deceptive trade practice statutes. Plaintiffs sought a preliminary injunction to prevent defendant from claiming that its drug was effective against breast cancer, was superior to plaintiffs', or was endorsed by the Food and Drug Administration.

OVERVIEW: Plaintiff drug marketer and plaintiff-intervenor drug laboratory sued defendant, a rival drug company, for violating federal and state unfair competition and deceptive trade statutes by an allegedly false marketing campaign for its drug. The court found that plaintiffs established a strong likelihood of success on merits, given abundant evidence that defendant falsely claimed that its drug reduced breast cancer risk and was superior to plaintiffs' drug, notwithstanding the lack of scientific evidence supporting those claims. The court further found that plaintiffs were irreparably harmed by defendant's false claims since their product was identified by name and public danger from the false claims warranted a presumption of irreparable harm. However, the court found insufficient evidence that defendant claimed that its drug was Food and Drug Administration approved. The court found that the equities favored granting an injunction given the public danger, injury to plaintiffs from allowing claims to continue, and lack of harm to defendant from injunction on false advertising.

OUTCOME: Preliminary injunction was granted to bar defendant's claims that its drug was effective against breast cancer and was superior to plaintiffs' drug. The court found that plaintiffs established a strong likelihood

of success, irreparable harm, and favorable equities. However, the injunction was denied as to the FDA endorsement claim because insufficient proof existed to show that such a claim had been made.

CORE TERMS: breast cancer, evista, fda, tamoxifen, raloxifene, reduction, proven, prevention, incidence, osteoporosis, doctor, placebo, label, efficacy, Lanham Act, cancer, invasive, clinical, protocol, patient, preliminary injunction, comparable, endpoint, message, postmenopausal, effectiveness, script, diagnosed, comparative, oncology

LexisNexis (TM) HEADNOTES - Core Concepts:

Civil Procedure: Injunctions: Preliminary & Temporary Injunctions
Evidence: Procedural Considerations: Rulings on Evidence
[HN1] The strict rules of evidence do not apply to a hearing on a motion for a preliminary injunction.

Civil Procedure: Injunctions: Preliminary & Temporary Injunctions
Evidence: Hearsay Rule & Exceptions: Residual Exception
[HN2] A federal court may consider hearsay evidence in a preliminary injunction hearing.

Evidence: Hearsay Rule & Exceptions: Admissions by Party Opponent
[HN3] In order for a hearsay statement to be admitted under *Fed. R. Evid. 801(d)(2)(D)*, a party must demonstrate (1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency.

Civil Procedure: Jurisdiction: Subject Matter Jurisdiction: Federal Question Jurisdiction
Trademark Law: Infringement: Jurisdiction

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

[HN4] A federal court has jurisdiction over an action alleging violations of § 43(a) of the Lanham Act, *15 U.S.C.S. § 1125*(a), pursuant to *15 U.S.C.S. § 1121* (a) and *28 U.S.C.S. §§ 1331* and 1338(a).

Civil Procedure: Injunctions: Preliminary & Temporary Injunctions
Trademark Law: Federal Unfair Competition Law: Lanham Act sec. 43(a)
[HN5] A party seeking a preliminary injunction bears the burden in Lanham Act, *15 U.S.C.S. § 1051* et seq., cases, as in all others, of demonstrating (1) that it will suffer irreparable harm if the preliminary injunction is denied and (2) either (a) a likelihood of success on the merits, or (b) serious questions going to the merits to make them a fair ground for litigation and a balance of the equities tipping decidedly in the movant's favor.

Trademark Law: Federal Unfair Competition Law: False Advertising
[HN6] Section 43(a) of the Lanham Act, *15 U.S.C.S. § 1125*(a), provides a civil remedy to those damaged by one who makes a false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics or qualities of his or her or another person's goods, services or commercial activities. Because § 43(a) is a remedial statute, it is broadly construed.

Trademark Law: Federal Unfair Competition Law: False Advertising
[HN7] Oral statements by a company's sales representative concerning a product constitute commercial advertising or promotion under the Lanham Act, *15 U.S.C.S. § 1051* et seq.

