


**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

CV-0? 0170

05-344

| | | |
|---|---|---|
| PHILIP MESSINA, | ) | |
| GEORGE DEMTRIOU, individually and | ) | Civil Action No. |
| on behalf of all others similarly situated, | ) | |
| and derivatively on behalf of | ) | |
| AMERICAN SOCIETY OF LAW | ) | |
| ENFORCEMENT TRAINERS, INC., | ) | |
| Plaintiffs, | ) | |
| (S.I) ) | | |

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JAN 16 2004 ★
1/26/04 · MTV

**COMPLAINT**
**FOR DAMAGES**
**and EQUITABLE RELIEF**

LONG ISLAND OFFICE

v.

**JURY TRIAL DEMANDED**  PLATT, J.

LINDSAY, M.

FRANK A. HACKETT, JR.,
ANDREW CASAVANT,
GREG MEYER,
GARY T. KLUGIEWICZ,
TIMOTHY DEES,
LISA KONRATH,
MARY GIFFORD,
DAVID SMITH,
DAVID GROSSI,
JULIE LINKINS
WILLIAM WESTFALL
DANIEL WATSON
GLENN YOUNG,
JOHN DOES 1-10,
                Defendants,

and AMERICAN SOCIETY OF LAW
ENFORCEMENT TRAINERS, INC.,
Nominal Defendant.

2005 MAY 31  AM II: 56
FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

**INTRODUCTION**

1.    This is an action brought by law enforcement officers and trainers for substantive

racketeering and racketeering conspiracy, fraud, corporate waste, and breach of the duty of

loyalty.



2.      The Plaintiffs are members of American Society of Law Enforcement Trainers, Inc.
which, until recently, was a non-profit organization comprised of police trainers solely dedicated
to educating law enforcement officers on safe and effective police tactics and techniques
("ASLET" or the "corporation").

3.      Since 1999, ASLET has been mismanaged, through a pattern of fraudulent acts and
material omissions, with the Executive Board turning a blind eye. If any member or corporate
director raises serious concerns regarding the state of the corporation or its finances, the
Executive Board takes whatever steps they can including generating fraudulent public
statements, destroying or concealing corporate records, hindering the communication to federal
law enforcement officers of information regarding the fraudulent activities, and retaliating
against witnesses who provide truthful information regarding the commission of possible federal
offenses to federal law enforcement officers.

4.      In order to compensate for the revenues lost through mismanagement and fraudulent
activities, ASLET Executive Director Frank Hackett softened the requirements (contained in the
ASLET bylaws) to become an ASLET member with full privileges ("regular" member).
ASLET's corporate bylaws require that in order to be a regular ASLET member, an individual is
required to show that he or she is a legitimate law enforcement trainer or active officer.  For
those individuals who were not law enforcement officers and/or not active in law enforcement
training, there is a second tier of membership called "associate member".  Associate members
are allowed to participate in ASLET training events and receive the ASLET magazine, but do not
receive voting privileges, and cannot hold elective corporate office.  For the protection of
ASLET members, and the federal and local agencies that provide training to those members at



ASLET seminars, ASLET bylaws require that a regular member in good standing sponsor associate members.

5.      In response to a pending fiscal crisis caused by Hackett's pattern of fraudulent activities and incompetence, Hackett arbitrarily, and without Board approval, created a new tier of membership (student) and arbitrarily converted associate members to full members (thus giving them full voting rights).

6.      Finally, in a nearly incomprehensible act in this post-9/11 world, where law enforcement must be vigilant about who they train and information they share (as intelligence reports indicate that terrorist organizations study U.S. law enforcement and military techniques and responses carefully), Hackett opened the doors to anyone willing to pay the $45 membership fee. Documents obtained by Plaintiffs clearly show that Hackett misled the ASLET membership into believing that there would be a basic screening of associate members, when, in fact, Hackett has provided wide-open doors for any and all applicants. Furthermore, Hackett's creation of "student" memberships, contrary to the ASLET bylaws, fraudulently attempted to deceive members and law enforcement agencies that their fellow members and seminar attendees were enlisted by law enforcement member "sponsors", creating a gaping security breach that has exposed federal, state and law enforcement officers to significant personal and intelligence threats.

