

Hackett's use of a "Diploma-mill" degree, it would not have permitted Hackett to be considered above the other candidates. The facts concealed and misrepresented by Hackett were material to ASLET's decision.

77.    In or about the summer of 1999, Hackett represented to an ASLET Search Committee, that he would need a salary and benefits package of at least $125,000 per annum, which would still result in his taking a "pay cut" in order to join the organization. Hackett's statement to that effect, made to former director Kathleen Kelley, was later published in an article in ASLET's "The Trainer" magazine. Upon information and belief, Plaintiffs are informed that Hackett's previous compensation package, at the Oklahoma state chapter of Volunteers of America, did not approach that pay level.

78.  Having obtained a position for which he was not qualified through fraudulent misrepresentations, Hackett found himself in over his head, while assuring the Plaintiffs that he would increase revenue and build the corporation.

79.  As a result of his unsuitability and unfamiliarity with the position, the corporation's expenses began to outstrip the corporation's revenues. Hackett then hatched a scheme to defraud members, and donors, by falsely withholding bills owed to vendors, while falsely assuring those directors and donors who reviewed the Policy and Procedure Manual that the corporation utilized GAAP, when, in fact, the corporation was using CMA against the advice of its auditors. In this way, Hackett could justify salary increases granted to him by Klugiewicz, while giving a false sense of financial success to Plaintiffs and to donors to the corporation.

**D.    MESSINA RESIGNS FROM THE BOARD AND RUNS AGAIN**

80.    On or about January of 1998, after attempts by Defendant Klugiewicz to have the membership remove Messina from the board failed at the Annual Membership Meeting, Messina

resigned from the board in disgust. In his resignation letter, he informed the membership of his disappointment in the Board's self serving goals. Messina and other members also continued to collect evidence of continued "double dipping" practices (without the interference of Klugiewicz and other Participants).

81.     A virtual mountain of evidence was collected.   For example, an eyewitness, while in the ASLET office, was introduced to Bunting.   This eyewitness went into an adjoining office, and called the University of Delaware's Newark, Delaware Public Safety Office.   Bunting answered, pretending to be at the University (showing Bunting worked both jobs during the same hours). Mr. Bunting then filed suit against ASLET for "failing to protect him" from Messina's investigations. The Board promptly placed Bunting on administrative leave with orders to stay away from the ASLET Office until his contract ran out. The corporation did not renew his contract upon its expiration. The lawsuit, according to Counsel, was subsequently settled by the corporation's insurer, for an undisclosed amount, believed to be only a small portion of Bunting's last year of his employment contract. A recent, more thorough review of the activities of Klugiewicz and other Participants has provided Plaintiffs with articulable suspicion that Klugiewicz and other Participants schemed to defraud the insurer out of approximately $300,000 in connection with Bunting's lawsuit.

82.     In January of 2001 (after being awarded the National Institute of Ethics "Award for Moral Courage" for his efforts to halt the wrongdoing at ASLET) Messina was re-elected to the ASLET Board.

## E.     ALLEGATIONS SURFACE THAT CORPORATE
## DIRECTOR KATHLEEN   KELLEY HAS BEEN FROZEN OUT

83.     On or about January of 2002, Messina was informed that fellow director Kathleen Kelley, a sworn law enforcement officer of the State of Florida, had been effectively "exiled" from the

22

Board. This was accomplished using (what was later found to be false) information provided to the directors (including Messina) by Hackett, Klugiewicz and (then) "Legal Counsel" Robert Thomas. The Defendants and other Participants had (falsely) stated that Ms. Kelley's attorney had directed (via a letter to the corporation) that no communication should be made to Ms. Kelley, except through his office, due to severe injury and illness.

84.     After months of requesting and not receiving the alleged letter, Messina finally contacted the attorney (a respected member of the Florida Bar and former Chief of Police) directly, only to find that he had never represented director Kelley in any ASLET matter, and had never sent any letter or verbal communication directing anyone not to communicate with Ms. Kelley. Messina subsequently received a sworn affidavit from Kelley corroborating the attorney's statements. Kelley also related to Messina that, after catching Hackett in several lies, she was "excommunicated" from the ASLET Board, so Hackett could take over her position as Magazine Editor.

