personnel, and legal counsel of ASLET, who are presently unknown to Plaintiffs, and who participated as officers, directors, lawyers for the Defendants and Participants and assisted in making and implementing decisions relating to the scheme. The identities of those individuals will be revealed in discovery.

134. Defendants and Participants managed and operated the Board Enterprise and the scheme. In managing and organizing the Board Enterprise and scheme, the Defendants played a central role, dictating its structure, decisional process, and organization.

### d. Distinction Between the Board Enterprise and of Unlawful Activity Within The Meaning of 18 U.S.C. § 1961(1)(B)

135. As described herein, the Board Enterprise was separate and apart from the pattern of unlawful activity within the meaning of 18 U.S.C. § 1961(1)(B), because the Enterprise engaged in a variety of unlawful activity and its structure was beyond that required for the commission of the pattern of unlawful activity. The members of the Board Enterprise included innocent parties unaware of the Defendants' and Participants' scheme or the use of the Enterprise in its execution.

### e. Continuity of The Board Enterprise

136. The Board Enterprise was created at least as early as 1994 when "double dipping" and fraudulent spending practices, and fraudulent efforts to obtain advantages in procuring government and private training contracts, as well as the efforts to cover-up those activities, were uncovered at the ASLET corporate office. At that time, those involved in the Board Enterprise contemplated its indefinite duration. Its personnel and structure continued over a substantial period of time until the date of the filing of this Complaint.

### f. Culpability of Members of the Enterprise

137. Some of the members of the Board Enterprise, including each of the Defendants and Participants, acted with culpability in their conduct of its affairs. Other members of the Board

Enterprise were the unwitting instruments or victims of the culpable members of the Board Enterprise.

### Racketeering Acts Related to the Mail and Wire Fraud Scheme

138. At all times relevant to this Complaint, as previously alleged herein, and continuing until the time of the filing of this complaint, in the EDNY and elsewhere, Defendants and others known and unknown did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud, and obtain money and property from, members of the public by means of material false and fraudulent pretenses, representations, and promises, and omissions of material facts, knowing that the pretenses, representations, and promises, were false when made.

139. It was part of said scheme and artifice that the Defendants published a corporate "Policies and Procedures Manual" (Implemented June 4, 1997, revised November 18, 1999, and republished by Defendant Hackett in February of 2001, to be distributed to the Board and membership) that stated that the financial procedures used by the corporation were those of Generally Accepted Accounting Practices ("GAAP"), namely the Accrual System of Accounting ("ASA"), when in fact they used a Cash Method of Accounting ("CMA").

140. It was further part of said scheme and artifice that as corporate members and donors became aware of these false statements, they were instead informed through published meeting minutes that the CMA was "recommended" by the independent auditor, when in fact the opposite was true.

141. It was further part of said scheme and artifice that, in order to conceal the accounting frauds, the Defendants made numerous statements through electronic and postal mailings that this method (CMA) was not being used to hide unpaid bills that were being passed from one

43

fiscal year to next, when in fact that was the case.

142. It was further part of said scheme and artifice that defendants and their co-conspirators would, by withholding these liabilities from one fiscal year to the next, cause current and prospective members, sponsors and contributors to believe the Enterprise had much greater financial and management stability than it actually had, and would prevent the public, members, corporate directors and government officials from uncovering those activities.

143. It was further a part of said scheme and artifice that Defendants communicated to the public nationwide in their own periodical that was distributed through the United States mails, and via the corporation's website on the Internet, that ASLET was the nation's largest, or premier, law enforcement training organization with 7,000 members representing 18,000 agencies, and that the organization's membership, and "Certified Law Enforcement Trainer" credentials were valuable assets to law enforcement officers and trainers, when, in fact, these memberships and credentials were signed by a Defendant who had obtained control of the Enterprise by utilizing a "Doctorate of Philosophy" from an entity described by the U.S. Department of Justice as the nation's "largest diploma mill", and had committed additional fraudulent and tortious acts that caused the value of any ASLET membership or credential to plummet in the law enforcement community.