Trademark Law: Federal Unfair Competition Law: False Advertising
[HN8] Under the Lanham Act, *15 U.S.C.S. § 1051* et seq., the burden of proving the literal falsity of a commercial manufacturer's product claims varies depending on the nature of the challenged claim. When a manufacturer makes no mention of scientific tests or studies, the plaintiff must affirmatively prove that the statement is false. However, when a manufacturer's promotion implicitly or explicitly refers to tests or data - a so-called establishment claim - a plaintiff can satisfy its burden of proving literal falsity by demonstrating that such tests are not sufficiently reliable to permit one to conclude with reasonable certainty that they established the claim made. This standard of proof applies when the ad relies on scientific studies, whether implicitly by making a claim while showing a graph or diagram, or explicitly, by stating, for example, that "studies show ."

Trademark Law: Federal Unfair Competition Law: False Advertising
[HN9] A Lanham Act, *15 U.S.C.S. § 1051* et seq., plaintiff seeking to enjoin an establishment claim can meet its burden by showing either (i) that the tests were not sufficiently reliable to permit the conclusion for which they are cited, or (ii) that the tests, even if reliable, do not establish the proposition asserted by the defendant and are thus simply irrelevant. Once a plaintiff has exposed a defendant's tests as irrelevant and/or unreliable, relief may be granted without reference to the advertisements' impact on consumers.

Trademark Law: Federal Unfair Competition Law: False Advertising
[HN10] A Lanham Act, *15 U.S.C.S. § 1051* et seq., plaintiff seeking to enjoin an establishment claim must prove that a defendant's efficacy claims are literally false, not simply that they fail to meet current federal licensing standards.

Evidence: Witnesses: Expert Testimony
Trademark Law: Federal Unfair Competition Law: False Advertising
[HN11] A Food and Drug Administration's expert conclusions are relevant evidence in determining whether a party violated the Lanham Act, *15 U.S.C.S. § 1051* et seq.

Civil Procedure: Injunctions: Preliminary & Temporary Injunctions
Trademark Law: Federal Unfair Competition Law: False Advertising
[HN12] Once a plaintiff seeking to enjoin a false comparative claim demonstrates a likelihood of prevailing on the merits, irreparable injury is presumed when the defendant's literally false comparative advertisement mentions plaintiff's product by name. Moreover, when the false or misleading advertising claims create a danger to public health, the presumption of irreparable harm is particularly appropriate.

Trademark Law: Federal Unfair Competition Law: False Advertising
[HN13] In the case of non-comparative false claims, the Lanham Act, *15 U.S.C.S. § 1051,* requires only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising. To obtain injunctive relief, a Lanham Act plaintiff need not even point to an actual loss or diversion of sales. Instead the plaintiff must show two things: (i) that the parties are competitors in the relevant market, and (ii) that there is a logical causal connection between the alleged false advertising and its own sales position.

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Affirmative Defenses
Trademark Law: Federal Unfair Competition Law: False Advertising
[HN14] Because of the public's overriding interest in preventing misleading advertising, the defense of laches is sparingly applied in Lanham Act, *15 U.S.C.S. § 1051* et seq., cases. This is particularly true when public health issues are implicated.

Civil Procedure: Injunctions: Preliminary & Temporary Injunctions
[HN15] Courts retain a great deal of flexibility when fashioning preliminary relief. The essence of equity jurisdiction has been the power to grant relief no broader than necessary to cure the effects of the harm caused by the violation. Thus although a district court has a wide discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct, the injunction framed by the district court must be narrowly tailored to fit specific legal violations and should not impose unnecessary burdens on lawful activity. Finally, a court's order of preliminary injunctive relief should be explicit and clear so that those who must obey it will know what the court intends to forbid.

COUNSEL: For Plaintiff: Harold P. Weinberger, Esq., Kramer Levin Naftalis & Frankel LLP, New York, NY.

For Plaintiff Intervenor: Michael K. Atkinson, Esq., Winston & Strawn, Washington, D.C.

For Plaintiff Intervenor: Daniel Murdock, Esq., Winston & Strawn, New York, NY.

For Defendant: Nina M. Gussack, Esq., Pepper Hamilton LLP, Philadelphia, PA.

JUDGES: John G. Koeltl, United States District Judge.