7.      Plaintiff Messina, an ASLET Board Member, vehemently objected to this new class of membership, and insisted that ASLET implement adequate and proper security screening and protocols. Defendant Hackett, and the other members of the Executive Board rejected Messina's proposal as too costly and unwieldy, while, at the same instant, continuing to provide Hackett with a compensation package obtained through fraudulent misrepresentations and *quid pro quo*

agreements designed to conceal previous acts of fraud and deceit.

8.      Suspecting far-reaching corporate wrongdoing, Plaintiff Messina formally demanded access to ASLET corporate books and records. Upon denial of his request, Plaintiff Messina brought a successful civil action to obtain records, pursuant to Section 220(e) of the Delaware General Corporate Law ("DGCL") in the Court of Chancery of the State of Delaware. Messina, along with an experienced fraud investigator and a Certified Public Accountant working alongside him, discovered that ASLET was concealing corporate bills and had been misleading the Internal Revenue Service, corporate donors, and members as to the true state of the corporation's health.

9.      After examination of records so obtained, and interviews with sources inside and outside the corporation, believed by Plaintiffs to be highly reliable, and unsuccessful attempts to mitigate the fraud perpetrated against the members and government agencies, Plaintiffs bring this action.

10.    This is an action to recover from Defendants monetary losses suffered by the membership as a result of Defendants' scheme perpetrated against the membership of ASLET (Class Action Claims), for monetary losses to the corporation (Derivative Claims), and for monetary losses suffered by Plaintiff Messina in his individual role as a corporate director investigating and uncovering the pattern of racketeering activity directed at Plaintiffs and at the ASLET membership (Messina's Individual Claim). This action is brought pursuant to the civil provisions of Chapter 96 of Title 18, United States Code, codified at 18 U.S.C. §§ 1961, *et seq.*, (Counts One, Two and Three), and pursuant to the common law (Counts Four, Five, Six and Seven).

**I.**                    **JURISDICTION AND VENUE**

11.    Jurisdiction in this action is predicated upon 28 U.S.C. § 1331 and 18 U.S.C. §§ 1964 (a) and (c).

12.    Venue for this action is predicated upon 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b), (c) and (e). Plaintiffs invoke the expanded service of process provisions of 18 U.S.C. § 1965(b). The Defendant corporation has maintained agents to market memberships and solicit donations, and has held seminars in the State of New York and elsewhere from at least 1987 to the present.  In addition, the Defendants have specifically targeted, and caused racketeering injuries to, Plaintiff Messina, a resident of the Eastern District of New York ("EDNY"), via numerous mailings and interstate wires sent into this district. Furthermore, Defendant Glenn A. Young, upon information and belief, is an employee of an agency of the United States, who, acting under color of legal authority (his employment is with the National Imagery and Mapping Agency ("NIMA"), an intelligence agency of the United States) violated 18 U.S.C. § 1962(c) (not involving real estate), and conspired with others known and unknown to Defendants, to violate 18 U.S.C. §§ 1962(b) and  1962(c), and, in doing so, specifically targeted Plaintiff Messina, a resident of the EDNY.

13.    This Court also has diversity jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. § 1332, as there is complete diversity between the named Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.

14.    This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

**II.**                        **PLAINTIFFS**

15.    Plaintiff Messina was elected, by ASLET's members, to a four-year term on the ASLET Executive Board in February of 2001.  Messina, a resident of Lindenhurst, New York, is a highly decorated retired New York City Police Sergeant, and respected law enforcement trainer, who

has successfully served as an expert witness and/or use-of-force consultant in several important criminal and civil cases. Messina was the recipient of the National Institute of Ethics "Award For Moral Courage" in 2000.

16.    Plaintiff George Demetriou, is a seventeen-year veteran of a large municipal police department, holding the rank of Detective, and currently serves as a member of a highly respected Task Force. Demetriou is a resident of New York.

**III.**                          **CLASS ACTION ALLEGATIONS**

17.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated, as members of the proposed Plaintiff Class. The proposed Plaintiff Class (the "Class") which Plaintiffs seek to represent is defined as follows:

>      All present and former ASLET members, Certified Law Enforcement Trainer
>      ("CLET") certificate holders, and Seal of Approval members on or after
>      September 1, 1999 through the date of the filing of this Complaint.