## F.    KLUGIEWICZ IMPROPERLY EXTENDS HACKETT'S EMPLOYMENT CONTRACT

85.     On or about October of 2002, Messina discovered that Klugiewicz had renewed Defendant Hackett's original contract much earlier than was mandated by ASLET bylaws (after the second year of the contract), and had awarded Hackett raises and bonuses, despite the fact that the criteria for raises and bonuses outlined in the contract were not reached. Messina also discovered that Klugiewicz desired to renew Hackett's contract a year earlier than mandated by ASLET Bylaws, in order to remove the incoming Board's ability to evaluate and decide on the renewal of Hackett's contract. Messina strenuously objected to this, and to Klugiewicz's false statements that he had "conducted" a "review" of Hackett's performance, when he had conducted no such fiduciary examination. Klugiewicz, Smith, Meyer, Grossi, Konrath and other

23

Participants voted to renew the contact on December 12, 2002, a month before the new Board
was scheduled to take office.

## G.    INFORMATION IS SOUGHT
## CONCERNING MISSING DIRECTOR

86.    On or about November of 2002, Messina, in his role as a corporate director, demanded
ASLET records, pursuant to his statutory right under Section 220 (e) of the DGCL. Included in
this demand were requests for records pertaining to Director Kelley's absence for almost two
years. Defendants Hackett, Klugiewicz, Meyer, Smith, Konrath, and other Participants ignored
Messina's requests, forcing Messina to file suit against Hackett and Klugiewicz, at his own
expense, in the Court of Chancery of the state of Delaware, to obtain these records.

87.    At a January 3, 2003 scheduling conference in the Court of Chancery action, counsel
representing Hackett and Klugiewicz admitted to the Honorable William B. Chandler III (the
"Chancellor") that Counsel could not come up with any reason why the Defendants had not
provided Messina the records (after being told by the Chancellor that "He is a Director and has a
right to the records"). Shortly thereafter, Defendants' counsel told Messina to sign a
Confidentiality Agreement. After doing so, he eventually received the records, which referred
(via a handwritten note from Hackett) to the "communication" by Kelley's attorney. No such
communication is included in the records production (as the attorney had already informed
Messina that no such communication ever occurred).  Kelley, contacted again by Messina,
related that although she had attempted to renew her membership in the corporation, first by
check and then by credit card, it had been allowed to expire, and she had not even received the
ASLET magazine since April of 2002, when she informed the board via fax that she wanted to
resume full duties as a director.

## H.    MEMBERS COMPLAIN OF
## BEING FROZEN OUT OF ELECTION

88.    On or about November 11, 2002, Messina was directed by members to a notice sent by

Hackett via electronic mail to members stating that ASLET Members who joined after

September 30th would not be eligible to vote in the elections for the Board. Knowing that this

edict was not in the election rules approved by the Board, Messina complained to Defendants

Hackett, Klugiewicz, Meyer, Smith, Grossi, Konrath, and other Participants that ASLET

members who had been allowed to vote in the past, and should be allowed to vote, were now

disenfranchised.

## I.    MESSINA FINDS APPARENT SELF DEALING AND
## ENRICHMENT IN HACKETT'S DEALING(S) WITH VENDOR(S)

89.    On or about November 3, 2002, Messina informed the Board that he had become aware

of a secret, self-serving contract between Hackett and a vendor. A clause in the contract stated

that the vendor would only provide a prestigious event to ASLET if Hackett remained Executive

Director. The contract, however, left ASLET open to contingent liabilities if the event wasn't

held and the fault was ASLET's.  Messina strongly stated his belief that this was an unethical act,

and constituted a breach of fiduciary duty on the part of Hackett in entrenching himself and

putting additional pressure on the Board to renew his contract. No director responded to

Messina's message.