144. It was further part of said scheme and artifice that Defendants would cause false and misleading assurances and guarantees that the Defendants were following the recommendations of their Certified Public Accountants ("CPAs") (made to those seeking answers to accounting issues) in utilizing the CMA, when, in fact, the corporation's accountants had recommended the use of the ASA, to be disseminated by mail and by interstate wire transmissions.

145. It was further part of said scheme and artifice that Defendants would take and receive and cause to be taken and received from the mails communications concerning membership, including payments via check, and credit card for memberships in the corporation.

146. It was further part of said scheme and artifice that defendants and their co-conspirators would mail and distribute via electronic mail and Internet website posting press releases and other public statements addressing members concerns and commenting on particular management issues.

147. It was a further part of said scheme and artifice that Defendants and their co-conspirators would and did misrepresent, conceal, and hide and cause to be misrepresented, concealed, and hidden, the purpose of, and acts done in furtherance of, the scheme to defraud.

148. It was a further part of said scheme and artifice, and in furtherance thereof, that Defendants would and did communicate with each other and with their co-conspirators and others, in person, by mail, and by telephone and other interstate and foreign wire facilities, regarding accounting issues, acts of fraud and omission committed by officers and directors and ways to suppress such information, and regarding ways to identify and target those exposing the aforementioned wrongdoing.

149. For the purpose of executing and attempting to execute the scheme and artifice described herein, Defendants and their co-conspirators would and did: knowingly place and cause to be placed in any post office or authorized depository for mail matter, matters and things to be sent and delivered by the United States Postal Service ("USPS") and private mail carriers; took and received therefrom such matters and things; and knowingly caused to be delivered by mail according to the direction thereon, and at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter and thing, in violation of 18 U.S.C.§ 1341,

including, but not limited to, the instances set forth below in paragraphs "176-182" of this Complaint: [Mail Fraud Acts]

150. For purposes of executing and attempting to execute that scheme and artifice, Defendants and their co-conspirators would and did knowingly transmit and cause to be transmitted in interstate and foreign commerce by means of wire communication writings, signs, signals, pictures and sounds (collectively "transmissions") in violation of 18 U.S.C. § 1343, including, but not limited to, the transmissions set forth below in paragraphs "151-175" of this Complaint. [Wire Fraud Acts]

### 1. Defendants Used the Wires to Further the Scheme

151. From early 1995 onward, Klugiewicz, Smith, and others used the wires, to engineer and direct the cover-up of financial irregularities at the former corporate office in Lewes, Delaware. They frequently sent electronic mail messages using "CompuServe" accounts provided to the Defendants and others by the corporation, to communicate amongst themselves and with others to further the scheme. Said e-mail transmissions utilized e-mail servers in several states, and, via interstate wire, traveled to, at a minimum, Delaware, Texas, Wisconsin, and New York

152. On or about October 12, 1997, Klugiewicz sent electronic mail messages to directors of the corporation, in furtherance of the scheme to conceal and disguise financial irregularities at the corporate office. Said e-mail transmissions utilized e-mail servers in several states, and, via interstate wire, traveled to, at a minimum, Delaware, Texas, Wisconsin California, Louisiana, and New York.

153. On or about July 30, 1997, Klugiewicz, Smith, and others known and unknown, used interstate telephone wires to conduct a corporate meeting at which Defendants and others fraudulently misled and concealed from others, including Plaintiffs, the extent of financial irregularities at the Lewes, Delaware corporate office. This telephone conference utilized

interstate wires to connect, at a minimum, Defendants and other Participants in Wisconsin, Delaware, California, and New York.

154. On or about October 13, 1997, Klugiewicz, Smith, and others, sent electronic mail messages to (then corporate director) Messina, advising Messina to stop investigating financial irregularities at the corporate office, and threatening retaliation if he did not (notwithstanding the fact that Section 141 of Title 8 of DCGL requires elected corporate directors, such as Messina, to perform such fiduciary functions. Said e-mail transmissions were forwarded, via interstate wire, between, at a minimum, Delaware, Texas, Wisconsin, California, Louisiana and New York.