OPINIONBY: John G. Koeltl

OPINION: OPINION AND ORDER

JOHN G. KOELTL, District Judge:

The plaintiff, Zeneca Inc. ("Zeneca") n1, and plaintiff-intervenor Barr Laboratories, Inc. ("Barr"), have sued the defendant, Eli Lilly and Company ("Eli Lilly"), under Section 43(a) of the Lanham Act, *15 U.S.C. § 1125*(a), and under the common law and statutory law of New York that prohibits unfair competition and deceptive trade practices. Zeneca is the manufacturer of the breast cancer drug tamoxifen citrate (hereinafter "tamoxifen citrate" or "tamoxifen"), which Zeneca markets and sells under[*2] the name Nolvadex. Barr distributes generic

tamoxifen citrate pursuant to a licensing agreement with Zeneca. Tamoxifen citrate has been approved by the Food and Drug Administration ("FDA") for the reduction of the incidence of breast cancer in women at high risk of developing the disease.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n1 Since this action was filed, Zeneca Inc. has merged with a pharmaceutical company called Astra. The merged entity is now called AstraZeneca Inc. Tr. at 2.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

Eli Lilly manufactures and sells the drug raloxifene hydrochloride (hereinafter "raloxifene") under the name Evista. Evista has been approved by the FDA for the prevention of osteoporosis in postmenopausal women. Zeneca and Barr allege that Eli Lilly is making three false claims about Evista: 1) that Evista has been proven to reduce the risk of breast cancer, 2) that Evista is comparable or superior to tamoxifen citrate for the prevention of breast cancer, and 3) that Evista has been indicated or approved by the FDA for the prevention of breast cancer. Defendant Eli Lilly[*3] argues that it has not made the second or third claims alleged. As to the first claim, the defendant argues that such a claim is not false because Evista has been proven to reduce the risk of breast cancer.

Zeneca and Barr have moved for a preliminary injunction. Following extensive expedited discovery, the Court held a five-day evidentiary hearing. As explained in detail below in the Court's Findings of Fact and Conclusions of Law, Eli Lilly has been promoting Evista with the claim that it has been established that it reduces the risk of breast cancer. That claim is based on the results of a significant clinical trial--the Multiple Outcomes of Raloxifene Evaluation ("MORE") study-- but the results of that trial do not prove that it has been established or proven that Evista reduces the risk of breast cancer. Further research is necessary to support the claim, and the FDA has specifically required Eli Lilly to include in the label for Evista, while discussing the results of the MORE trial, that "the effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established." Def.'s Exh. II (Evista Package

Case 1:05-cv-00344-JJF   Document 50-14   Filed 05/31/2005   Page 28 of 31

Page 7

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

Insert Revised as of Dec. 2, 1998) at 8. Hence, it is literally[*4] false for Eli Lilly to promote Evista with the claim that it has been established or proven that Evista reduces the risk of breast cancer. It is important in the public interest that the results of the MORE trial, as discussed below, be disseminated so that doctors and public health professionals can assess and understand the results of that study. It is also important, however, that the results of that study be truthfully disseminated and that false claims not be made, because false claims will not only hurt competitors who are marketing a drug that has been established to reduce the risk of breast cancer, but such false claims will also harm the public interest in assuring that truthful information about highly significant drugs is disseminated.

As a preliminary matter, during the evidentiary hearing the parties raised a number of hearsay objections. The Court received the evidence, including hearsay evidence such as affidavits, subject to a motion to strike. In reaching the Findings of Fact and Conclusions of Law, the Court has considered the hearsay objections raised by all parties. The Court has concluded that the objections do not warrant exclusion of the evidence. The Court[*5] has, however, carefully considered the reliability of all the disputed evidence and will separately discuss the evidence as to which objections were made. [HN1] The strict rules of evidence do not apply to a hearing on a motion for a preliminary injunction. See, e.g., *Securities and Exch. Comn'n v. Cherif, 933 F.2d 403, 412 n.8 (7th Cir. 1991),* cert. denied, *502 U.S. 1071, 117 L. Ed. 2d 131, 112 S. Ct. 966 (1992); Asseo v. Pan American Grain Co., 805 F.2d 23, 25-26 (1st Cir. 1986); Commodity Futures Trading Comm'n v. American Metal Exch. Corp., 693 F. Supp. 168, 173 (D.N.J. 1988); Delman Fabrics Inc. v. Holland Fabrics, Inc., 1984 U.S. Dist. LEXIS 16612, 84 Civ. 2512, 1984 WL 367,* at *5 (S.D.N.Y. May 17, 1984). The Court has, nevertheless, applied the Federal Rules of Evidence in determining the weight to be accorded the evidence that was introduced and has also assessed whether the evidence would be admissible under the Federal Rules of Evidence.