18.    This action has been brought and may properly be maintained and brought pursuant to the provisions of FRCP 23(a), 23(b)(1)(A) and/or 23(B)(1)(B). It satisfies the numerosity, commonality, typicality, and adequacy requirements. Absent unitary class adjudication pursuant to FRCP 23(b)(1), inconsistent adjudications will result, which will both impair class members' rights and establish incompatible standards of conduct for the defendants.

19.    There are approximately 5,000 members of this Class, who are so numerous that their individual joinder herein is impracticable. Class members may be notified of the pendency of this action by mail, or by electronic mail.

20.    Common questions of law and fact exist as to all of the members of the Class, which questions must be resolved on a unitary basis in order to protect the class as a whole. These

common legal and factual questions include:

       a.     Whether Defendants defrauded the class members by marketing memberships to the Class members through a pattern of fraudulent misrepresentation and omissions, and concealed these misrepresentations and omissions during the course of their marketing efforts; and

       b.     Whether the Class has sustained damages which were proximately caused by the Defendants' wrongdoing;

21.    The claims of Plaintiffs are typical of the claims of the members of the Class because Plaintiffs were denied the promised value of the ASLET memberships sold to them. Furthermore, Plaintiffs and all members of the Class are entitled to punitive or exemplary damages for the fraud practiced against them, and/or treble damages under the Racketeer Influenced Corrupt Organization Act by reason of being injured in their property by the pattern of racketeering employed against them by Defendants.

22.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent, they have retained counsel competent and experienced in prosecuting actions involving fraud and other wrongful conduct, and he intends to prosecute this action vigorously. The interests of the members of the Class will be adequately protected by Plaintiffs and their counsel.

23.    The class action is necessary for the fair, efficient, and unified adjudication of the claims of Plaintiffs and members of the Class. The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent adjudication with respect to individual members of the Class, which, as a practical matter, would be dispositive of the interests of other members who are not parties to the adjudications, or substantially impair or impede their ability

to protect their interests.

24.    In addition, individual adjudication could result in inconsistent adjudications and/or could establish incompatible standards of conduct for the Defendants. Class treatment of the fraud issues will ensure that all claims and claimants are before this Court for consistent adjudication and equitable distribution of any recovery.

IV.                          **DEFENDANTS**

25.    Defendant ASLET is a Delaware nonstock (membership) corporation, recognized as a 501(c)(3) tax-exempt charity by the United States Internal Revenue Service ("IRS").

26.    Defendant Frank A. Hackett, Jr., is the current Executive Director of ASLET, and is a resident of Maryland.

27.    Defendant Gary T. Klugiewicz is the former Executive Board Chair of ASLET, and is a resident of Wisconsin.

28.    Defendant Andrew Casavant is the current Executive Board Chair of ASLET, and is a resident of Illinois.

29.    Defendant Greg Meyer is the former ASLET Treasurer, and current ASLET Vice-Chair. Meyer is a resident of California.

30.    Defendant David Grossi is a current ASLET director, and the former ASLET Secretary. Grossi is a resident of Florida and Colorado.

31.    Defendant David Smith is a current ASLET director, the current ASLET Treasurer, and is a resident of Illinois.

32.    Defendant Timothy Dees is a current ASLET director and the current ASLET Secretary, and is a resident of Washington.

33.    Defendant Lisa Konrath is a current ASLET director and former ASLET Secretary, and is

a resident of Arizona.

34.    Defendant Mary Gifford is a current ASLET director and a resident of Indiana.

35.    Defendant Glenn Young is, upon information and belief, a Security Guard for the National Geospatial-Intelligence Agency (formerly known, until 11/24/2003, as the National Imagery and Mapping Agency), an intelligence agency of the United States. Young is a resident of Missouri.

36.    Defendant Julie Linkins is, upon information and belief, employed as a civilian writing instructor at the FBI National Academy in Quantico, Virginia. Linkins is a resident of Virginia.

37.    Defendant William Westfall is, upon information and belief, a training consultant and a resident of Michigan.

38.    Defendant Daniel Watson, a retired LAPD Commander, is a police chief in a small California city, and a part-time author and trainer, publishing articles in, among other venues, the ASLET bi-monthly magazine. Watson is a resident of California.

## V.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

39.    Plaintiffs also bring this action derivatively in the right of and for the benefit of ASLET to redress injuries suffered, and to be suffered, by ASLET as a result of the pattern of racketeering activity, breaches of fiduciary duties, waste of corporate assets, and the aiding and abetting thereof, by Defendants. ASLET is named as a nominal defendant solely in a derivative capacity.