## J.    MESSINA TOLD OF WIDESPREAD VIOLATIONS
## OF DELAWARE LAW IN THE CONDUCT OF ELECTIONS

90.    On or about November 14, 2002, Messina consulted with an experienced fraud

investigator, who informed Messina of his belief that ASLET's elections had never complied

with Delaware Law in several ways. During an emergency Board meeting called for November

21, 2002, Messina suggested that the entire Board run, and advised the Board that the Certificate



of Incorporation clearly states that the Board shall be elected at the annual meeting. Defendants

Hackett, Klugiewicz, Meyer, Grossi, Smith and Konrath, and other Participants, ignored

Messina's recommendation, agreed to claim "honest error" if challenged, and made no mention

of it on the meeting minutes, which were subsequently published on the corporate website, and

distributed via electronic mail, and via the U.S. Mail.

## K.    MESSINA DEMANDS ELECTION
IRREGULARITIES BE CORRECTED

91.    On November 18, 2002, within hours of Messina making additional inquiries concerning

election irregularities, and demanding that Delaware law be followed to the letter, Hackett and

Klugiewicz directed (former) ASLET Legal Counsel Robert Thomas to call attorney Henry Hart

(an associate of Hackett's from the American Society of Association Executives which had aided

Hackett, a member of the Association, in obtaining his ASLET position) and seek advice on the

"removal of a director".

## L.    MESSINA FINDS CORPORATE BUSINESS BEING CONDUCTED BY AN
EXECUTIVE COMMITTTEE BEHIND HIS BACK, AND IN VIOLATION OF
STATE LAW AND ASLET'S CERTIFICATE OF INCORPORATION

92.    In or about November of 2002, after requesting Board minutes dating back to Messina's

first term as an elected director, Messina informed the Board that the "Executive Committee"

which had made the majority of management decisions over the past several years, and was

operated and financed with corporate funds, had never been legally created. The members of the

Board refused to acknowledge his complaint.

## M.    DIRECTORS FALSELY TELL MEMBERS THAT
THEY HAD "FOUND" MESSINA's CHARGES TO BE BASELESS

93.    Defendants Klugiewicz, Meyer, Hackett, Grossi, Konrath, Smith (the "Director

Defendants"), and other Participants, falsely represented, on numerous occasions, that they had

investigated Messina's charges of financial improprieties committed by the salaried Executive

Directors and found them to be baseless or without merit. As detailed more fully within this

Complaint, they falsely claimed, through meetings, letters, and electronic mail messages sent to

Plaintiffs, to have found no wrongdoing and to have found Messina's charges to be baseless.  In

fact, they possessed corporate internal reports validating Messina's original charges of

improprieties, and they refused to even look into Messina's secondary findings, even while in

possession of evidence from corporate counsel and others that Messina's charges of corporate

violations of Delaware law in the conduct of the corporate elections were fully substantiated.

94.   Before making these representations, the Director Defendants knew that the Executive

Directors had engaged in improper practices that violated state statutes, the corporate charter,

and the corporate bylaws.

95.   The Director Defendants made their misrepresentations that the Executive Directors were

not involved in wrongdoing with the intent to cause Director Messina and other members to rely

on their misrepresentations and to refrain from further investigating the Executive Director and

the elected directors, and to hinder, delay and prevent Messina from forwarding evidence of

possible state and federal offenses to the Delaware Attorney General and to federal law

enforcement officers or judges.

96.   Plaintiffs reasonably and justifiably relied upon the Defendants' representations that neither

the Executive Directors nor the elected directors were involved in scheming to defraud the

corporation and scheming to cover up said fraud. Had Plaintiffs known about the Defendants'

participation in the scheme, they, the majority being career law enforcement officers and law

enforcement trainers, would have directed additional resources at investigating the Defendants,

and would have refused to provide their own or their employers' funds (in the form of



membership dues) to financially support the fraudulent practices. The facts concealed and

misrepresented by Defendants were material to Plaintiffs' decisions to remit membership dues to

the corporation.

**N.    CORPORATE FUNDS ARE IMPROPERLY
ADVANCED TO PAY LEGAL BILLS**

97.    Greg Meyer, on or about December of 2002, and later, David Smith (on or about January,

2003), as ASLET's Treasurers, authorized corporate monies (in excess of $ 25,000) to be used to

pay the legal defense bills of Hackett and Klugiewicz, without first obtaining an "undertaking" to

pay said monies back to the corporation if Defendants were found to be at fault by the Court, as

required by Title 8, Section 145(e) of DGCL. Defendants Meyer and Smith advanced said

monies in support of the Enterprise's schemes to defraud and to conceal its activities, even after

being informed by Messina that this was both improper and unlawful under Delaware Law.