155. From early 2001 onward, Hackett, Klugiewicz and others began to utilize the internet to offer memberships in the corporation, resulting in memberships being sold via a credit card form provided on the corporation's website, or via a printed out form that Defendants provided for prospective purchasers to download and mail to the corporate office with a check, money order, or with credit card information. This use of the Internet resulted, at a minimum, in the transmission, via interstate wire, of the web pages referenced above from Illinois to Maryland.

156. On or about December 24, 2003, Casavant, Dees, Grossi, Meyer, Hackett, Konrath, Gifford, and Smith caused a facsimile transmission furthering the scheme to be sent, via interstate wire, from Frederick, Maryland, to Lindenhurst, NY. In particular, this transmission was an attempt to threaten and coerce Messina into withdrawing his letter to the corporation's membership detailing the financial improprieties and security breaches he had discovered in his investigation of the ASLET office, said letter having been generated in response to the Defendants' charges against him.

157. On or about December 23, 2002, Klugiewicz, Hackett, Grossi, Konrath, Meyer, Smith and others, in an attempt to conceal financial, security, and legal irregularities at the corporate

office, and to discredit Messina whose investigation had detailed same, posted a letter on several internet web pages, falsely advising members of the corporation that the Board had found that charges of wrongdoing made by Messina and others against the Executive Director were unfounded. In fact, however, there had been no investigation, whatsoever (a fact later acknowledged by Klugiewicz's successor as Board Chair, Casavant), and Defendants simply utilized the mailing to conceal from the Plaintiffs the existence of financial, security, and legal irregularities in the conduct of the corporation's business. This use of the internet resulted, at a minimum, in the transmission of the web pages referenced above, via interstate wire, from Illinois to Maryland, and the forwarding of e-mail transmissions between Wisconsin, Maryland, Florida, Arizona, California, Illinois and other states.

158. On or about December 23, 2002, Klugiewicz, Hackett, Grossi, Konrath, Meyer, Smith and others, in an attempt to conceal financial, security, and legal irregularities at the corporate office, and to discredit Messina (whose investigation had detailed same), posted the minutes of a Board meeting of the corporation that falsely stated that an investigation had found that charges of wrongdoing made by Messina and others against the Executive Director were unfounded. In fact, however, there had been no investigation, whatsoever (a fact later acknowledged by Klugiewicz's successor as Board Chair, Casavant), and Defendants simply utilized the web page to conceal from the Plaintiffs the existence of financial, security, and legal irregularities in the conduct of the corporation's business. This use of the internet resulted, at a minimum, in the transmission of the web pages referenced above, via interstate wire, from Illinois to Maryland, and the forwarding of e-mail transmissions between Wisconsin, Maryland, Florida, Arizona, California, Illinois and other states.

159. On or about October 10, 2002, Klugiewicz caused electronic mail messages to be sent to

Defendants and others, detailing Klugiewicz's non-existent review of Hackett's performance and recommending extension of his contract along with a salary increase. This allowed for continued concealment of the financial and security irregularities at the corporation, and served to hinder, delay and prevent the communication to a federal law enforcement officer or Judge of information relating to the commission and possible commission of a federal offense. Said e-mail transmissions were forwarded, via interstate wire, between, at a minimum, Delaware, Wisconsin, Illinois, California, and New York

160. On or about October 10, 2002, Klugiewicz, Hackett, Meyer, Grossi and others known and unknown, used interstate telephone wires to conduct an "Executive Committee" meeting at which Defendants schemed to falsely advise the membership that Klugiewicz had performed a review of Hackett's job performance, pursuant to the requirements of the ASLET bylaws. Defendants recommended an extension of Hackett's contract along with a salary increase for the purpose of rewarding Hackett for his leading role in the concealment of the Enterprise's activities. This allowed for continued concealment of the financial and security irregularities at the corporation, and served to hinder, delay and prevent the communication to a federal law enforcement officer or Judge information relating to the commission and possible commission of a federal offense. The telephonic meeting traveled over interstate wires between, at a minimum, Wisconsin, Maryland, California, and Illinois.