The defendant objects first to the admissibility of the "call notes" that were written by Eli Lilly sales representatives about their meetings with and "detailing" of doctors concerning Evista. [*6] The defendant argues that the call notes are inadmissible hearsay and do not meet any of the exceptions to the hearsay rule.

As an initial matter, as noted above, [HN2] the Court may consider hearsay evidence in a preliminary injunction hearing. In any event, the call notes satisfy the business records exception to the hearsay rule. See *Fed. R. Evid. 803(6).* The testimony of Newt Crenshaw, Eli Lilly's Vice President of U.S. Sales, established that sales

representatives are required to submit call notes in the course of their duties, that they are trained in how to make call notes, and that the call notes are required to be typed up as soon as possible after each visit with a doctor--usually the same day as the visit itself. Moreover, the call notes are intended to be accurate because sales representatives rely on the call notes when planning future meetings with doctors. The call notes are also backed up on a central computer system. Tr. at 152-63 (Crenshaw); see also Tr. at 852-53, 875-78 (Torres) (indicating that call notes are like a "diary" and that they are used by sales representatives and their partners to record accurate information). It is plain that the notes are made[*7] at or near the time of the meeting with the doctors by a sales representative with knowledge of the meeting, that the call notes are kept in the ordinary course of Eli Lilly's business, and that it was the regular practice of Eli Lilly's sales representatives to write and keep call notes. Thus the call notes are admissible under Rule 803(6). See, e.g., *United States v. Goodchild, 25 F.3d 55, 62 (1st Cir. 1994).*

The call notes are also admissible as admissions under *Federal Rule of Evidence 801(d)(2)(D).* [HN3] To be admitted under Rule 801(d)(2)(D), a party must demonstrate only "(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." *Pappas v. Middle Earth Condominium Assoc., 963 F.2d 534, 537 (2d Cir. 1992).* In this case, the plaintiff has demonstrated that an agency relationship existed between the sales representatives and Eli Lilly, that the statements in the call notes were made during the course of that relationship, and that the call notes concerned a matter within the scope of the agency relationship--namely the promotion[*8] and detailing of Evista. Thus the call notes are admissible under Rule 801(d)(2)(D).

Moreover, the probative value of the notes is not outweighed by any danger of unfair prejudice. The notes are highly probative of what the representatives said, which is an important issue in the case, they are not inflammatory, and they do not present a situation where the Court is being asked to consider them for an improper purpose. There is no basis for arguing they should be excluded under *Federal Rule of Evidence 403.*

The defendant next moves to exclude certain FDA documents on hearsay grounds. But hearsay evidence is admissible in a hearing on a preliminary injunction. Further, the documents are not hearsay to the extent that they are not offered for their truth. Here, the plaintiff seeks to admit the FDA documents for the fact of what the FDA said to Eli Lilly about Evista, the results of the MORE study, and the meaning of the language in the

Case 1:05-cv-00344-JJF    Document 50-14    Filed 05/31/2005    Page 29 of 31

Page 8

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

Evista label. The documents are relevant to Eli Lilly's contention concerning the FDA's interpretation of the MORE study and the meaning of the language on Evista's label stating that "the effectiveness of raloxifene in reducing the risk of breast cancer[*9] has not yet been established." Thus the documents are admissible as non-hearsay.

The FDA documents--in particular the minutes of the January 1999 and May 1999 meetings--are also admissible under the exception to the hearsay rule for public records that set forth "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." *Fed. R. Evid. 803(8)(c)*. The Meeting Minutes sought to be admitted contain factual findings by the FDA concerning Evista's efficacy for breast cancer prevention. The Minutes were the result of a timely review. There is no dispute that the FDA has the authority to and routinely does evaluate clinical data submitted by pharmaceutical companies and that the FDA's Division of Oncology Drug Products specifically performs this function with respect to cancer drugs. Tr. at 428-29 (Carlson); Tr. at 740-41 (Cummings). Moreover, the FDA's investigators have technical skill and expertise and were unbiased. In addition, other factors confirm the reliability of the documents. For example, Eli Lilly was given the opportunity to review the Meeting Minutes[*10] and to correct any errors in them. Tr. at 1117-18 (Dere); Def.'s Exh. K-9 (stating in cover letter to Meeting Minutes from May 11, 1999 that "these minutes are the official minutes of the meeting. You are responsible for notifying us of any significant differences in understanding you have regarding the meeting outcomes"). Thus the FDA documents, including the Meeting Minutes, are trustworthy and admissible.