40.    Plaintiffs were members of the corporation at the time of the wrongdoing, Messina being a director during a portion of the wrongdoing (including as of the date of the filing of this Complaint), and, notwithstanding the efforts of Defendants to conceal their fraudulent activities

and retaliate against Messina by claiming to have expelled Messina from membership through

sham proceedings, Plaintiffs claim to be members of the corporation as of this date.

41.     Plaintiffs will fairly and adequately represent the interests of ASLET and its members in

enforcing and prosecuting ASLET's rights.

42.     The current Executive Board of ASLET consists of the following individuals: Defendants

Casavant, Meyer, Hackett, Grossi, Konrath, Smith, Dees, and Gifford, as well as Plaintiff

Messina and Robert Bragg (not a party hereto).

43.     As a result of the facts set forth herein, Plaintiffs have not made any demand on the

Board to institute this action against Defendants.

44.     In order to bring this suit, a majority of the Board would be forced to sue themselves and

persons with whom they have extensive business and personal entanglements, which they will

not do, thereby excusing demand.

45.     Each member of the Board, save Bragg, is alleged to have caused harm to ASLET and it

would be futile for Plaintiffs to make demand upon these directors to cause ASLET to sue them

to recover for their own wrongful injuries to ASLET.

46.     The Defendants would not agree to permit ASLET to sue them, and even if they would so

agree, because of their conflicted status, they should not be permitted to do so.

47.     A demand, or any delay in awaiting a response to a demand, would endanger law

enforcement officer members of ASLET, and cause irreparable harm to ASLET.

48.     The Defendants, as more fully detailed herein, participated in, approved and/or permitted

the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise

those wrongs from ASLET's members (many of whom are law enforcement officers) and/or

negligently disregarded the wrongs complained of herein, and therefore are not disinterested persons.

49.    The acts complained of constitute violations of fiduciary duties owed by ASLET's officers and directors and these acts are incapable of ratification.

50.    ASLET has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct and damages ASLET has suffered and will suffer thereby.

51.    Any suit by the Board to remedy these wrongs would likely expose the individual Defendants and ASLET to the possibility of self-incrimination, as the predicate acts that underlie the RICO claims made against the Defendants are all felony violations of Title 18 of the United States Code. This would result in Defendants making criminal allegations against themselves; thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

52.    Due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain certain provisions which eliminate coverage for any action brought by ASLET against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves, there would be no insurance protection, they would face a large uninsured liability, thus, this is a further reason why they will not bring such a suit.

11

**VI.**                          **DEFINITIONS**

53. As used in this Complaint, "mail," "mails," "mailed," "mailing", "or "letter" includes the use of these terms as used in 18 U.S.C. § 1341.

54. As used in this Complaint, "wire," "wires," "wired," "wiring", ""wire communication" or "telephone" includes the use of these terms as used in 18 U.S.C. § 1343.

**VII.    THE SCHEME TO DEFRAUD**

55.    ASLET was founded in 1987 as a non-profit, charitable corporation to lead and further the training of law enforcement officers worldwide.

56.    Beginning in or about 1994, Defendants and other Participants devised a scheme to defraud, corrupt, cheat, steal and conceal in violations of the laws of the United States ("the scheme"). The primary objective of the scheme was to realize illicit personal gains through misusing corporate positions at ASLET to obtain improper financial gain and improper competitive advantage over other members of the corporation in the solicitation of government and private contract awards. This scheme inflicted substantial injury upon Plaintiffs, by among other things, cheating Plaintiffs out of hundreds of thousands of dollars in membership dues through a pattern of false misrepresentations and omissions, and spending hundreds of thousands of dollars in support of Defendants' and Participants' racketeering acts and the concealment of those racketeering acts. The scheme also caused Plaintiffs additional injury, interfering with Plaintiffs' abilities to receive certain training and information security benefits owed to Plaintiffs by Defendants and other Participants. The scheme also resulted in Plaintiffs being cheated out of the honest right of legitimate elections of corporate directors, as Defendants and other Participants, through a pattern of fraud that utilized the mails and wires, tampered with ASLET elections in violation of Delaware law.