**O.     MESSINA IS CENSURED AFTER DEMANDING RECORDS**

98.    On December 12, 2002, Meyer, in a further attempt to protect the Enterprise by attacking

those who would not join in its scheme, submitted a prepared surprise resolution to "censure"

Messina without any prior notice on the meeting agenda (as required by Robert's Rules of Order,

which control the business of the ASLET Board pursuant to ASLET Bylaws). This censure

motion was submitted after Messina left the meeting, and after Messina's corporate resolution (to

direct Defendant Hackett and Klugiewicz to provide records Messina is entitled to under

Delaware law) was rejected by the Director Defendants and other Participants.

**P.    SECRET VOTE TO EXPEL
MESSINA FAILS, AND IS COVERED UP**

99.    On December 19, 2002, as a follow up to the December 12th censure, and in an attempt to

hinder, delay and prevent Messina from providing truthful information (including documentary

and testimonial evidence) to federal law enforcement officers, Meyer and Grossi put forth a motion to expel Messina from the corporation. This was done with no prior notice to Messina (whom they knew would not be attending the meeting). When the motion failed to carry, then "Legal Counsel" Robert Thomas resigned his position with a fusillade of vulgarities, and Corporate Secretary Grossi intentionally failed to enter the vote into the minutes of the meeting. This "secret" vote, omitted by Grossi from the minutes of the meeting (which minutes were later ratified by Defendants and Participants), was later confirmed by Defendants David Smith and Andrew Casavant, and was also confirmed by (then) ASLET Assistant Executive Director Ed Nowicki (who hung up in disgust when the voting began).

100.    The following day, Meyer and Grossi, frantic to eliminate Messina's ability to obtain records concerning the Enterprise, lobbied the members who voted "no" or abstained, to change their vote. Meyer and Grossi then arranged for another Board meeting for the evening of January 2, 2003. This meeting was not included on the Board meeting schedule, and Messina was not invited to the meeting. The meeting was cancelled when Chancellor William B. Chandler III was made aware of it during a Scheduling Conference (in Messina's records demand case) that afternoon, and "suggested" to counsel for Hackett and Klugiewicz that he might have to "gear up" for a TRO hearing the next day if the meeting took place.



**Q.    PLOT TO PREVENT MESSINA FROM ATTENDING
THE ANNUAL MEETING OF THE MEMBERS
AND THE ASSOCIATED ANNUAL SEMINAR IS HATCHED.**

101.    On or about December 20, 2002, Meyer used interstate telephone wires to call Smith,

Konrath, and other Participants, in an attempt to convince them to change their vote of December

19, and to vote yes to the expulsion of Messina at the secret meeting planned for January 2,

2003.

102.    Meyer told Smith that if the vote carried, he would use his influence as a Captain in the

Los Angeles Police Department to have Messina escorted out of the seminar (by either San

Bernardino County Sheriffs' Deputies or officers of the City of Ontario Police Department) in

full view of the membership, when Messina arrived for the Board meeting. Smith later divulged

this plot at the Ontario, California seminar, in front of several witnesses. It is later confirmed by

the current Chair, Casavant, who had asked Smith to confirm it, and who himself relayed Smith's

confirmation to Messina in the presence of another ASLET member.

**R.    SCHEME TO TAMPER WITH THE NEW ELECTION**

103.    On or about December 27, 2002, Meyer secretly obtained three exclusive ASLET

membership lists from Hackett, which had been denied to Messina and then Board candidate

Robert Bragg (in violation of Section 220 of The DGCL). Meyer used these lists to selectively

solicit votes in regions of the country that were less likely to vote for candidate (and Plaintiff)

George Demetriou, who is a member of a highly respected Task Force, a training associate of

Plaintiff Messina, and had also openly and frequently raised many concerns about ASLET's

security and financial practices.