161. On or about October 17, 2002, Klugiewicz, Meyer, Konrath, Grossi, Smith and others known and unknown, used interstate telephone wires to conduct a Board meeting at which defendants and others fraudulently misled Director Messina and the membership of the corporation, to wit: Defendants heaped praise on Hackett's performance, all the while being aware that Klugiewicz had never performed any actual review of Hackett's job performance, and

that his recommended extension of Hackett's contract along with a salary increase was for the purpose of furthering the concealment of the Enterprise's activities. This allowed for continued concealment of the financial and security irregularities at the corporation, and served to hinder, delay and prevent the communication to federal law enforcement officer or Judge of information relating to the commission and possible commission of a federal offense. This telephonic meeting traveled over interstate wires between, at a minimum, Maryland, California, Wisconsin, and Illinois.

162. Between October 10 and December 12, 2002, Klugiewicz, Grossi, Meyer, Hackett, Konrath, Smith, and others exchanged numerous electronic mail messages in support of Hackett's contract extension of his contract and salary increase. This allowed for continued concealment of the financial and security irregularities at the corporation, and served to hinder, delay and prevent the communication to federal law enforcement officer or Judge relating to the commission and possible commission of a federal offense Said e-mail transmissions were forwarded, via interstate wire, between, at a minimum, Delaware, Wisconsin, California, Illinois and New York.

163. On or about December 23, 2002, Klugiewicz, Hackett, Meyer, Grossi, Konrath, Smith and others, in an attempt to conceal financial, security, and legal irregularities at the corporate office, and to discredit Messina whose investigation had detailed same, posted on the corporation's internet website, the minutes of a December 19, 2002, Board meeting that contained omissions made by Grossi in his former role as Secretary of the corporation. Grossi, in an attempt to conceal the Defendants' failed attempt to remove Messina from the Board by a secret vote, intentionally concealed and omitted details of the failed vote to conceal from Plaintiffs the Defendants' active effort to conceal their wrongdoing, to hinder, delay and prevent the communication to federal law enforcement officers, and to retaliate against director Messina for

his performing his fiduciary duties as a corporate director and for providing truthful information regarding the commission and possible commission of a federal offense to federal law enforcement officers. This use of the internet resulted, at a minimum, in the transmission of the web pages referenced above, via interstate wire, from Illinois to Maryland, and the forwarding of e-mail transmissions between Wisconsin, Maryland, Florida, Arizona, California, Illinois and other states.

164. On or about June 4, 2003, Hackett, Grossi, Smith, Meyer, Casavant and others utilized interstate wires to hold a telephonic "Finance Committee" meeting wherein Defendants stated falsely and fraudulently that the corporation's outside auditors had "recommended" the corporation's use of the CMA system, when, in fact, the auditors, and the previous auditors, had recommended the use of the ASA system. The telephonic meeting traveled over interstate wires between, at a minimum, Maryland, California, and Illinois.

165. On or about June 21, 2003, Hackett, Meyer, Grossi, Smith, Casavant, Dees, Konrath, Gifford and others held a Board meeting wherein Defendants stated falsely and fraudulently that the corporation's outside auditors had "recommended" the corporation's use of the CMA system, when, in fact, the auditors, and the previous auditors, had recommended the use of the ASA system. Defendants used the interstate wires to send electronic mail messages containing the minutes of the aforementioned meeting to approve said minutes and further their scheme on or about June 27, 2003. Said e-mail transmissions utilized e-mail servers in several states, and traveled to, at a minimum, Maryland, Illinois, California, Arizona, Indiana, and Washington.

166. On or about June 27, 2003, Hackett, Meyer, Grossi, Smith, Casavant, Konrath, Gifford, Dees and others utilized interstate wires to post, on the corporation's website, the minutes of the Board meeting (discussing corporate accounting policies) for all members to view. This use of the wires was in

furtherance of Defendants' fraudulent attempt to convince the membership that the use of the CMA system had been recommended by outside auditors, when, in fact, the ASA system was being utilized by Hackett and others to: 1) fraudulently withhold bills payable from the view of the membership; 2) submit false and fraudulent Annual Returns to the IRS (IRS Form 990's); and to 3) deceive members, and charitable donors (many of whom viewed the publicly available Form 990's to make donation decisions) into believing that the corporation was being run soundly, when, in fact, due to mismanagement and excessive overhead, it was running annual deficits. The electronic posting utilized interstate wires and was viewed by, or visible to, ASLET members in all fifty states. This use of the internet resulted, at a minimum, in the transmission of the web pages referenced above, via interstate wire, from Illinois to Maryland, and the forwarding of e-mail transmissions between Wisconsin, Maryland, Florida, Arizona, California, Illinois and other states.