The fact that the Minutes are the FDA's non-final factual findings does not render the reports untrustworthy and inadmissible. See *Reynolds v. Giuliani, 1999 U.S. Dist. LEXIS 462, 98 Civ. 8877, 1999 WL 33027*, at *2 (S.D.N.Y. Jan. 21, 1999); *Meriwether v. Coughlin, 879 F.2d 1037, 1039 (2d Cir. 1989)* (noting admission of a page of an interim report). The Pullman case cited by the defendant is not to the contrary because it affirmed the exclusion of a non-final report by a government agency not merely because the report was an "interim" report but also because the report, unlike the FDA minutes, "expressly declined to state a conclusion on the most significant safety question" at issue in that case. See *City of New York v. Pullman Inc., 662 F.2d 910, 914-15 (2d Cir. 1981)*.[*11] In sum, the defendant has not demonstrated that the FDA Meeting Minutes are untrustworthy and thus the motion to exclude them is denied. The defendant was, of course, permitted to

introduce evidence that goes to the weight to be given to the factual conclusions stated in the Meeting Minutes and that evidence has been considered by the Court.

Finally, the Court will consider the doctors' affidavits that have been submitted by the defendant. These affidavits attempt to contradict some of the call notes. Def.'s Exhs. T-4 through R-5. The strict rules of evidence do not apply in a preliminary injunction hearing. However, the Court is mindful of the fact that there is a preference for live testimony when the Court is called on to resolve disputed issues of fact. See, e.g., *Davis v. New York City Housing Auth., 166 F.3d 432, 437-38 (2d Cir. 1999)* ("When a factual issue is disputed, oral testimony is preferable to affidavits."); *Fox Broadcasting Co. v. Fox Broadcasting Co., 1986 U.S. Dist. LEXIS 19265, 86-4989, 1986 WL 11445*, at *1 (E.D. Pa. Oct. 9, 1986) (determining that the Court would consider affidavits in deciding a motion for a preliminary injunction even though the authors of [*12]the affidavits were not available to be cross-examined, but noting that the Court would be aware of that objection "in determining the evidentiary weight of any relevant affidavit"); cf. *Securities and Exch. Comm'n v. Petrofunds, Inc., 414 F. Supp. 1191, 1196 (S.D.N.Y. 1976)* (noting that when district judges are asked to award preliminary relief, they are "not to resolve a factual dispute on affidavits or depositions for then (they are) merely showing a preference for one piece of paper to another") (internal citation omitted) (Weinfeld, J.). Thus although the Court will consider the doctors' affidavits, the affidavits are necessarily of less weight than the live testimony of witnesses who were available and subject to cross-examination at the hearing.

The Court now makes the following findings of fact and reaches the following conclusions of law.

I.

FINDINGS OF FACT

A. The Parties

1. Plaintiff Zeneca is a Delaware corporation with its principal place of business in Wilmington, Delaware. The company researches, develops, and produces medicines. (Compl. P 6; Ans. P 6.) Zeneca manufactures and sells a breast cancer drug called Noivadex (tamoxifen[*13] citrate). Nolvadex has been approved by the FDA for the reduction of the incidence of breast cancer in women at high risk of developing the disease. Pl.'s Exh. 3 (Nolvadex label) at p. 13.

2. Defendant Eli Lilly is an Indiana corporation with its principal place of business in Indianapolis, Indiana. Eli

Lilly is a global pharmaceutical corporation that, like Zeneca, researches, develops, and markets medicines for use in a variety of therapeutic areas. Eli Lilly advertises, distributes, and sells its pharmaceutical products throughout the United States. (Compl. P 7; Ans. P 7.)