57.    The scheme to defraud, corrupt, cheat, steal, obtain by fraud and convert property was in existence by at least 1994. As Defendants and Participants concealed their activities and delayed the discovery of the true nature of their activities through the alteration and destruction of documents, and through engaging in misleading conduct towards another person in order to hinder, delay and prevent the discovery of their offenses, and the communication of theses offenses to federal law enforcement officers, the scheme was allowed to continue, and continues to operate as of the date of the filing of this Complaint.

58.    Defendants, who control the Executive Board ("Board of Directors" or "Board") of ASLET, and their co-conspirators, have for many years schemed to deceive the membership of the corporation ("membership" or "members"), law enforcement agencies, the IRS, and charitable donors about the financial management of the corporation. Defendants have repeatedly and consistently denied that financial irregularities exist, while being aware that substantial misrepresentations were being made about financial practices. Defendants have repeatedly and consistently led members and prospective members to believe that the corporation was operating "in the black" and its salaries and expenses were appropriate for a Section 501(c)(3) charity, when, in fact, Defendants were, year after year, sending hundreds of thousands of dollars down a "black hole" that enriched and aided a select few who have obtained Plaintiffs' money and property through patterns of racketeering activity.

59.    Defendants and their co-conspirators have for many years schemed to deceive the membership, law enforcement administrators (federal, state and local), and other individual officers and trainers regarding (non-existent) security procedures that (falsely) led those paying monies to the corporation to believe that the corporation actually screened prospective members who had physical access to other members and sensitive law enforcement training. Defendants

13

have repeatedly and consistently denied that security holes existed within the corporation, even though they have known since 2001, at the latest, that mailings and electronic communications to members stating that all associate members must have sponsors are false, increasing the risk of danger to law enforcement officer members. Defendants have repeatedly and consistently used advertising and marketing techniques to lead members and prospective members to believe that certain basic checks would be performed before associate members were admitted to membership (and, accordingly, to ASLET seminars and functions), making ASLET less attractive to criminals and terrorists seeking intelligence on United States law enforcement training techniques and operation tactics. Even though Defendants have long understood the hazards caused by their misrepresentations and could have developed and provided quick and secure checks to provide the protections that they had misled members into believing they were receiving for their membership dollars, Defendants chose and conspired not to do so. Instead, they have knowingly marketed memberships to law enforcement officers, many of whom count on their peer associations to provide them a safe environment to protect them and to protect the confidentiality of their training materials they may provide at ASLET seminars. Defendants have knowingly misled federal law enforcement agencies, such as the Federal Bureau of Investigation and the United States Secret Service, into providing federal law enforcement officers to teach at ASLET seminars under the (false) assumption that the materials they were teaching were being delivered to a screened audience.

60.    The Defendants have also created the misleading and false impression that respected institutions were still sponsors, contributors or "Seal of Approval" members long after those institutions severed their relationships with ASLET. This fraudulent behavior caused prospective members and contributors to falsely believe that those institutions were still supporting ASLET.

14

Defendants used several of those institutional corporate names or product names as internet "meta tags" in an attempt to sell memberships and obtain money and property through falsely representing an association with the victimized institutions' intellectual properties, without ever acquiring permission or authorization from those institutions.

61.     In all relevant respects, Defendants acted in concert with each other in order to further their fraudulent scheme. Beginning not later than 1992, Defendants, their various agents and employees, and their co-conspirators, formed an "enterprise" (the "Enterprise") as that term is defined in 18 U.S.C. § 1961(4). That Enterprise has functioned as an organized association-in-fact for more than ten (10) years to achieve, through illegal means, the shared goals of maximizing their control over the corporation, maximizing personal benefits and profits to leaders of the enterprise, and avoiding the consequences of their actions. Each Defendant has participated in the operation and management of the Enterprise, and has committed numerous acts to maintain and expand the Enterprise.

62.     In order to avoid discovery of their fraudulent conduct and the possibility that they might be called to account for their conduct, Defendants engaged in a widespread scheme to frustrate public scrutiny by making false and deceptive statements and by concealing and destroying documents and research that they knew would have exposed their public campaign of deceit. This scheme included making false and deceptive statements to the public and in judicial proceedings, preventing a corporate director from accessing documents detailing financial improprieties that could be forwarded to federal civil investigators and/or law enforcement officers, and engaging in a separate pattern of racketeering activity directed at a corporate director to prevent him from exposing the Defendants' actions, and to retaliate against him for providing truthful information to federal law enforcement officers. Defendants also aided and

abetted the violation of Department of Defense ("DOD") intelligence agency directives prohibiting the private use of government property and the dissemination of information about United States citizens by employees of NIMA, an intelligence agency of the United States.