104.    Corporate books and records, obtained through the Court of Chancery action, later

showed that Mr. Demetriou had won the original election, recalled by the Board (in which



almost twice as many members voted) by a comfortable margin, yet lost the second election,

which was manipulated by Hackett and Meyer in hopes of protecting the Enterprise.

105.    The Director Defendants and other Participants planned to select Meyer to succeed

Klugiewicz as Chairman, and then insure Messina's removal as a director. This election plot

almost succeeded, as all but one of Meyer's selected candidates won the second election, and

Meyer missed being elected Chairman by one vote. Many ASLET members have stated that they

did not open the ballots for the second election, because they knew they had already voted, and

thought it was sent in error (as no previous notice was mailed to them regarding the second

election).

**S.    MEYER USES HIS POSITION AS ASLET TREASURER
        TO UTILIZE ASLET FUNDS TO OUST MESSINA,
        (A RIVAL OF MEYER'S IN THE EXPERT WITNESS,
        CONSULTATION AND TRAINING FIELDS.)**

106.    On December 31, 2002, Messina sent a message to Meyer advising him that if he

authorized ASLET funds to be used to finance the seminar trip for Robert Thomas, the recently

resigned "Legal Counsel" (as had been done in the past), that he (Messina) would institute legal

action on behalf of the members. According to legal billing records obtained by Messina via the

Court of Chancery action, Meyer immediately contacted attorney Henry Hart, and discussed

"removal of a director".

**T.    HACKETT ARBITRARILY CHANGES AND
        CREATES NEW BYLAWS, WITHOUT BOARD
        AUTHORITY, OR MEMBERSHIP RATIFICATION**

107.    On January 7, 2003, Hackett, after being directed (by a unanimous January 6th vote of

the Board) not to take any action regarding proposed bylaws changes that were not ratified by the

membership, arbitrarily changed the corporate bylaws to his own benefit (by reducing the

authority of the Board, his potential successor, and the membership, and increasing his own

authority). Hackett posted these purported bylaws on the ASLET website, dated January 7, 2003.

**U.    MESSINA IMPROPERLY SUSPENDED AS A DIRECTOR,
IN AN ATTEMPT TO FORESTALL HIS DEMANDS FOR
CORPORATE RECORDS, AND AMIDST NUMEROUS
INQUIRIES ABOUT ASLET ACCOUNTING PRACTICES**

108.    On June 10, 2003, Messina received notice that a "Resolution" to suspend him from

membership was scheduled for vote at the Board meeting of June 20th. This was less than one

week after Messina had insisted on attending the Finance Committee Meeting of June 4, 2003, at

which time he made known his objections to the proposed budget for fiscal year 2004, informed

the attendees of his suspicions of the misuse of accounting practices, and also advised the

attendees that he was aware that fraudulent statements had been made and published by Hackett,

Meyer, Grossi and Smith regarding the recommendations of the auditor to change the current

accounting practices.

**V.    UNLAWFUL PURPORTED SUSPENSION OF MESSINA,
AS BOTH A MEMBER AND DIRECTOR, ATTEMPTS
TO PREVENT HIM FROM OBTAINING DEMANDED RECORDS.**

109.    On June 20, 2003, in a further attempt to prevent Messina from accessing records of the

Enterprise's activities, Defendants and other Participants purported to suspend Messina as both a

member and a director, without a hearing agreed to on January 6, 2003 (and outlined in a letter to

Chancellor William B. Chandler subsequent to the Scheduling Conference of January 2, 2003).

110.    The resolution was based on a never-used emergency clause in the bylaws (authored by

Mr. Messina) providing for the temporary suspension of membership "privileges", pending a

hearing to determine membership "status". The section was written to curtail dangerous and/or

violent activity at an ASLET Seminar, pending a hearing. As the bylaws do not require a director

to be a member and several past directors have not been members, the actions of the Defendants

and other Participants had no effect under Delaware law, on Messina's director's status. Directly

contrary to law, the Defendants and other Participants used the unlawful "suspension" as an excuse to prevent and delay Messina from gaining access to corporate records, while they "arranged" for his eventual expulsion.