167. On or about August 5, 2003, Dees sent an electronic mail message to an Internet "list-server" utilized by many members of the corporation to discuss law enforcement training issues and corporate business, wherein Dees sought to falsely reassure the corporation's members that the CMA method of accounting was not being utilized to hide unpaid bills that were being passed from one fiscal year to the next. This e-mail message traveled, at a minimum, from Washington to Lindenhurst, New York.

168. Between about August 1 and December 31, 2003, Casavant, Grossi, Meyer, Dees, Hackett, Konrath, Gifford, Smith, Westfall, Linkins, Watson and Young exchanged numerous electronic mail messages furthering Defendants' efforts: 1) to conceal the financial irregularities and security breaches from the Plaintiffs; 2) to hinder, delay and prevent the communication to a federal law enforcement officer or Judge of information relating to the commission and possible commission of a federal offense; and 3) to retaliate against a person who had provided truthful

information about the commission of a federal offense to federal law enforcement officers. These messages used electronic mail servers in various states, and traveled in interstate commerce, between, at a minimum, Maryland, Illinois, California, Arizona, Indiana, Virginia and Missouri.

169. On or about September 4, 2003, Casavant, Grossi, Meyer, Hackett, Konrath, Dees, Gifford, and Smith caused a facsimile transmission furthering the scheme to be sent via interstate wire from Frederick, Maryland to Lindenhurst, New York.. In particular, this transmission set forth that Messina would not be receiving records required to be forwarded to him by Title 8, Section 220(d) of DGCL due to his arbitrary suspension as a member, which "complicated" (according to Defendants and other Participants) his status as a director.

170. On or about November 11, 2003, Casavant, Grossi, Meyer, Hackett, Konrath, Dees, Gifford, and Smith caused a facsimile transmission furthering the scheme to be sent from Frederick, Maryland to Lindenhurst, New York. In particular, this transmission set forth a notification that the Board had voted at its 8 p.m. meeting of November 11, 2003, to send out proxy ballots (on or about December 1, 2003) in an attempt to remove Messina as a corporate director. The letter stated, contrary to Section 141 of DGCL, that the removal would be determined by a simple majority of those voting. The letter was initialed by Melissa Taylor, who, upon information and belief, works from 8 a.m. to 5 p.m., although the Board meeting referred to therein commenced at 8 p.m. and ended at 9:34 p.m.

171. On or about November 12, and on or about December 11, 2003, Casavant, Grossi, Dees, Meyer, Hackett, Konrath, Gifford, Smith and Young caused facsimile transmissions furthering the scheme to be sent from Frederick, Maryland to Lindenhurst, New York. In particular, these transmissions set forth the terms of Messina's participation in what Casavant had stated was an "impartial" hearing panel. The "impartial panel," was, in fact, stacked with longstanding

professional associates of the defendants, each of whom had contacts with, and had received professional benefits from, many of the Defendants controlling the Enterprise.

172. On or about December 20, 2003, Casavant, Grossi, Meyer, Hackett, Konrath, Dees, Gifford, Smith, Linkins, Watson, Westfall and Young caused a facsimile transmission furthering the scheme to be sent from Frederick, Maryland to Lindenhurst, New York in furtherance of the scheme. In particular, this transmission claimed that the Defendants' "impartial" hearing panel had found Messina guilty of making statements damaging to the corporation and to Hackett and Meyer, when, in fact, the hearing panel was a sham created by Defendants and other Participants to hinder, prevent and delay Messina's communication of further information concerning the commission or possible commission of federal offenses, and to retaliate against Messina for his having provided truthful information concerning the commission or possible commission of federal offenses to federal law enforcement officers.

173. On or about December 24, 2003, Casavant, Grossi, Meyer, Hackett, Konrath, Dees, Gifford, and Smith caused a facsimile transmission furthering the scheme to be sent from Frederick, Maryland to Lindenhurst, New York. In particular, this transmission set forth an attempt to coerce Messina into withdrawing his response to the Defendants' charges against him.