3. Plaintiff-intervenor Barr is a New York corporation with its principal place of business in Pomona, New York. Pursuant to a Distribution and Supply Agreement between Barr and Zeneca, Barr purchases from Zeneca and then distributes generic tamoxifen citrate under its own name. Tamoxifen citrate accounts for over 60% of Barr's net sales. Barr also markets two hormone replacement drugs for use in the treatment of osteoporosis, which compete directly with Eli Lilly's osteoporosis drug Evista. (Barr Compl. P 8; Tr. at 548, 552-53 (Sawyer)). n2

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n2 Barr moved to intervene approximately one month after Zeneca commenced this action. On May 4, 1999, the Court granted Barr's motion pursuant to *Federal Rule of Civil Procedure 24(a)(2)* and (b)(2). See Order dated May 4, 1999. Barr did not participate in expedited discovery but did attend and offer testimony at the hearing on the preliminary injunction.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*14]

B. Zeneca's breast cancer drug Nolvadex

4. In the 1970s, scientists at Zeneca developed a synthetic hormone "antagonist" called tamoxifen citrate, which was shown to have significant "anti-estrogenic" properties. Tamoxifen "antagonizes," or counteracts or neutralizes, the cancer-promoting effects of estrogen in the breast by binding itself to the estrogen receptor in a cancerous cell. The presence of an anti-estrogen such as tamoxifen prevents estrogen from binding to the receptor, which in turn affects tumor growth. Tamoxifen has since been used, either in addition to or in lieu of more drastic and invasive forms of therapy, to treat both early and advanced-stage breast cancer and to prevent recurrence. Since it was first discovered nearly thirty years ago, tamoxifen has become the most widely prescribed treatment for breast cancer. Tr. at 42, 46-47 (Anson); Tr. at 299-301 (Lewis).

5. Zeneca markets tamoxifen under the brand name Nolvadex. Nolvadex is one of Zeneca's most successful and widely-prescribed products. Nolvadex was originally approved by the FDA for the treatment of advanced breast cancer in 1978. It was later approved for other uses, including early stage adjuvant[*15] treatment, this is, treatment after the primary treatment for breast cancer, such as surgery. Tr. at 42, 47 (Anson); Tr. at 299-302 (Lewis).

6. Beginning in 1992, the National Cancer Institute (NCI) sponsored a clinical trial, conducted by the National Surgical Adjuvant Breast and Bowel Project (NSABP), to determine whether the use of tamoxifen could play a role in reducing the incidence of breast cancer in healthy women at high risk of developing the disease. This Breast Cancer Prevention Trial ("BCPT") enrolled more than 13,000 pre- and post-menopausal women at 131 different clinical sites, Tr. at 49 (Anson); Tr. at 306-08 (Lewis); Tr. at 440 (Carlson).

7. All the women recruited for the study were determined to be at high risk for developing breast cancer. Each woman qualifying for the study had to satisfy at least one of the following three enrollment criteria: (i) a history of lobular carcinoma in situ--benign breast tumors which are a known precursor to invasive or metastatic breast cancer, (ii) a score of 1.67 or higher on a breast cancer risk assessment model called the GAIL model, n3 and/or (iii) an age of 60 or older. Thirty percent of the patient population in[*16] the BCPT qualified based on the age criteria alone. The remainder fell into the other two risk categories. Tr. at 306-10 (Lewis).

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -

n3 The GAIL risk assessment model is a mathematical formula used to predict a woman's chances of developing breast cancer based on all known risk factors, including age, family history of breast cancer, age at onset of menstruation, age at first live birth, and number of benign breast biopsies. Tr. at 298-99 (Lewis); Tr. at 417 (Carlson).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -

Case 1:05-cv-00344-JJF    Document 50-14    Filed 05/31/2005    Page 31 of 31

Page 10

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

8. The BCPT study demonstrated that the ongoing use of tamoxifen citrate by women at high risk of developing breast cancer reduced the incidence of invasive breast cancer by 49 percent. The results were so positive that NCI discontinued the study in March of 1998 to allow all high-risk women--including those in the placebo arm of the study--to benefit from its findings. Tr. at 49-50 (Anson); Tr. at 310-12 (Lewis).

9. In April 1998 Zeneca submitted a supplemental New Drug Application ("sDNA") to the FDA seeking approval of tamoxifen for[*17] use in reducing the incidence of breast cancer. Based upon the results of the Breast Cancer Prevention Trial, on October 29, 1998 the FDA, after an expedited review, approved tamoxifen for the reduction of the incidence of breast cancer in both pre- and post-menopausal women at high risk of developing the disease. Tr. at 47-49 (Anson); Tr. at 314-15 (Lewis); Pl.'s Exh. 3 (Nolvadex Label) at p. 13.