63.     The scheme has been successful. Defendants and Participants obtained control over the Enterprise, conducted the Enterprise's business through a pattern of fraud, obstruction and retaliation, reaped hundreds of thousands of dollars in salaries, bonuses and reimbursed expenses, and gained substantial advantage over certain Plaintiffs in the solicitation of government and private law enforcement training contracts. ASLET, under the control of its original Executive Director had, enjoyed legitimate net operating surpluses. By 2003, the fraudulent activities of Defendants and Participants moved ASLET's net revenues from a high of $115,343 to net losses of $126,845 with zero dollars being spent on any charitable functions (such as training scholarships or membership benefits) according to IRS records. A recent site inspection audit by a CPA accompanying Messina appears to show the corporation with a net operating deficit of over $50,000 for fiscal year 2003, and documents recently obtained by Messina show an accumulated operating deficit of over $ 126,000 for the fiscal period April 1-November 30, 2003.

64.     Defendants' tortious and unlawful course of conduct has caused the members and Director Messina to suffer racketeering and other financial injuries. As a consequence of Defendants' tortious and unlawful conduct, federal government law enforcement agencies have spent federal funds, and authorized federal agents and instructors to attend and teach at seminars hosted by the corporation, relying upon the fraudulent misrepresentation of the Defendants that members and seminar attendees have been screened and are suitable to receive law enforcement sensitive information. As a consequence of Defendants' tortious and unlawful conduct, law

enforcement officers and law enforcement trainers have spent hundreds of thousands of dollars

of their personal funds, and, in some cases, their agency's funds, to purchase memberships and

"certification' credentials, and to attend seminars, from a "peer" organization that they were

falsely led to believe would be an asset to their law enforcement careers, their agencies, or their

private training businesses; more specifically, Plaintiffs relied upon the fraudulent

misrepresentations of the Defendants that they were purchasing memberships in the nation's

largest law enforcement training organization, with 7,000 members representing 18,000 agencies

(falsely claimed as of December 30, 2003), which would allow them to network with a

substantive peer group, the majority of which had command and purchasing authority. The effect

of Defendants' fraudulent scheme and wrongful conduct continues to this day; Defendants are

continuing to prosper and profit from their unlawful and tortious conduct; and, unless held liable

by this Court, Defendants are likely to continue their unlawful activities into the future.

**VIII.**                    **FACTS COMMON TO ALL CLAIMS**

**A.     ASLET DIRECTOR BRUCE SIDDLE**
        **ASKS QUESTIONS AND IS ATTACKED**

65.     In or about April of 1994, Bruce Siddle, then a corporate director of ASLET, started to

make inquiries regarding the management, financial and ethical practices of ASLET's (then)

Chairman, Gary Klugiewicz; (then) Executive Director Steven Bunting; and (then) Director,

Corporate Treasurer and Legal Counsel, Mildred O'Linn. Almost immediately, in an attempt to

protect themselves from investigation for financial and ethical violations, the three corporate

officers embarked on a campaign to destroy Siddle financially, and to discredit him until he

resigned from the board. These actions included, but were not limited to, the covert and unlawful

audio taping of his telephone calls to and from the ASLET office in Lewes, Delaware (including

calls initiated by Steven Bunting), the transcribing of those tapes, and the personal delivery of

17

those transcripts to Mr. Siddle's largest and most prestigious government training contract client,

The Federal Law Enforcement Training Center in Brunswick, Georgia. This was not only an

attempt to retaliate against him and discredit him for questions he had raised regarding the

propriety of several of Ms. O'Linn's actions, but also was designed to financially benefit

Klugiewicz, who was a chief competitor with Siddle for these training contracts.

## B.    ALLEGATIONS SURFACE OF "DOUBLE DIPPING" AND UNCONTROLLED SPENDING AT THE ASLET OFFICE IN LEWES, DELAWARE. MESSINA IS ASSIGNED TO INVESTIGATE ALLEGATIONS AND IS ATTACKED

66.    In or about January of 1995, Messina was assigned as a member of the Ethics Committee

to investigate complaints (made by members and employees of the corporation) of improprieties

allegedly committed by (then) ASLET Executive Director Steven Bunting. These complaints

included, but were not limited to, office staff being forced to work for the University of

Delaware while their salaries were being paid by ASLET, and the improper sub-contracting of

the ASLET Seminar Coordinator's position to Bunting's (then) live in girlfriend, Linda Fleming.