111.    By the time the Defendants and Participants admitted, five months later, that Messina was in fact still a legal director, they had already delayed Messina from accessing records and information, and were able to hold at least five board meetings, from which Messina was unlawfully excluded.

**W.    NEW ATTEMPTS TO REMOVE MESSINA AS DIRECTOR, AND TO JUSTIFY HIS PREVIOUS UNLAWFUL SUSPENSION (WHICH WAS RETRACTED AFTER FIVE MONTHS)**

112.    On November 13, 2003, Messina received a fax from the ASLET office, signed by Casavant, which informed him that a ballot seeking to remove him as a director, and containing charges against him, would be mailed to the ASLET membership on or about December 1, 2003. He was also advised that he was entitled by Delaware Law to respond to the charges. The emergency Board meeting which generated these charges was held only three days after Messina sent out e-mail messages to ASLET members warning them of massive security breaches committed by Hackett since at least 9/11/01. These security breaches resulted from an apparent effort to infuse revenues into the organization to hide the decline in annual revenues that the corporation had suffered since he became Executive Director. Although Messina suspected that the mandated security protocols were being ignored, he had been unable to obtain the records he had requested, due to the refusal of Defendants and other Participants to send him records during his five-month-long unlawful exile from the Board.

33

## X.    MOCK HEARING HELD BY UNLAWFULLY CREATED "PANEL"

113.    On December 13, 2003, Meyer represented the Defendants and other Participants at an

"impartial" hearing panel created by Casavant.  Meyer failed to state for the record that at least

two alleged "witnesses" had submitted statements to ASLET attesting that the "charges"

attributed to their statements were untrue.  Meyer also neglected to state for the record that a

third charge was based on alleged statements that were "backdated" so they would appear to have

been uttered before the "emergency" suspension. Meyer also did not inform the "hearing panel"

that many witnesses had inquired to the ASLET office, about how they could testify on behalf of

Messina, and Messina was not given that information, finding out only after the fact.

114.    The "impartial" Hearing Panel created by Casavant consisted of:

a)    William Westfall, who as previous Ethics Committee Chairman agreed to

requests by Klugiewicz and others to "sanitize" Ethics Committee Reports, after which he

then resigned his post and was rewarded with a position of "Board Consultant" (which

included perks and benefits). Westfall's activities allowed Klugiewicz and other

Participants to disband the Ethics Committee, even though numerous complaints of

wrongdoing were still pending;

b)    Daniel Watson, who had known Meyer, and worked in the same agency with

Meyer for over twenty years, and who stood to benefit from Meyer and Hackett's control

of the Enterprise, including ASLET's publications and seminars; and,

c)    Julie Linkins, a close friend and associate of both Konrath and Hackett, who had

received important professional benefits from Konrath and Hackett's control of ASLET

publications and seminars.

115.    All three of these so called "impartial" panel members either publish articles in the ASLET magazine, teach at the ASLET seminar or both, which provides them added professional recognition and contacts, and financial benefits, and is completely controlled by the Defendants and other Participants in the Enterprise.

116.    Defendants and other Participants schemed to notify ASLET members, via the U.S Mail, that they had constituted an "impartial" panel to hear charges that Messina had defamed Hackett, Meyer and other Participants in the Enterprise. In fact, Defendants never created and announced a committee in accordance with ASLET bylaws, falsely announced that the committee was impartial when they had stocked it with their close associates, and then had continuous *ex- parte* communications with the committee for weeks prior to the meeting.  This is in direct violation of the one-day the bylaws dictate the panel "shall" meet with both sides present.  Defendants and Participants also proclaimed their panel to be a secret committee, all the while communicating with them behind Messina's back. Messina had no contact with the alleged hearing panel until two days before the scheduled hearing on December 13, 2003 (at which time Defendants Linkins, Watson and Westfall suddenly referred to themselves as a "Disciplinary Committee").

117.    Despite numerous requests over several weeks (before the hearing) for ASLET's Legal Counsel to provide a written opinion that this committee was legally created, Messina never received any opinion. After the refusal, and after learning of the involvement of an individual (Westfall) that his investigation had uncovered evidence against, and of the involvement of personal associates of Defendants and Participants (including Westfall, Linkins and Watson, who benefited from their association with Defendants and Participants) Messina refused to attend the Defendants' fraudulent and already predetermined, expulsion.