174. On or about October 20, 2003, Hackett, Casavant, Meyer, Grossi, Young, Dees, Gifford, Konrath, Smith, Watson, Linkins, and Westfall, caused a facsimile transmission to be sent via interstate wires, from Frederick, Maryland to Lindenhurst, New York, in support of the efforts of Defendants and other Participants to remove Messina from membership, in furtherance of their efforts to hinder, prevent and delay Messina's communication of further information concerning the commission or possible commission of federal offenses, and to retaliate against Messina for his having provided truthful information concerning the commission or possible commission of

54

federal offenses to federal law enforcement officers.

175. On or about September 30, and on or about October 2, 2003 Young and Hackett caused electronic mail transmissions furthering the scheme to be sent, via interstate wire, from the Eastern District of Missouri (using Young's U.S. government e-mail account of "youngge2@nima.mil) to the District of Maryland (to Hackett's e-mail account of HacFAH@aol.com). In particular, these transmissions, which improperly used a United States military e-mail account to send and receive said transmissions, contained false allegations, and backdated dates, regarding a conversation that Young, while on duty, had with a medical doctor, who is a member of ASLET, and whom Defendants believed to be an associate of Messina. In addition, these electronic mail transmissions constitute the dissemination of information gathered by Young (against Messina, a U.S. citizen) while on duty, under color of law, in his capacity as an employee of the NIMA. Defendants' actions, in addition to being fraudulent, were in clear violation of Executive Order 1233 and NIMA Policy Directive 8900 (" NIMA will conduct intelligence activities in accordance with applicable law and regulations, employing only those collection techniques necessary to perform its mission. NIMA will not collect, retain, or disseminate information about U.S. citizens unless explicitly authorized and then will limit collection to the least intrusive means available. Violators of applicable law, authorities, and regulations are subject to appropriate administrative action as defined in NI 1455.1 (reference 1.b. (4)). NIMA may refer cases to appropriate law enforcement agencies for prosecution and imposition of civil or criminal penalties.")

### 2. Defendants Used the Mails to Further the Scheme

176. On or about March 1998, Klugiewicz and others, in an attempt to conceal the financial irregularities at the corporate office and discredit Messina, whose investigation had detailed

55

same, sent a letter via the U.S. Mail to Plaintiffs, at over five-thousand (5,000) locations in and outside of the U.S., advising all members of the corporation that an investigation by the Board at their Annual Meeting in Mobile, Alabama, had found that charges of wrongdoing made by Messina and others against the Executive Director were unfounded. In fact, however, an internal investigation, accepted and acknowledged by Klugiewicz in an e-mail message of December 19, 1996, had found charges of wrongdoing to be accurate. Included amongst the recipients of the mailing, in the EDNY, were Plaintiffs Messina, Demetriou, as well as Elizabeth Kennedy, Barry Culpepper, Fabio Mattiasich, and other ASLET members residing in the EDNY.

177.    On or about March 1, 1998, Klugiewicz and others, in an attempt to conceal the financial irregularities at the corporate office and discredit Messina, whose investigation had detailed same, authored and published an article in the March/April 1998 issue of "The Trainer," a bi-monthly magazine published by the corporation for its members, declaring that all allegations of wrongdoing leveled by members and office employees of the corporation were "not sustained." Klugiewicz and other participants caused this to be sent via the U.S. Mail to Plaintiffs, at over five-thousand (5,000) locations in and outside of the U.S., advising all members of the corporation that an investigation by the Board at their Annual Meeting in Mobile, Alabama, had found that charges of wrongdoing made by Messina and others against the Executive Director were unfounded. In fact, however, an internal investigation, accepted and acknowledged by Klugiewicz in an e-mail message of December 19, 1996, had found charges of wrongdoing to be accurate. Included amongst the recipients of the mailing, in the EDNY, were Plaintiffs Messina, Demetriou, as well as Elizabeth Kennedy, Barry Culpepper, Fabio Mattiasich, and other ASLET members residing in the EDNY.