10. In the period between the conclusion of the BCPT trial and the FDA's approval of tamoxifen for the reduction of the risk of breast cancer, Zeneca devoted substantial time, energy, and resources to developing a marketing plan for tamoxifen's new indication. According to Lisa Anson, Zeneca's Business Development Manager for Oncology, the new indication for tamoxifen was viewed as a "very significant opportunity" for Zeneca--a potential "blockbuster drug." Tr. at 51-52 (Anson). Ms. Anson also highlighted the difficulties facing Zeneca in marketing tamoxifen for breast cancer risk reduction because of the fact that "nobody has ever had a drug in the area of prevention" and "there [was] no . . . market for risk reduction or prevention." Tr. at 52 (Anson). Zeneca thus had to create the[*18] market from scratch. Tr. at 51-53, 100 (Anson).

11. Shortly after FDA approval, in early November 1998 Zeneca began promoting tamoxifen for its new indication for the reduction of the risk of breast cancer. Tr. at 53 (Anson).

12. Over time, researchers have discovered that Nolvadex is associated with an increase in the risk of uterine cancer. This increased risk was not discovered until about ten years after tamoxifen was approved in the United States. Tr. at 303-05, 364 (Lewis).

C. Eli Lilly's osteoporosis drug Evista

13. One of Eli Lilly's products in the field of women's health is an osteoporosis drug called Evista. Evista, which contains the active ingredient raloxifene hydrochloride, was first approved by the FDA in December 1997, solely for the prevention of osteoporosis

in postmenopausal women. Tr. at 54 (Anson); Tr. at 317 (Lewis).

14. Evista is an important product for Eli Lilly. At least during the period right after launch, however, sales of Evista were disappointing. Tr. at 855 (Torres). Eli Lilly has since revised its Evista sales projections downward. Tr. at 856-57 (Torres).

15. While breast cancer is often associated with a high cumulative exposure [*19]to estrogen, osteoporosis afflicts women at the opposite end of the hormonal spectrum--those with reduced levels of estrogen. Estrogen acts on the bone to maintain bone density and thereby prevent osteoporosis. This may explain why postmenopausal women, who have less circulating estrogen, become increasingly vulnerable to osteoporosis. Tr. at 720 (Cummings); Tr. at 337-38 (Lewis); Tr. at 456-57 (Carlson).

16. Raloxifene, like tamoxifen, has been shown to have both estrogenic and anti-estrogenic properties. Tr. at 317-18 (Lewis). However, raloxifene is structurally different from tamoxifen. Tr. at 317-19 (Lewis).

17. In the mid-1990s, Eli Lilly scientists began a series of ten osteoporosis studies, one of which was titled "Multiple Outcomes of Raloxifene Evaluation" or "MORE." There is no dispute that the results from nine of these studies, even when combined, did not demonstrate that raloxifene decreases the incidence of newly diagnosed breast cancer. Tr. at 655 (Cummings); Tr. at 905-06 (Eckert); Tr. at 1125 (Dere); Lippman Dep. Tr. at 155-56.

18. The MORE study itself was a randomized, double-blind, placebo-controlled, multicenter clinical trial. The women in the study[*20] were randomly assigned to be given either raloxifene or a placebo, and neither they nor their doctors knew whether they were taking raloxifene or a placebo. Tr. at 608-09, 622 (Cummings); Pl.'s Ex. 37 (Clinical Study Main Report for the MORE study) at EV 2718 1545. The MORE study was designed to examine the outcomes of exposure to raloxifene and to gather the data necessary to secure an indication for Evista for the prevention of postmenopausal osteoporosis. Tr. at 618-19 (Cummings).

19. As discussed below, Eli Lilly has predicated its claim that Evista has been proven to reduce the incidence of breast cancer on the results of the MORE study. As of the date the study was terminated in early 1999, a total of forty cases of invasive breast cancer were reported among MORE study participants, 27 for the patients taking placebo and 13 for the nearly twice as many patients taking raloxifene. Tr. at 406-10 (Carlson); Def.'s