67.    Klugiewicz, shortly thereafter, at the request of Bunting who had created the Chairman's

position for Klugiewicz, began actively obstructing the efforts of Messina, and others, to

investigate the multitude of complaints alleging that Bunting was working several jobs during

the same hours, while being in the full time employ of ASLET. Klugiewicz, acting as ASLET's

Chairman, gave directives to other corporate directors not to cooperate in Messina's

investigations and used every opportunity to attempt to retaliate against Messina, through

convening unsuccessful parallel "mock investigations" against Messina, and by claiming that

Messina's allegations against Bunting had been fully investigated and found to be false, although

no investigation actually ever took place.

68.    The Fleming portion of the investigation was eventually turned over to another

18

investigator, but became a moot point, for as soon as Ms. Fleming moved out of Mr. Bunting's house, her services as Seminar Coordinator were terminated. Being totally frustrated in his attempts to get records and cooperation from the Board, Messina resigned from the Ethics Committee to run for the Board in January 1996, and was elected by the membership.

69.    In December of 1996, Klugiewicz and the Board stated for the record, in an electronic mail message, that they agreed with the Ethics Committee findings that double dipping had in fact occurred and would enforce the Recommendation that Bunting make a choice between working for the University of Delaware or ASLET.

70.    With statutory fiduciary responsibilities mandated by the DGCL, Messina continued looking into the activities at the ASLET office. He was, once again, continuously obstructed, and retaliated against, by Klugiewicz in an attempt to frustrate his investigation. Mr. Messina, an elected corporate director, was directed by Klugiewicz not to investigate any allegations of wrongdoing, in clear violation of the statutory and decisional law of ASLET's state of incorporation (Delaware). Other board members were again directed not to cooperate with Messina's inquiries.

71.    Although the Board, in internal documents, agreed with the Ethics Committee findings that Bunting was in fact working for ASLET and the University of Delaware during the same hours, and although (then) ASLET employees testified that they were made to conduct University business via a remotely forwarded phone line, allowing Bunting to pretend to be at his office at the University and the ASLET Office (which were in Newark, Delaware and Lewes, Delaware, respectively) at the same time, Klugiewicz intensified his efforts to protect Bunting and to retaliate against Messina.

72.    Messina's access to corporate books and records only diminished (in violation of Title 8,

Section 220 of DGCL), causing Messina to resign from the Board in 1998 to allow him to more fully investigate the continuing reports of wrongdoing without interference from Klugiewicz and other Defendants and Participants.

73.    Publicly, however, Klugiewicz intensified his efforts to defraud the members, and cover-up allegations of Bunting's continued double dipping. When additional allegations arose, Klugiewicz, in March of 1998, published an article in ASLET'S bi-monthly magazine stating that all the complaints had been found to be unsubstantiated, when internal ASLET documents clearly indicated otherwise.

## C.    HACKETT OBTAINS ASLET's EXECUTIVE DIRECTOR POSITION THROUGH FRAUDULENT MISREPRESENTATIONS.

74.    In or about the summer of 1999, while seeking employment with ASLET, Hackett presented ASLET officials with documentation claiming that he possessed a "Doctorate in Education." This constituted a representation that he had higher educational qualifications than all but seven (7) of the seventy-five (75) candidates competing for the position of salaried corporate Executive Director. Through this documentation, Hackett claimed to have the academic training and expertise needed to run a large national non-profit corporation, when, in fact, Hackett knew that his "Doctorate" was a sham.

75.    This "Doctorate" was, in fact, a piece of paper obtained from what an attorney for the United States Department of Justice ("DOJ") described as the nation's "largest diploma-mill," whose principals were imprisoned after being indicted by a federal grand jury on charges that included mail fraud, wire fraud and money laundering.

76.    ASLET reasonably and justifiably relied upon Hackett's representation that he possessed a Doctorate in Education and had, therefore significantly greater education and training than almost all of the other applicants for the Executive Director position. Had ASLET known about