**Y.   PLANS TO EXPEL MESSINA ARE RUSHED, WHEN HIS ON SITE AUDIT EXPOSES SUBSTANTIAL EVIDENCE OF FINANCIAL FRAUD**

118.   On December 20, 2003, one day after Messina conducted an on site financial inspection at ASLET Headquarters, in the presence of a member witness and another member (a Certified Public Accountant), and uncovered clear and substantial evidence of financial fraud, Casavant, Hackett, Konrath, Meyer, Grossi, Smith, Dees, Gifford and other Participants held a sudden and previously unscheduled Board meeting to endorse the findings of the allegedly impartial panel, which had been generated by Defendants while Messina was conducting the financial inspection and seeking incriminating records.

**Z.   RULES CHANGE FOR EFFORTS TO REMOVE HIM AS A DIRECTOR VIA A MEMBERSHIP BALLOT**

119.   On December 20, 2003, Messina received notice from Casavant that the ballots to remove him as a director, that were supposed to be mailed out "on or about December 1, 2003" would instead be mailed out on or about December 29, 2003, with the findings of the alleged impartial hearing panel added to the mailing.

**AA.   EFFORTS INTENSIFY TO DISCREDIT MESSINA AND TO AGAIN TRY TO PREVENT HIM FROM ATTENDING THE ANNUAL MEETING AND SEMINAR.**

120.   On December 31, 2003, Hackett and Casavant mailed out another set of "charges" to the membership, which included rebuttals of Messina's responses to their previous two sets of charges. Although the bottom of the letter contained the names of all ASLET directors, at least one director has stated that he and other directors were not informed of this set of "charges" before they were sent out.

**BB.    FRAUDULENT ADVERTISING OF ASLET SECURITY MEASURES**

121.    From the point at which the Defendants and other Participants took control of the Enterprise, members and prospective members have been misled into believing that there were certain screening and security protocols in place to help insure that they would be networking, training, training with, and sharing intelligence with either:

i.    Regular Members, who consisted of Law Enforcement Officers, or legitimate Law Enforcement Trainers, whose identities were verified by the ASLET Office, or

ii.    Associate Members, who were screened and "sponsored" by Regular Members.

122.    Government agencies have spent taxpayer dollars to send their personnel to ASLET seminars, based primarily on the belief that their personnel would be in a relatively safe and secure environment with others who were either screened or sponsored by someone who was screened. This false belief was based on a plethora of mailings, advertisements, promotional material and application forms that have been disseminated through the years. This, in addition to the information published on the ASLET website, the corporation's bylaws, and the screening practices of the original ASLET administration, would lead any reasonable person to believe that at least minimal security standards were in place. Records recovered by Plaintiffs, dating back to September 11, 2001, clearly show, however, that none of this was true, and, in fact, the only requirement to have a membership application approved was for the applicant's check or credit card to clear.

**IX.**       **FACTS RELEVANT TO THE § 1964 CLAIMS**

    **A.**    **The Enterprise**

123.   At all relevant times, at least the following "Enterprise" existed within the meaning of 18

U.S.C. § 1961(4). This Enterprise is an entity that engaged in activities affecting interstate and

foreign commerce, and was an enterprise at all times relevant to this Complaint. The Defendants

participated in the operation and management of each aspect of this Enterprise and conducted its

affairs through their pattern of unlawful activity within the meaning of 18 U.S.C. § 1961(1)(B),

including execution of their scheme to defraud, corrupt, cheat, steal and convert the money and

property of Plaintiffs. Each Defendant has knowingly and intentionally engaged in acts to further

the conspiracy to defraud Plaintiffs, obstruct justice, retaliate against a witness/informant and

conceal the existence of the Enterprise.