178.    On or about December 23, 2002, Klugiewicz, Hackett, Grossi, Konrath, Meyer, Smith and

others, in an attempt to conceal financial, security, and legal irregularities at the corporate office, and to discredit Messina whose investigation had detailed same, sent a letter via the U.S. Mail to all candidates for election to the corporate Board, falsely advising all members of the corporation that the Board had found that charges of wrongdoing made by Messina and others against the Executive Director were unfounded. In fact, however, there had been no investigation, whatsoever (a fact later acknowledged by Casavant, Klugiewicz's successor as Board Chair), and Defendants simply utilized the mailing to conceal from the Plaintiffs the existence of financial, security, and legal irregularities in the conduct of the corporation's business. Included amongst the recipients of the mailing were Plaintiffs Messina and Demetriou, in the EDNY, and candidate Jim Smith, a sworn police officer of a subdivision of the State of New York, residing in the Northern District of New York.

179.  On or about October 21, 2003, Hackett, Casavant, Meyer, Grossi, Young, Konrath, Dees, Smith, Gifford, Watson, Linkins, and Westfall, caused a letter to be sent via the U.S. Mail to Messina in support of the efforts of Defendants and other Participants to remove Messina from membership, in furtherance of their efforts to hinder, prevent and delay Messina's communication of further information concerning the commission or possible commission of federal offenses, and to retaliate against Messina for his having provided truthful information concerning the commission or possible commission of federal offenses to federal law enforcement officers.

180.  On or about December 31, 2003, Hackett, Casavant, Meyer, Grossi, Konrath, Dees, Smith, Gifford, Watson, Linkins, and Westfall, in an attempt to influence members to vote for the removal of Messina as a corporate director, to conceal financial, security, and legal irregularities at the corporate office, and to discredit and retaliate against Messina, whose investigation had

detailed same, sent a letter via the U.S. Mail to all voting members stating that the Board had found that charges of wrongdoing made by Messina and others against the Executive Director were unfounded. In fact, however, there had been no investigation, whatsoever, of Messina's claims, and Defendants simply utilized the mailing to conceal from the Plaintiffs the existence of financial, security, and legal irregularities in the conduct of the corporation's business. This letter posted the names of all corporate directors at the bottom of the letter, in an attempt to deceive members into believing that all directors were informed and endorsed the letter, when, in fact, at least one director claimed that he had not been informed of the letter or its contents until after it was mailed. Included amongst the recipients of said letter were Plaintiffs Messina and Demetriou, as well as Elizabeth Kennedy, Fabio Mattiasich, Nick Brando, Jennifer Haas, and others, all residents if the EDNY.

181.   Consistently throughout the year, Defendants and other Participants mail, or cause to be mailed, via U.S. Mail and private carriers, color brochures soliciting the purchase of memberships in the corporation. Prospective members, and current members who receive bulk quantities of these brochures and are asked to solicit membership sales as agents of the corporation, are advised (falsely) that individuals who are not currently employed as law enforcement officers or law enforcement trainers may join as "Associate Members" only by being sponsored by a member in good standing. Records obtained by Messina show conclusively that no such security screening procedures are in place.

    **2.**    **Customers Used the Mails and Wires to Further the Scheme**

182.   The following constitute examples of regular communications:

ASLET members Jennifer Haas, Elizabeth Kennedy, Barry Culpepper, Nick Brando, Rob Coffman, Fabio Mattiasich, and others, received solicitations for membership and/or membership

renewal sent by Defendants and other Participants via U.S. Mail. These members then used the U.S. Mail and interstate telephone wires to make payments for the memberships purchased from Defendants and other Participants. Plaintiffs, after a review of recent ASLET financial documents, believe that over $200,000 per year has been sent via U.S. Mail and interstate telephone wires, with over 4000 such mailings or wirings occurring each year at an average remittance of approximately forty-five dollars ($45).

### 3. Pattern

183. Each such communication during the period constituted a separate execution of the scheme through mails, and interstate wire communications.

184. Each such communication accomplished, among other things, the purpose of retaining the fruits of the scheme by the Defendants in the form of increased profits and improper benefits to them.