    **1.**    **The Executive Board Enterprise**

124.   The Board Enterprise is an association-in-fact enterprise that is comprised of Defendants,

and many others involved in the law-enforcement training field. It is included as an enterprise

because each of the Defendants was associated with this Enterprise and has conducted or

participated, directly or indirectly, in the management and operation of the affairs of this

Enterprise through a pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B),

1961(5) and 1962(c) (First Claim for Relief below). Defendants also conspired to engage in such

conduct (Second Claim for Relief below), and conspired to acquire or maintain an interest in or

control of the Board Enterprise through unlawful activity (Fourth Claim for Relief below).

    **a.**    **Purpose of the Enterprise**

125.   At all relevant times, the purposes of the Board Enterprise were: (1) to allow the

controlling participants to reap improper financial benefits from ASLET; (2) to conceal all

improprieties in the conduct of ASLET business and to hinder, delay and prevent the

communication of federal offenses to federal law enforcement officers; (3) to retaliate against any person or persons attempting to mitigate or stop the improper acts committed by the members of the enterprise; and (4) to provide financial or other beneficial rewards to members of the Enterprise and others providing assistance to them.

126.   Planning. The members of the Board Enterprise formulated a broad-ranging plan to control the affairs of the corporation and reap personal and professional benefits. The members of the Board Enterprise recognized that the success of the plan was dependent on concealing the evidence of financial wrongdoing, security breaches, and violations of the law in the conduct of corporate elections.

127.   At all relevant times, the Defendants used the Board Enterprise to further their illegitimate purpose of using the corporation as a personal piggy bank and to obtain unfair advantages over Plaintiffs in the solicitation of government and private training contracts. Plaintiffs, the intended victims of the scheme, were defrauded and cheated out of hundreds of thousands of dollars, and were also cheated out of the ability to protect themselves and their law enforcement agency employers from sharing law enforcement sensitive information with unscreened individuals.

      **b.**     **Membership in the Board Enterprise**

128.   The membership in the Board Enterprise is as follows:

      a.     Frank A. Hackett, Jr.

      b.     Andrew Casavant

      c.     Greg Meyer

      d.     Gary T. Klugiewicz

      e.     Tim Dees

      f.     Lisa Konrath

g.    David Smith

h.    David Grossi

i.    Mary Gifford

j.    William Westfall

k.    Dan Watson

l.    Julie Linkins

m.    Glenn Young; and

n.    Those other officers and executives, managerial and supervisory personnel, and legal counsel of ASLET, who are presently unknown to Plaintiffs, and who participated as officers, directors, lawyers for the Defendants and Participants and assisted in making and implementing decisions relating to the scheme. The identities of those individuals will be revealed in discovery.

c.    **Structure of the Enterprise**

129.  At all relevant times, the Board Enterprise was an ongoing association-in-fact enterprise of individuals with a common purpose, a continuity of structure and personnel, and a consensual decision-making structure that was used to effect its scheme to defraud, corrupt, cheat, steal, obtain by fraud and convert the money and property of Plaintiffs, and to hinder, delay and prevent the communication of information relating to the commission and possible commission of federal offenses, and to retaliate against any party that provided truthful information to federal law enforcement officers. The roles that were performed by the various members of the Board Enterprise are described as follows:

130.  Members of the Board. The following individuals:

a.    Frank A. Hackett, Jr.

      b.    Andrew Casavant

      c.    Greg Meyer

      d.    Gary T. Klugiewicz

      e.    Tim Dees

      f.    Lisa Konrath

      g.    David Smith

      h.    David Grossi

      i.    Mary Gifford

131. Committee Personnel. The following individuals served to conceal Defendants' scheme, to hinder, delay and prevent the communication to federal law enforcement officers of information relating to the commission and possible commission of federal offenses, and to retaliate against a witness/informant who had provided truthful information to law enforcement officers of the United States:

      a.    Julie Linkins

      b.    William Westfall

      c.    Daniel Watson

132. Glenn E. Young: a Captain with the Security Police Force of NIMA. Young used his United States government e-mail account to construct false and fraudulent reports that were instrumental in the Enterprise's scheme to defraud, to retaliate against a witness/informant, and to hinder, delay and prevent the communication of truthful information to federal law enforcement officers. Young, as a NIMA employee, violated Executive Order 12333, and DOD Directive 89000, in providing the reports to Defendant Hackett and others.

133. Other individuals. Those other officers and executives, managerial and supervisory