### Racketeering Acts Related to Obstruction of Justice and Retaliating Against a Witness/Informant

185. Defendants Casavant, Klugiewicz, Hackett, Meyer, Smith, Konrath, Grossi, Dees, Gifford, and other Participants withheld corporate books and records, and ordered others not to cooperate with Messina, so as to prevent him from gathering additional evidence of double dipping, spending fraud, contracting fraud, and fraud in the conduct of corporate elections, and forwarding it to agents of the FBI and/or United States Postal Inspectors.

186. Defendants Casavant, Klugiewicz, Hackett, Meyer, Smith, Konrath, Grossi, Dees, Gifford and other Participants planned and executed a campaign to use false and fraudulent mailings and e-mail messages to damage Messina's business, and his professional reputation, in an effort to prevent him from continuing his investigation and forwarding documentary and testimonial evidence to agents of the FBI and/or United States Postal Inspectors.

187. According to a sworn affidavit obtained in January 2003 from Dees, Hackett ordered Dees (before he was appointed Secretary), to destroy all documents in Dees' possession relating to the allegations of fraud and misconduct at the former corporate office in Lewes, DE. Dees admitted, in the same affidavit, to having destroyed those documents.

188. Defendants Hackett, Meyer, Smith, Konrath, Casavant, Grossi, Dees, Gifford, Westfall, Linkins, Watson, and other Participants planned and executed a campaign to use false and fraudulent mailings and e-mail messages to remove Messina from membership in the corporation, in an effort to retaliate against him for his having provided truthful information to individuals whom Defendants and other participants clearly knew were law enforcement officers as defined in 18 U.S.C. § 1515 (a)(4)(A). Defendants created a sham "hearing panel" comprised of Westfall, Linkins and Watson, who all had ties to corporate directors accused of wrongdoing by Messina, and all had received, and might continue to receive, benefits from the Defendants for their actions. Although corporate bylaws dictated that the "hearing panel" was to meet at a designated time and place to hear arguments from Messina and from those (led by Meyer) seeking to discipline him, in fact, Defendants Meyer, Hackett, Casavant and others acting on their behalf had, for weeks, maintained *ex parte* communications with Linkins, Watson and Westfall to make certain that they aided in the completion of the scheme by removing Messina from membership in the corporation.

189. The foregoing predicate acts, taken together, constitute a pattern of unlawful activity within the meaning of 18 U.S.C. § 1961(1)(B). The predicate acts are both related and continuous. The acts are connected to one another as part of a scheme to accomplish a uniform purpose. The repeated nature of this conduct during the period of the scheme and the threat of similar conduct occurring in the future makes the acts continuous.

C.     **Summary of 18 U.S.C. § 1964 Allegations**

190. In connection with the activities giving rise to these claims, the Defendants at all relevant times acted corruptly, with malice, intent, and knowledge, and in reckless disregard of Plaintiffs' rights.

191. At all relevant times, the Enterprise as defined herein was engaged in interstate and foreign commerce in various states, including New York.

192. As set forth above, the Defendants at all relevant times in connection with the activities giving rise to these claims, conspired with each other and with others as yet unknown to engage in the various activities set forth herein and aided and abetted one another in these activities, all in violation of the statutes set forth herein, and specifically 18 U.S.C. § 2, and conspired to do so in violation of 18 U.S.C. § 1962(d). In addition, unknown individuals not yet named as Defendants conspired with the Defendants as alleged herein.

193. Each of the Defendants agreed to the operation of the conspiracies to defraud, corrupt, cheat, steal, obtain by fraud and convert the property and money of Plaintiffs.

194. As set forth above, at all relevant times, and in furtherance of and for the purpose of executing the scheme and artifice to defraud, corrupt, cheat, steal, obtain by fraud and convert the money or property of Plaintiffs, the Defendants, on numerous occasions used and caused to be used the mails and wire communications. Each such use of the mails and wire communications in connection with and in furtherance of the scheme constitutes the offense of mail fraud in violation of 18 U.S.C. §§ 2 and 1341 and the offense of wire fraud in violation of 18 U.S.C. §§ 2 and 1343.

195. As set forth above, at all relevant times, and in furtherance of and for the purpose of concealing the discovery of, and aiding the execution of the scheme and artifice to defraud the