Exh. L-9 ("The Effect of Raloxifene on Risk of Breast Cancer in Postmenopausal Women," The Journal of the American Medical Association ("JAMA"), June 16, 1999) n4 at 2192. The results of the MORE study are discussed in greater detail below. Eli Lilly also plans [*21]to participate in a five-year comparative trial titled Study of Tamoxifen and Raloxifene ("STAR"), sponsored by NCI/NSABP, which will test the potential efficacy of Evista against the proven efficacy of tamoxifen in reducing the risk of breast cancer in postmenopausal women. Enrollment in STAR has just begun and the study likely will not be completed for at least five years. Tr. at 322 (Lewis); Pl.'s Exh. 34 (NSABP Protocol P-2 Study of Tamoxifen and Raloxifene (STAR) for the Prevention of Breast Cancer) at Z 15096.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n4 The Journal of the American Medical Association, or "JAMA," is a prestigious medical journal in the United States. Lippman Dep. Tr. at 45.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

D. Eli Lilly's promotional claims for Evista

20. Although Evista is an osteoporosis drug, Eli Lilly planned to market Evista for breast cancer prevention. Eli Lilly's market strategy documents and business plans contain numerous references to Evista's long-term "value proposition" and brand strategy that "Evista is the only single agent proven to safely[*22] protect women after menopause against three of the most serious threats to their health and independence: osteoporosis, breast cancer, and cardiovascular disease." Pl.'s Exh. 9 at EV 2014-1599; Pl.'s Exhs. 11 & 67. Eli Lilly witnesses have also described Evista's "competitive advantage," at least over the long term, as protecting against the risk of breast cancer. Tr. at 217-19 (Torres).

21. Eli Lilly's internal documents also reflect the company's understanding, based on market research it commissioned, that if Eli Lilly could make a breast cancer prevention claim for Evista, it would have a substantial impact on physicians and differentiate Evista from competitors. Tr. at 217-24 (Torres); Pl.'s Exh. 9 at EV 2014-1582, 1585, 1602.

22. A primary form of advertising for Evista takes place through in-person visits by Eli Lilly sales representatives to physicians. Tr. at 144 (Crenshaw); Tr. at 245-47 (Nicholson); Tr. at 857-59 (Torres). Sales representatives are an important source of information for physicians about prescription drugs, and physicians--who are the "gatekeepers" for patients, Tr. at 233-34 (Harenberg)--often rely to some extent on the information they are given [*23]by sales representatives in determining what drugs to prescribe. It is thus critical that sales representatives convey accurate and reliable information when detailing drugs to physicians. Tr. at 44-45 (Anson); Tr. at 166-68 (Crenshaw).

23. Eli Lilly has approximately one thousand primary case sales representatives. These representatives receive a base salary as well as a bonus based on the number of prescriptions for Eli Lilly drugs written by physicians they visit. The representatives detail an average of eight doctors per day, which translates into nearly 200 detail visits each month. Tr. at 147-49, 151 (Crenshaw); Tr. at 857 (Torres). The evidence suggests that each detail visit lasts an average of just two to three minutes. During those two to three minutes, representatives must detail several Eli Lilly drugs, not just Evista. Tr. at 798-99 (Torres).

24. Eli Lilly has several measures in place to ensure that its representatives convey authorized and intended messages to physicians and that they follow-up appropriately in subsequent visits. To that end, Eli Lilly provides its sales representatives with selling scripts or "verbatims" that tell them what to say to doctors[*24] about Evista either proactively or in response to questions from physicians. Tr. at 801-02 (Torres).

25. In addition, Eli Lilly representatives are trained and required to maintain written notes, prepared as soon as possible after each visit with a physician, encapsulating the visit. The purpose of these "call notes" is to provide an accurate record of what the sales representative and the doctor discussed and to record contemporaneously what the representative believes were the most salient aspects of each visit. Eli Lilly's Vice President of U.S. Sales, Newt Crenshaw, testified that the call notes are "utilized by that sales representative and/or their partner in the ongoing dialogue or promotional efforts with a given physician." Tr. at 154 (Crenshaw); see also Tr. at 152-60 (Crenshaw); Tr. at 877-78 (Torres). As contemporaneous written accounts, they are the best evidence of what the representatives communicated to doctors during their detail visits.

26. Eli Lilly also relies on market research to track the messages that its sales representatives are conveying to

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

physicians. Tr. at 168 (Crenshaw). In the case of Evista, Eli Lilly commissioned a series of surveys conducted[*25] bimonthly throughout 1998 by a market research firm called Richard Day Research. Under Eli Lilly's guidance and direction, Richard Day periodically surveyed hundreds of physicians who had recently been detailed by an Evista sales representative and asked them among other things to describe the message the Eli Lilly representative had communicated about Evista. Tr. at 234-36 (Harenberg). According to John Ross, the Project Manager at Richard Day who together with Eli Lilly designed and conducted this survey, "one of the goals of the study [was] to get a sense of the message that was being delivered to those doctors from those reps and see if specific messages were being recalled by those doctors or not." Tr. at 519 (Ross).

27. The evidence adduced at the hearing demonstrates that since at least October 1998, Eli Lilly representatives have been communicating to physicians that Evista has been proven to reduce the risk of breast cancer and that Evista is comparable or superior to tamoxifen in reducing the risk of breast cancer. This evidence includes the following: (i) Eli Lilly's detail scripts distributed to sales representatives in November and December 1998, (ii) the sales[*26] representatives' call notes, (iii) the testimony of Eli Lilly business executives, (iv) eyewitness testimony, and (v) a Richard Day survey conducted in late November and early December 1998.

28. In mid-1998, even before tamoxifen had received an indication from the FDA for breast cancer risk reduction, Zeneca began receiving anecdotal reports that Eli Lilly was promoting Evista for breast cancer prevention. In late May 1998, Zeneca's Chief Executive Officer wrote to Eli Lilly's president asking him to put a halt to any improper breast cancer promotion by the company's sales representatives. See Pl.'s Exh. 1 (Ltr. from T.F.W. McKillop to Sidney Taurel dated May 29, 1998). In June 1998, Eli Lilly's president denied Zeneca's accusations and communicated to Zeneca that any such claims by Eli Lilly sales representatives would be cause for "serious disciplinary action" by the company. His letter assured Zeneca that

sales representatives have been instructed repeatedly and in no uncertain terms that they cannot promote Evista for the prevention of breast cancer. We regularly check promotional message recall with our customers through controlled market research, and breast[*27] cancer prevention has not been mentioned, as you would expect were our representatives promoting Evista for that use.

Pl.'s Exh. 2 (Ltr. from Sidney Taurel to T.F.W. McKillop dated June 3, 1998); Tr. at 54-59 (Anson).

29. Zeneca was reassured by the letter from Eli Lilly's president, concluding that Eli Lilly "took our issues very seriously" and responded "as you would expect them to behave as a major pharmaceutical company." Tr. at 59 (Anson). However, in late 1998, after the launch of the new indication for breast cancer prevention for Nolvadex, Zeneca gradually began to hear more and qualitatively broader anecdotal evidence that Eli Lilly representatives were making the claims in question. Zeneca also commissioned market research as part of its Nolvadex launch, and that research, particularly the studies completed in January 1999, provided more concrete proof that Eli Lilly's representatives were making breast cancer risk reduction claims. Tr. at 62-68 (Anson).

30. As set forth below, it appears that Eli Lilly began communicating two of the claims in question--that Evista has been proven to reduce the risk of breast cancer and that Evista is comparable or superior[*28] to tamoxifen in reducing the risk of breast cancer--in a systematic way in late 1998, when Eli Lilly issued new verbatim scripts for its sales representatives. However, there is insufficient evidence to conclude that Eli Lilly was communicating the third alleged claim--that Evista is approved or indicated by the FDA for reduction of the risk of breast cancer.

1. The November and December 1998 detailing scripts

31. Until November 1998, Eli Lilly had in place a verbatim script which stated only that recent data have shown that Evista "may also prevent breast cancer." Pl.'s Exh. 14 (Document re: Sales Representative Verbatim Response to Evista and Breast Cancer Prevention Questions dated May 14, 1998). This was part of a verbatim response that could be given to an unsolicited question by a doctor as to whether Evista prevented breast cancer. It was linked to the message that Evista prevented osteoporosis without increasing the risk of breast cancer. Shortly after Zeneca obtained the risk reduction indication for tamoxifen from the FDA, Eli Lilly revised its selling script for its sales representatives. Tr. at 867 (Torres); Pl.'s Exh. 15 (Document re: Questions comparing the[*29] ability of Evista and tamoxifen to prevent the incidence of newly diagnosed breast cancers dated Nov. 18, 1998). In an effort to position Evista as a drug that could also be used in the same way as tamoxifen, Eli Lilly told its representatives in November 1998 that in response to unsolicited questions from physicians concerning the comparative efficacy of the two drugs, Eli Lilly representatives should reply as follows:

Dr., Evista is not approved for the prevention of breast cancer. However, let me share with you these data we

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 3 of 30

Page 13

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

currently have with regard to Evista reducing the incidence of breast cancer. Dr., these data come from about 13,000 women age 45 - 80 enrolled in our osteoporosis prevention and treatment studies. Women who have taken Evista for an average of 29 months had a greater than 50% reduction in the incidence of newly-diagnosed breast cancers compared with the placebo group. While we do not currently have head-to-head trials, these results are similar to those for tamoxifen in women at high risk of breast cancer.

Pl.'s Exh. 15 at EV 2609 327-28 (emphasis added). The script went on to promote the purported superior safety profile of Evista over tamoxifen: [*30] "Dr., a very distinct difference between Evista and tamoxifen lies in the uterine safety profile. In women, tamoxifen increases endometrial thickness, and increases the risk of polyps, and endometrial cancer. In contrast, Evista, does not increase endometrial thickness or increase the risk of endometrial cancer." Id. at 328.

32. As Eli Lilly has acknowledged, without a head to head trial there is no scientific basis for drawing this comparison, particularly the statistical comparison of the efficacy of the two drugs in the same population. Tr. at 180 (Crenshaw); Tr. at 740 (Cummings). Indeed, Eli Lilly's Director of Oncology Business testified that he could think of no situation in which it would be appropriate for an Eli Lilly sales representative to compare tamoxifen to Evista. Tr. at 251 (Nicholson).

33. In December 1998, the FDA approved a change in the safety portion of Evista's label to include results of the MORE study with respect to breast cancer, which was a secondary endpoint of the MORE study. Tr. at 619 (Cummings); Tr. at 846 (Torres); Tr. at 914-16 (Eckert). The approved language in the new package insert stated that:

Among 7017 women randomized[*31] to raloxifene, there were 6 cases of invasive breast cancer per 14,605 person-years of follow-up (0.41 per 1000). Among 3368 women randomized to placebo there were 10 cases of invasive breast cancer per 6991 person-years of follow-up (1.43 per 1000). The effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established.

Def.'s Exh. H (Evista Package Insert Revised as of Dec. 2, 1998) at 8 (emphasis added). n5

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - -
- -

n5 The most recent data from the MORE study have shown 27 cases of invasive breast cancer in those women taking a placebo and 13 cases for those women taking raloxifene.

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - -
- - - -

34. As a result of the label change, Eli Lilly gave its sales representatives a revised detailing script, which was distributed to the Evista sales force in mid-December. That detailing script instructs representatives to deliver the following message:

Dr., the FDA has recently approved a label (package insert) change for EVISTA regarding the incidence of newly diagnosed invasive breast[*32] cancer. . . . As you can see [from the package insert] this reflects a greater than 50% reduction in newly diagnosed breast cancer compared to placebo. As a matter of fact, in our clinical trial of over 10,000 women of which 7,017 took EVISTA as compared to 3,368 who took placebo, there was a greater than 50% reduction in the incidence of newly diagnosed breast cancer.

Pl.'s Exh. 21 (Document re: Evista 3-year interim analysis from the Multiple Outcomes of Raloxifene Evaluation (MORE) study regarding fracture data and label change regarding breast cancer dated Dec. 11, 1998) at EV 2218 668. The sales script also provides that in the event physicians ask, "how can EVISTA show prevention of breast cancer with only 16 patients?" the appropriate response is that "10 cases of invasive breast cancer were diagnosed in the placebo group and six were diagnosed in the Evista group" and "this information translates to a greater than 50% reduction in breast cancer risk." Id. at 672; see also Pl.'s Exh. 67 at EV 205 77[5] (noting that in "Q4 98," Eli Lilly "added proactive BC information" to its core message).

35. As part of the label change, the FDA required Eli Lilly[*33] to place on the label the following statement: "The effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established." Def.'s Exh. H at 8. The December script instructed that, if representatives are asked what that sentence means, they should respond: "This is somewhat standard language included by the FDA to ensure that physicians understand that studies are ongoing and EVISTA is not indicated for the prevention of breast cancer." Pl.'s Exh. 21 at EV 2218 673. The plain language of the statement contradicts that interpretation.

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 4 of 30

Page 14
1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

2. Eli Lilly sales representatives' call notes

36. In light of these instructions, Eli Lilly sales representatives have repeatedly told physicians that Evista is a proven breast cancer prevention drug and a proven alternative to tamoxifen. Tr. at 230, 874-75 (Torres). From October 1998, when Nolvadex was first approved for breast cancer risk reduction, through March 1, 1999, after this suit was filed, call notes made by Eli Lilly sales representatives contain more than 500 entries in which Eli Lilly representatives report making explicit breast cancer efficacy claims about Evista. Those claims fall into the following[*34] two categories and are typified by the statements quoted below.

a. Claims that Evista has been proven to reduce the risk of breast cancer

. "I explained evista decreases risk of breast cancer drastically compared to placebo." (10/8/98-844401745)

. "[I] tell him that e reduces the incidence of newly diagnosed breast cancer ranging from 50 to 80%." (10/20/98-210000310)

. "Hit him with strong evista message...he asked if we have a cancer indication or a treatment indication...told him the indication are coming it's just a matter of time...but the data is there and is strong." (11/4/98-338007116)

. "Ev: he basically said he doesn't believe the claims Ev has made...w/cancer (breast cancer reductions) ...need to be confident in standing up for Ev and telling him these claims are proven not suspected." (11/16/98-348606679)

. "She mentioned that Evista doesn't reduce the risk of breast cancer [sic]. I sd well doctor that is not true any longer. I then went through the MORE data and Asco data." (11/17/98-657601659)

. "Promoted breast cancer prevention need to remind her next time." (11/24/98-807602090)

. "Told [Dr.] that all pm pts are right because[*35] evista . . . has been shown to reduce cancer risk." (12/4/98-615802967)

. "Evista 3 combined benefits for the prevention of all three diseases not just one." (12/4/98-736800257)

. "Told him new data on EV...now shown to reduce risk of newly diagnosed breast cancer vs placebo." (12/15/98-489006635)

. "He asked does that mean you can be used for breast cancer - I said no we do not have breast cancer indication but by the fda allowing us to put this data in our pt they believe there is a definite [sic] decrease risk." (1/11/99-848001303)

. "I told him to rest assure and to tell Pt.'s actually reducing the incidence of breast cancer." (1/20/99-848801004)

. "He said Evista will be huge once we can say for sure that it protects women against breast cancer. I said 'with all due respect, Dr. Dejarnatte, that's what the package insert now states with the change that took place in December.'" (1/25/99-761405939)

. "I told him now he can actually say with confidence that Evista actually reduces the incidence of breast cancer..." (1/26/99-848801056)

. "Point out the fact that there's no 'up-in-the-air' w/ evista, because we know it reduces breast cancer, etc. [*36] " (2/8/99-240003187)

. "Quick reminder evista builds bone, lowers lipids and reduces the risk for breast cancer...." (2/12/99-618492020)

. "Told her that EV is not a BC drug, but the BC prevention is an element of the combined benefits of the drug." (2/25/99-678008612)

. "Bottom line is why give women agent that will make them worry they could get breast cancer when can give an agent that can prevent it." (3/1/99-740210792)

Pl.'s Exh. 25 (Call Notes of Eli Lilly Representatives).

b. Claims that Evista is proven equal or superior to Tamoxifen

. "Evista 3 way - wanted to know re breast cancer data - told him the 60-80% reduction - he said what about tamox - said evista's data is better and doesn't increase risk for endometrium either." (10/5/98-578403397)

. "F [follow up]: Push tamoxifen vs evista-BC data doc needs to hear again and again-why even start pats on tamoxifen?" (10/15/98-623600314?)

. "He asked right away about BC, went into MORE and compared w/ Tamoxifen, we agreed that evista is a much better choice. . . ." (11/3/98-244001904)

. "He then wanted to know if I was saying-replace Tamoxifen with Evista. I said well, no FDA approval,

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 5 of 30

Page 15

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

[*37] but most of the doctors are already doing that, what will you do? He said Tamoxifen rep already came to detail him. I said so far what you have is study on Tamox vs. placebo and Evista vs. placebo, although you can't really compare, Evista looks better and without the endo effects." (11/16/98-422406095)

. "evista-3 way combined benefit given, interested in the STAR study and the breast cancer prevention, mentioned the MORE study and that evista's reduction in incidence of newly diagnosed breast ca was greater than tamoxifen's." (11/23/98-921201870)

. "Asked if [STAR trial] will show Evista is better than Tamox. Told him already better - No endo. cancer." (12/14/98-248000538)

. "Informed him about 63% reduction of breast cancer among women who have high risk of breast cancer compared to [Tamoxifen.] He was pretty pleased with that." (12/17/98-888000151)

. "Shared with him the PI change. He also asked how it compares to Tamoxifen. Explained we are believed to build bone every bit as well, and we don't have the endometrial issues they have. Evista is clearly a better choice for many reasons." (1/8/99-587000147)

. "Evista first line ahead of tamox. for prevention. [*38] " (1/12/99-281202408)

. "He talked to me about several women that the oncologists were switching from Tamoxifen to Evista. He asked me if this was ok in my opinion. I stressed breast cancer data again about reductions in pervasive type cancer and ert positive cancer. He said he guesses it makes sense but he'd be more comfortable with some studies. I started to tell him the lack of studies didn't slow him down from rxing ERT but I didn't. Maybe next time." (1/21/99-870608719)

. "Nolvadex rep had just left....listened to her give entire tamox detail....gave all sorts of figures on BC....went right in and asked him... 'Dr Bill, why and where would you ever use Tamox over Evista????' / ... said he wouldn't....no reason to with the risks of endomet cancer, which of course she DID NOT mention." (2/17/99-360201058)

Pl.'s Exh. 23 (Call Notes of Eli Lilly Representatives).

37. There are some call notes from Eli Lilly sales representatives that suggest that a very small number sales representatives have told doctors that Evista has been approved or indicated by the FDA for the prevention of breast cancer. See Pl.'s Ex. 24. However, many other call notes indicate that representatives [*39]have informed doctors that Evista is not indicated for the prevention of breast cancer. See, e.g., Pl.'s Ex. 25 (call note from 1/11/99-848001303). Moreover, one of the verbatims that was given to sales representatives specifically instructed them to tell doctors that "Evista is not approved for the prevention of breast cancer." Pl.'s Exh. 15 at EV 2609 327. Thus there is insufficient evidence to conclude that Eli Lilly sales representatives have promoted Evista as approved or indicated by the FDA for the prevention of breast cancer.

38. The entries in which the two claims about Evista were made--that Evista has been proven to reduce the risk of breast cancer and that Evista is comparable or superior to tamoxifen for reduction of the risk of breast cancer--were written by more than 170 different representatives, or approximately 17 percent of Eli Lilly's general sales force. In addition to being largely reflective of the Eli Lilly scripts, the fact that representatives recorded these messages in the business records of the company confirm that they were not inadvertent or unauthorized. Indeed, as set forth below, Eli Lilly executives and Eli Lilly's verbatims confirm that[*40] the representatives are authorized to convey these messages. n6 In fact, at the hearing Eli Lilly conceded that its representatives are authorized to state that raloxifene has been established to reduce the risk of breast cancer. (Tr. dated June 24, 1999 at 69, 74.) The verbatims and testimony of Eli Lilly executives also confirm, however, that Eli Lilly sales representatives have not promoted Evista as having been approved or indicated by the FDA for the reduction of the risk of breast cancer. Thus the evidence establishes that two of the three contested statements have been made by Eli Lilly representatives.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n6 Eli Lilly emphasized at the hearing that the nearly 600 offending call notes cited by Zeneca are purportedly just a small portion of the 1.8 million total call note entries concerning Evista compiled since January 1998. The only relevant period, however, is from October 1998 forward, since that is when Zeneca entered the breast cancer risk reduction market. In any event, that Zeneca did not offer more entries does not mean that Eli Lilly representatives did not make these false claims on other occasions. In light of the detail scripts the representatives are required to follow, the testimony of Eli Lilly's executives, as well as the results of Eli Lilly's market research (described in more detail below), these hundreds of entries are appropriately representative

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

of messages conveyed by Eli Lilly representatives on other occasions.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -

[*41]

3. Testimony by Eli Lilly's business executives

39. The entries in the call notes are echoed by the testimony of three Eli Lilly executives: Denice Torres, Eli Lilly's Evista Brand leader; Newt Crenshaw, Eli Lilly's Vice President of Sales and Operations; and Garry Nicholson, Eli Lilly's Director of Oncology Business. The testimony of these executives supports the contention of Zeneca and Barr that two of the three alleged statements are being made and supports Eli Lilly's position that sales representatives have not been telling physicians that Evista has been approved or indicated by the FDA for reduction of the risk of breast cancer.

40. First, Ms. Torres testified that the "key breast cancer message" that Eli Lilly representatives should now communicate to physicians in response to unsolicited questions about Evista and breast cancer is that "in studies up to three years, Evista reduces the risk of breast cancer by greater than 50 percent," and that when a physician asks whether Evista reduces the risk of breast cancer, the representative should respond that "the data have shown and studies have shown that Evista reduces the incidence of breast cancer greater than[*42] 50 percent." Tr. at 863 (Torres). She also testified that the representatives are not directed to disclose any of the potential flaws in the MORE study or any other drawbacks which might bear on this conclusion, except for the fact that Evista is not indicated for breast cancer risk reduction. Tr. at 863-64 (Torres). Ms. Torres noted that responses by representatives to unsolicited questions from physicians are not isolated occurrences, since physicians are constantly asking a whole variety of questions depending on their level of interest. Tr. at 866 (Torres).

41. Ms. Torres likewise testified that if a physician asks what is meant by the phrase on the Evista label--"the effectiveness of Evista in reducing the risk of breast cancer has not yet been established"--an Eli Lilly rep is supposed to respond that "while Evista is not indicated for reduction in the risk of breast cancer there are data that demonstrate that Evista is effective in clinical studies in reducing the risk." Tr. at 216-17 (Torres). She also expressed satisfaction that the messages in question had

been delivered by Eli Lilly representatives and that representatives continued to deliver them even after this litigation[*43] began. Tr. at 216, 874-75 (Torres).

42. Mr. Crenshaw, who is responsible for supervising Eli Lilly's primary care sales representatives, similarly testified that he would not be troubled if an Eli Lilly sales representative told a physician that the MORE data shows that raloxifene is effective in reducing the risk of breast cancer. Tr. at 186-87 (Crenshaw). Moreover, he testified that sales representatives are authorized to present data from the MORE trial without stating that "the effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established." Tr. at 177-78 (Crenshaw).

43. Finally, Mr. Nicholson testified that Eli Lilly at launch developed a program to detail oncologists concerning Evista during the first half of 1998. Tr. at 241-42 (Nicholson). The mere fact that Eli Lilly was detailing Evista to oncologists is itself telling, since Evista is not indicated for breast cancer treatment or prevention. Mr. Nicholson also noted that oncology representatives continue to respond to unsolicited questions from oncologists concerning Evista. Tr. at 262 (Nicholson).

44. Moreover, Mr. Nicholson testified that in their discussions with oncologists, [*44] Eli Lilly's oncology representatives are not prohibited from telling oncologists in response to unsolicited questions, that (i) the MORE study proves that Evista reduces the risk of breast cancer, (ii) Evista's reduction in the incidence of breast cancer is greater than tamoxifen's, (iii) the data on the Evista label demonstrates that Evista reduces the risk of breast cancer, and (iv) physicians may tell their patients that Evista reduces the risk of breast cancer. Tr. at 256-57, 259, 262, 265-66 (Nicholson).

4. Eyewitness testimony

45. Several Zeneca sales representatives and others have observed Eli Lilly sales representatives telling physicians and oncologists that Evista has been proven to prevent or reduce the incidence of breast cancer. For example, one Zeneca district manager testified that he overheard an Eli Lilly representative inform a physician that "the findings [of MORE] were there was a 77 percent reduction in breast cancer" for patients taking Evista. The Eli Lilly representative went on to note that "you're aware of the dangerous side effect profile of Tamoxifen." Tr. at 118 (McLellan). Another Zeneca representative overheard an Eli Lilly representative, [*45] in the presence of an Eli Lilly supervisor, tell a physician that "Evista would reduce the incidents [sic] of breast cancer." Tr. at 123 (Blair).

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 7 of 30

Page 17

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

46. In addition, one Zeneca representative found an Evista patient brochure in a physician's office with a signed note from the Eli Lilly representative, which stated: "New label change includes the Reduction of Breast Cancer incidence -- by 50%!" Tr. at 131-32 (Tirk) & Pl.'s Exh. 7 (emphasis in original). And a registered nurse working in the office of a well-known oncologist testified that an Eli Lilly representative told the nurse and the doctor that the MORE data which was soon to be released would "prove that the effectiveness of Evista had been established in breast cancer patients." Tr. at 272 (Landes). The doctor later told the nurse that she heard "[didn't] like the way [Evista] was presented to us and I think that has been misleading." Tr. at 278 (Landes).

47. Finally, one Zeneca representative testified that last October in a doctor's office, and again at a physicians' conference in late March 1999--after this lawsuit had been filed--he observed Eli Lilly representatives repeatedly refer to clinical materials[*46] to convey the message that Evista has been shown to reduce the risk of breast cancer in women by 50 percent or greater. Tr. at 105-09, 110-11 (Centers).

    5. Eli Lilly's market research

48. Market research commissioned by Eli Lilly likewise confirms that its representatives have been telling physicians that Evista has been proven to reduce the risk of breast cancer. As noted above, Eli Lilly's president acknowledged that, if the representatives were making breast cancer prevention claims, "you would expect" that fact to be reflected in the company's market research. Pl.'s Exh. 2; see also Tr. at 169 (Crenshaw).

49. According to the last Richard Day survey conducted in late November and early December 1998, physicians who were detailed by Eli Lilly representatives reported having received the following "main messages" based on their recent detail visit from an Evista sales representative:

. "prevention of breast cancer and osteoporosis"

. "decrease of breast cancer risk"

. "prevent breast cancer"

. "lowers risk of breast cancer"

. "shown to decrease risk of breast cancer"

. "Osteoporosis prevention and breasxt [sic] cancer prevention"

.[*47] "Decreases breast cancer"

. "Very effective prevention of breast cancer"

. "it reduces breast cancer risk"

. "new data has come to show it is effective in fighting breast cancer"

. "new indication of the reduction of bc"

. "the three-year study that's out now from the FDA that says that Evista lowers the risk of breast cancer"; and

. "its [sic] shown to reduce the risk of breast cancer by 50 percent."

Pl.'s Exhs. 63 & 65; Tr. at 522, 524, 528-30 (Ross). Significantly, both the Project Manager for Richard Day and Eli Lilly's executives testified that they were satisfied with the methodology used by Richard Day and believed that the results were reliable. Tr. at 235-36 (Harenberg); Tr. at 526-27, 535 (Ross).

    6. Eli Lilly's arguments with respect to two of the three claims

50. At trial, Eli Lilly did not meaningfully dispute that its sales representatives are making the claim that it has been established that Evista reduces the risk of breast cancer. In fact, counsel for Eli Lilly appeared to agree that Eli Lilly sales representatives have been making that claim. (Tr. dated June 24, 1999 at 69, 74.) Instead, Eli Lilly contended that it[*48] is not making claims that Evista has been proven equivalent or superior to tamoxifen for reduction of risk of breast cancer or that Evista is approved by the FDA for the reduction of the risk of breast cancer. With respect to the claim that it has been established that Evista reduces the risk of breast cancer, Eli Lilly contended that, despite the contrary language in the Evista label, the statement is not literally false.

51. At trial, Eli Lilly attempted to undercut the accuracy of the call notes by relying on declarations from doctors who were detailed by certain of its representatives. The Court has considered these affidavits in light of the fact, as explained above, that the strict rules of evidence do not apply on a motion for a preliminary injunction. Nevertheless, the affidavits do not seriously compromise the persuasive evidence that two of the three contested statements are being made. That these statements are being made is supported by numerous sources in addition to the call notes themselves. Moreover, under the circumstances of this case, in which Zeneca challenges oral statements by Eli Lilly sales representatives, memory and credibility are critical. The absence [*49]of any

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 8 of 30

Page 18

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

opportunity for cross-examination renders these out-of-court statements of limited value. Eli Lilly had the opportunity to introduce the depositions of any of these doctors but did not. It is unlikely that a doctor would be able to recall what a particular sales representative did or did not say in a two or three minute conversation that took place several months ago. The affidavits do not purport to recount all of the relevant details of what was said in the conversations. Def.'s Exhs. T-4 through R-5. Under the circumstances, the contemporaneous call notes themselves, which fall under the well-recognized business records exception to the hearsay rule, are more persuasive evidence of what was said.

52. It is also significant that Eli Lilly has not made any representation that it will not make at least the claim that it has been established that Evista reduces the risk of breast cancer, nor has it undertaken to instruct its representatives not to make that statement. Indeed, Eli Lilly maintains that its representatives are authorized to state that it has been established that Evista reduces the risk of breast cancer.

53. In sum, for purposes of this preliminary injunction[*50] motion, Zeneca has met its burden of proving that Eli Lilly representatives are communicating the claims that Evista has been proven to reduce the risk of breast cancer and that Evista is comparable or superior to tamoxifen in reducing the risk of breast cancer.

E. Eli Lilly's claims about Evista are false

54. Eli Lilly's witnesses acknowledge that Evista is not indicated by the FDA for the reduction of the risk of breast cancer, Tr. at 199-200 (Crenshaw); Tr. at 265 (Nicholson), and thus that if its representatives are making that claim, it is false. However, the Court has found that there is insufficient evidence that Eli Lilly's representatives are making such a claim. Eli Lilly also concedes that Evista has not been tested against, much less proven comparable or superior to, tamoxifen. Tr. at 180, 208-09 (Crenshaw); Tr. at 740, 771, 786 (Cummings). That claim, too, is false and the evidence indicates that Eli Lilly's representatives are making that claim.

55. With respect to the remaining claim, Eli Lilly contended at the hearing that Evista has been proven to reduce the risk of breast cancer. As set forth below, however, the FDA, as well as numerous other experts in[*51] the field of clinical oncology, have reviewed the relevant data and reached the nearly unanimous conclusion that, while Eli Lilly's data is promising, it does not prove that Evista reduces the incidence of breast cancer. Given the state of the evidence, and particularly in view of the highly regulated nature of drugs and their

indicated uses, at this time there is not sufficient evidence to conclude that raloxifene has been proven to reduce the risk of breast cancer. Thus the claim that raloxifene has been proven to reduce the risk of breast cancer is a false claim in light of current scientific evidence.

1. The conclusions of the FDA

56. By statute, the FDA is the agency that is responsible for determining the safety and efficacy of prescription drugs in this country. See 21 U.S.C. § 393(b). The parties' experts and other witnesses testified, and the Court finds, that the FDA is a recognized authority and has expertise in assessing the results of clinical drug tests. Tr. at 372 (Lewis); Tr. at 427-29 (Carlson); Tr. at 740-41 (Cummings); Tr. at 1102 (Dere); Lippman Dep. Tr. at 84.

57. The FDA has reviewed all the breast cancer data from the[*52] MORE trial and has met with Eli Lilly's study investigators and scientists in response to Eli Lilly's request that the FDA evaluate whether the MORE data proves that Evista reduces the risk of breast cancer and would support such an indication for Evista. Based on its review, the FDA has repeatedly determined and communicated to Eli Lilly in Meeting Minutes that the MORE study does not and cannot prove that Evista reduces the risk of breast cancer. The Court finds the FDA's conclusions and reasoning highly persuasive.

58. One of the basic flaws cited by the FDA concerning Evista and breast cancer prevention is that the MORE study was intended as an osteoporosis study, not a breast cancer trial. To that end, the "primary objective[ ]" set forth in the MORE study protocol was "to establish the effects of long-term treatment . . . with raloxifene . . . on the rate of new vertebral fractures in osteoporotic postmenopausal women . . . ." Def.'s Exh. P (Protocol H3S-MC-GGGK(e) [MORE study protocol]) at EV 013 837. Among the last of many secondary endpoints, the protocol instructed the investigators to gather data on the "risks of breast and endometrial cancer." Id. But the sole[*53] purpose of gathering this data was to find out whether long-term use of Evista was safe in the breast and would not increase a woman's risk of developing breast cancer. Tr. at 411-14 (Carlson); Tr. at 618-19, 622-25, 722-23, 728-29 (Cummings). The protocol was not designed, nor was the study intended, to determine if Evista would be efficacious in reducing the risk of breast cancer.

59. Women were not selected for the MORE study based on their risk of developing breast cancer, nor were they randomized between the raloxifene and the placebo arms of the MORE study based on breast cancer risk factors. Tr. at 730 (Cummings); Tr. at 1146-47 (Scott).

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 9 of 30

Page 19

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

60. Months before the Evista launch, Eli Lilly itself anticipated this point and acknowledged the danger of relying on the MORE data to support a breast cancer risk reduction claim. For example, Eli Lilly's internal instructions to its oncology representatives concerning Evista declared:

Evista was not associated with an increased risk for breast cancer. . . . However, it is premature to draw conclusions about Evista as a cancer preventive agent. To do so would be a disservice to the millions of women who fear the disease. [*54]

Pl.'s Exh. 26 at EV 2446 40. Eli Lilly's Director of Oncology Business, Mr. Nicholson, testified that this statement is equally true today. Tr. at 250-51 (Nicholson).

61. The FDA's decision to allow Eli Lilly to include the interim data from MORE in the safety section of Evista's label does not, as Eli Lilly contends, demonstrate the FDA's acceptance of the MORE study as proof that Evista reduces the risk of breast cancer. In August 1997, in response to Eli Lilly's first such inquiry, the FDA advised Eli Lilly that the MORE data did not and probably never would support a breast cancer efficacy claim:

The data provided appear to be grossly insufficient to support a claim that raloxifene reduces breast cancer risk. Despite the summary nature of the information provided, it is unlikely that more information will improve the acceptability of the methodology or the credibility of the data used by the sponsor to conclude that raloxifene reduces the risk for breast cancer.

Pl.'s Exh. 38 (FDA Document--Center for Drug Evaluation and Research Approval Package--Evista, Medical Officer Consult dated Aug. 6, 1997) at EV 413 411. Among other criticisms, the FDA reviewer[*55] noted that the study lacked proper controls and that to support this claim Eli Lilly would need to develop a protocol in which "breast cancer incidence is a primary endpoint." Id.

62. In the fall of 1997, the FDA told Eli Lilly that "it is not acceptable to include language in the label that 'there was a statistically significant reduction in the frequency of newly diagnosed breast cancer in raloxifene-treated women compared to placebo'" because "acceptance of this claim would effectively provide [Eli Lilly] with a second indication for raloxifene. . . ." Pl.'s Exh. 40 (Breast Cancer Statement from FDA) at EV 651 1055; see also Pl.'s Exh. 38. Later, in March of 1998, the FDA indicated that Eli Lilly could apply for a label change to

reflect the interim data from the MORE trial. In doing so, however, the FDA's reviewer reiterated "there are questions about the reliability of the [MORE] data"; that "it is expected that it will not be possible to retrospectively obtain sufficient information to justify a claim related to breast cancer prevention"; and that if Eli Lilly were to reference the MORE study, the label would have to state that "the effectiveness of raloxifene[*56] in reducing breast cancer has not been established." Pl.'s Exh. 41 (Medical Officer Review of Raloxifene Adjudication Data dated Mar. 2, 1998) at EV 415 2059.

63. In December 1998, the FDA approved a change in the safety section of Evista's label which allowed Eli Lilly to refer to the MORE breast cancer data as part of Evista's safety profile. In approving this limited change, however, the FDA again made clear that Eli Lilly could not use the MORE data to suggest that Evista has been shown to reduce the risk of breast cancer or that the drug has been approved for that purpose. Thus, Eli Lilly was able to report on the label the combined interim data from MORE and its other osteoporosis trials as follows:

Independent review has determined that ... cases (raloxifene and placebo combined) represented newly-diagnosed invasive breast cancer. Among 7017 women randomized to raloxifene, there were 6 cases of invasive breast cancer per 14,605 person-years of follow-up (0.41 per 1000). Among 3368 women randomized to placebo there were 10 cases of invasive breast cancer per 6991 person-years of follow-up (1.43 per 1000).

But to warn physicians that this data was safety information[*57] only, the FDA required Eli Lilly to state expressly in the label that "the effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established." Def.'s Exh. H at 8.

64. After the label change, in January 1999, Eli Lilly representatives attended a meeting at the FDA in an attempt to persuade the FDA's Oncology Division that more recent breast cancer data from the MORE trial--a total of 27 cases of invasive breast cancer on placebo and a total of 13 cases on raloxifene--proved that Evista reduces the risk of breast cancer and would support a contemplated supplemental new drug application ("sNDA") for an indication for the reduction of the risk of breast cancer. Prior to the meeting, Eli Lilly posed the following question to the FDA: "We believe the data presented in this briefing document provide compelling evidence that raloxifene reduces the incidence of breast cancer in post-menopausal women with osteoporosis. . . . Does the Agency concur . . .?" The FDA responded as follows:

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 10 of 30

Page 20

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

We have concerns about the credibility of the finding (fewer cases on the raloxifene arms compared to the placebo arm). The following issues represent critical problems[*58] in the clinical trial design that probably cannot be addressed retrospectively.

Pl.'s Exh. 45 (Meeting Minutes for Jan. 28, 1999 Meeting, Questions for Discussion with FDA Response) at EV 2383 55. The FDA then proceeded to identify various flaws in the MORE trial, which went beyond the fact that "breast cancer incidence was not prospectively defined as an endpoint." See id. at EV 2383 55-57.

65. Based on statements made by FDA officials at the January 1999 meeting, Eli Lilly's scientists concluded that "nothing could be done to salvage the MORE Study for a breast cancer indication." Tr. at 956, 959-60 (Eckert); Pl.'s Exh. 46 at EV 2386 1818. Shortly after the FDA issued these findings, Eli Lilly decided to terminate the MORE trial. Tr. at 962 (Eckert); Pl.'s Exh. 46 at EV 386 1818.

66. In response to this termination, the FDA urged Eli Lilly on March 11, 1999 to continue to follow up on the MORE patients, noting that such data "will provide important supportive information in conjunction with the STAR data for a sNDA submission for raloxifene to reduce the incidence of breast cancer." Pl.'s Exh. 46 at EV 2386 1820. Eli Lilly then proposed to the FDA that it would [*59]commence a "new" study called "Continuing Outcomes of Raloxifene" or CORE, using as many of the women enrolled in the MORE study who would agree to participate. Like MORE, CORE will continue to have both a raloxifene and a placebo arm and will last four years. Eli Lilly made substantial changes in the way the trial will be conducted. For example, the incidence of breast cancer is now the primary endpoint of the study; new study participants will be given a GAIL risk assessment; the appropriate statistical analysis for the breast cancer data is set forth in the protocol; and the protocol requires annual breast physical examinations. Tr. at 751-53 (Cummings); Tr. at 938-40, 967-68 (Eckert).

67. Nonetheless, the FDA has since determined that MORE--even when coupled with the CORE extension-- still will not prove that Evista reduces the risk of breast cancer. In early April, Eli Lilly submitted the CORE protocol to the FDA and posed the following question:

We believe that achievement of statistical significance with the stated endpoints in the enclosed proposed draft CORE protocol will confirm, along with the data provided to date from the 3-year MORE protocol, that Evista does [*60]reduce the incidence of invasive breast cancer after long term treatment in postmenopausal

women with osteoporosis. Does the Agency concur with these conclusions?

Pl.'s Exh. 46 at EV 2386 1872. On April 16, 1999 the FDA responded as follows:

No, we do not.
The primary endpoint should be the occurrence of all invasive breast cancer.
Analyses that demonstrate long-term clinically and statistically significant differences between patients treated with raloxifene and placebo in the incidence of breast cancer will provide supportive evidence of efficacy. Data from a prospective randomized trial of raloxifene in which the reduction in the incidence of breast cancer is the primary endpoint will be needed, such as data from the STAR trial.

Pl.'s Exh. 47 (Facsimile from FDA to Eli Lilly dated Apr. 16, 1999) at EV 2736 000003.

68. The FDA recognized that the "CORE study will address some of the problems identified in the MORE study with respect to the breast cancer endpoint, such as poorly documented baseline status, short follow-up, and lack of consistent follow-up." FDA went on to explain, however, that "despite these improvements, it is unlikely that data from[*61] [MORE] and CORE will be sufficient" to support an application for a breast cancer risk reduction indication. Id. at EV 2736 000002. Accordingly, the FDA told Eli Lilly that based solely on the combined data from MORE and CORE, it would not support a new drug application submission even for a limited indication "for the reduction in risk of invasive breast cancer in postmenopausal women with osteoporosis." Id. at EV 2736 000003-04.

69. Representatives of Eli Lilly met again with the FDA on May 11, 1999. In the minutes of that meeting prepared by the FDA, which Eli Lilly received on June 4, 1999, the FDA reiterated that MORE and CORE cannot prove that Evista reduces the incidence of invasive breast cancer in post-menopausal osteoporotic women and told Eli Lilly once again that it would not support an sNDA based solely on the results of those studies. Specifically, Eli Lilly had asked the FDA:

We believe that achievement of statistical significance with the stated endpoints in the enclosed proposed draft CORE protocol will confirm, along with the data provided to date from the 3-year MORE protocol, that Evista does reduce the incidence of invasive breast cancer[*62] after long term treatment in postmenopausal women with osteoporosis. Does the Agency concur with these conclusions?

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 11 of 30

Page 21
1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

The FDA responded, consistent with its response on every previous occasion: "No, we do not." Def.'s Exh. K-9 (May 11, 1999 Meeting Minutes) at 3.

70. The FDA suggested several alternatives for Eli Lilly to consider, involving various combinations of MORE/CORE, the STAR trial and an Eli Lilly trial called RUTH, which is currently proposed to determine the cardiovascular effects of raloxifene. Alternatively, if Eli Lilly decided to pursue a "limited indication" for the reduction of the incidence of invasive breast cancer in postmenopausal women, "it is possible that MORE/CORE plus RUTH will be sufficient to demonstrate a reduction in the incidence of invasive breast cancer" but the FDA suggested that Eli Lilly add breast cancer risk reduction as a primary or co-primary endpoint of the RUTH trial. Def.'s Exh. K-9 at EV 2736 000367; Tr. at 979-81 (Eckert). Thus, the FDA has made clear that MORE--even when coupled with the CORE extension--will not suffice as a basis for proving the efficacy of raloxifene in the reduction of risk of breast cancer.

71. None[*63] of the Evista trials Eli Lilly plans to conduct or participate in will be completed in the near future. CORE is supposed to last four years. RUTH is expected to last five years. Enrollment in STAR began just last month and the study will not be completed for at least five years. Tr. at 761 (Cummings); Tr. at 982 (Eckert). Thus, while the MORE results may be promising, it has not yet been shown to be sufficient proof that Evista reduces the risk of breast cancer.

3. Other experts have agreed that MORE does not prove that Evista reduces the risk of breast cancer

72. There is other support for the conclusion that it is premature to find that raloxifene reduces the risk of breast cancer.

73. During the testimony of the experts on both sides in this case, it became clear that the issue of whether the MORE trial has proven the efficacy of raloxifene in reducing the risk of breast cancer has been considered by several well-respected third-party organizations in the field of clinical oncology. Experts on both sides acknowledged that these organizations have determined that it is premature to conclude that Evista reduces the risk of breast cancer. Tr. at 331-34 (Lewis); Tr. at[*64] 430-41 (Carlson); Tr. at 668, 702-07 (Cummings).

74. In May of this year, a special committee of the American Society of Clinical Oncology ("ASCO"), issued a report based on its assessment of the propriety of using tamoxifen or raloxifene for reducing the risk of breast cancer. The Committee, comprised of leading experts in several fields, analyzed all research conducted on tamoxifen and raloxifene from 1990 through 1998. In response to the question, "Is there strong or credible evidence to conclude that raloxifene will reduce the risk of developing breast cancer" the Committee responded "it is premature to recommend raloxifene use to lower the risk of developing breast cancer outside of the clinical trial setting." Tr. at 430-33 (Carlson); Tr. at 668, 702 (Cummings).

75. Significantly, both parties' experts have testified that ASCO is the premier clinical oncology organization in the world. They also agreed that the conclusions of the ASCO committee, like any other ASCO publication, are entitled to great weight. Tr. at 292-93 (Lewis); Tr. at 394-95 (Carlson); Tr. at 705-07 (Cummings); Tr. at 1105 (Dere); Lippman Dep. Tr. at 85-87.

76. Similarly, a committee of the National[*65] Comprehensive Cancer Network ("NCCN"), a prestigious consortium of major cancer centers throughout the United States, has recently prepared a draft of breast cancer prevention guidelines. The draft guidelines conclude that "insufficient data are available to make definitive statements regarding the benefit or toxicity of raloxifene." Tr. at 434-35 (Carlson). The parties' experts agree that, like ASCO, NCCN is an expert body in the field of clinical oncology and that its guidelines are authoritative in the field. Tr. at 395-97 (Carlson); Lippman Dep. Tr. at 83-84.

77. At trial, Eli Lilly attempted to downplay the significance of the ASCO and NCCN guidelines--even though Eli Lilly's expert Dr. Steven Cummings served as a member of the ASCO Committee for a period of time, Tr. at 693-94, 697, 701 (Cummings)--because the organizations purportedly did not have the full data from the MORE study, which ran to a median of 40 months, or the recently published article in JAMA, written by doctors and other experts affiliated with the MORE study, which concluded that Evista reduces the risk of breast cancer in postmenopausal osteoporotic women after 40 months of treatment. However, there is[*66] no dispute that ASCO and NCCN had data through 33 months from the MORE study, Tr. at 708-09 (Cummings), a significant amount of data. In addition, the ASCO report made clear that the grounds for its conclusion were that "this study was designed as an osteoporosis trial; breast cancer risk was not specifically addressed at entry; nor was breast cancer development a primary outcome measure." The Committee also noted that the MORE finding was based on a small number of events. Tr. at 709 (Cummings). These deficiencies are not cured by an additional seven months of MORE data or by the publication of the JAMA article.

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 12 of 30

Page 22

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

78. As for the NCCN, the expert who testified on behalf of Zeneca, Dr. Robert Carlson, is the Chairman of the Committee charged with drafting those guidelines. As set forth below, he is of the firm conclusion, even after having reviewed the 40-month data and the JAMA article, that raloxifene has not been proven to reduce the risk of breast cancer.

79. As indicated by the experts' testimony, two other organizations, the NCI and the NSABP--which are jointly sponsoring the upcoming STAR trial--have likewise made clear that the efficacy of raloxifene in reducing the[*67] risk of breast cancer has not yet been proven. In the model consent form for the STAR study, which was prepared by scientists and about which both Zeneca and Eli Lilly had the opportunity to comment, participants in STAR are advised that the very purpose of the study is to try to find an answer to the following three questions:

. "Is raloxifene, also known by the trade name Evista, effective in reducing the incidence of breast cancer in women who are at increased risk for developing breast cancer?"

. "If it is effective, how does raloxifene compare to tamoxifen, also known as Nolvadex, in reducing the incidence of breast cancer?" and

. "How do the side effects (good and bad) of raloxifene and tamoxifen compare?"

Tr. at 324-27, 331-34, 357 (Lewis); 436-38 (Carlson); Pl.'s Exh. 34 (NSABP Protocol P-2, Study of Tamoxifen and Raloxifene (STAR) for the Prevention of Breast Cancer) at 51. The model consent form also clearly states that "the FDA and the [Canadian Health Protection Branch] consider the use of raloxifene for reducing the risk of breast cancer to be experimental at this time." Pl.'s Exh. 34 at 51 (emphasis added); Tr. at 333-34 (Lewis).

80. [*68] The Court was also persuaded by the testimony of two expert oncologists and one biostatistician offered by Zeneca. These witnesses--whom the Court finds to be both qualified and credible--cited numerous persuasive reasons why the data from the MORE trial, though encouraging, do not prove that Evista reduces the risk of breast cancer.

81. Dr. Robert Carlson is a professor of medicine and oncologist at Stanford University with extensive experience and expertise in the area of breast cancer treatment and research as well as the conduct and design of clinical trials. He was a principal investigator for the BCPT and is one of the investigators for the STAR trial. Tr. at 389-93 (Carlson). Having reviewed all of Eli

Lilly's breast cancer data, including the results of the nine other osteoporosis studies conducted for Eli Lilly, Dr. Carlson testified that "the data is insufficient to conclude definitively that raloxifene decreases the incidence of breast cancer." Tr. at 398-402 (Carlson).

82. Dr. Carlson noted, first, the inconsistencies between the MORE results and those in the other nine Eli Lilly raloxifene trials. Dr. Carlson concluded that if the MORE findings had truly established[*69] that Evista reduces the risk of breast cancer to the degree claimed by Eli Lilly, one would have expected at least a trend in the same direction, if not a statistically significant difference, in the nine pooled studies of some 3,000 patients. No such trend is evident in the data. Tr. at 402-11 (Carlson).

83. With respect to the MORE study itself, Dr. Carlson identified several flaws, both in the design of the protocol and the analysis of the data. These flaws include the fact that MORE was designed primarily as an osteoporosis study and breast cancer appeared among several other safety-related issues in the seventh secondary endpoint of the study. In addition, the MORE protocol did not articulate a prospectively defined method for collecting and analyzing the breast cancer data in particular. Tr. at 411-14, 452-54 (Carlson). As Eli Lilly acknowledged, the statistical analysis contained in the MORE protocol was a general one specified for all of the safety endpoints in the trial. Tr. at 733 (Cummings); Tr. at 937, 941 (Eckert).

84. Dr. Carlson also explained that in a properly designed breast cancer trial such as the BCPT or STAR, it is crucial to recruit patients with a[*70] high risk of breast cancer to ensure a sufficient number of overall breast cancer events. Without an adequate number of cases, he opined, one cannot rule out the possibility that the results are due to chance. To that end, Dr. Carlson observed that a properly designed breast cancer study should assess patients for breast cancer risk prior to entry in the study using the GAIL risk assessment model, and patients should be equally randomized between the two arms of the study with respect to the full array of breast cancer risk factors. MORE failed to follow this procedure. Tr. at 415-19, 455-57, 467-68 (Carlson).

85. Dr. Carlson also identified diagnostic flaws in the protocol that cast doubt on the MORE breast cancer results. Tr. at 650-51, 732 (Cummings); see also Tr. at 111-22 (Dere). Finally, Dr. Carlson observed that women in the MORE study were permitted to take estrogen, which many believe increases the risk of breast cancer and may thus have confounded the results. Tr. at 419-27 (Carlson).

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

86. Dr. Jerry Lewis, formerly Chief of the Hematology and Oncology Division at the University of California, Davis, and now Zeneca's Senior Medical Director for Oncology, also[*71] testified. Dr. Lewis has taught and practiced in the area of clinical oncology and also has extensive experience in the design and analysis of clinical drug trials. Tr. at 290-95 (Lewis); Pl.'s Exh. 77.

87. Dr. Lewis testified convincingly to the same list of criticisms as Dr. Carlson. Tr. at 334-46 (Lewis). He specifically noted that the study population in the MORE trial were women with osteoporosis, who tend to be at low risk for breast cancer. Tr. at 337-38 (Lewis). He also opined that Evista has "not been proven to be efficacious in reducing the incidence of breast cancer." Tr. at 328 (Lewis).

88. Finally, Zeneca offered the expert testimony of Dr. Mark Scott, a biostatistician with extensive experience in the design and analysis of clinical drug trials. Dr. Scott responded to Eli Lilly's argument that the many flaws in the MORE trial may be overlooked because the breast cancer results in MORE were statistically significant at a level of p = .000005. A p value of less than .05 typically is required for a finding of statistical significance in a clinical trial. n7

- - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n7 Under typical circumstances, where the variable in question is the primary endpoint of the study, a p value of .05 means that the odds are one in 20 that the result in question is due to chance. On its face, a p value of .000005 means that the odds are five in one million that the results in question are due to chance.

- - - - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - -

[*72]

89. Dr. Scott explained that because breast cancer risk reduction was not the primary endpoint of the MORE trial, and there was no pre-specified statistical plan for analyzing breast cancer data, it is inappropriate to use a p value of .05 as a benchmark to assess the statistical significance of the MORE breast cancer data. Rather, to ensure that the results in question were not due to chance, Dr. Scott opined that the appropriate p value should be adjusted to take into account the fact that breast cancer risk reduction was a secondary endpoint and just one of

hundreds of statistical tests performed in the MORE trial. Tr. at 1143-45 (Scott).

90. Dr. Scott made that adjustment, using the well-established formula, acknowledged by Eli Lilly's witnesses, Tr. at 645 (Cummings), of dividing the p value of .05 by the number of tests conducted. According to the lead MORE investigator, Eli Lilly's expert Dr. Steven Cummings, 400 safety tests alone were conducted in MORE. Tr. at 646 (Cummings). Using that number, which did not even take into account the non-safety statistical analyses performed on the MORE data, Dr. Scott concluded that the appropriate p value to determine statistical [*73]significance was .000125. Tr. at 1144-45 (Scott).

91. Although the MORE trial's breast cancer results still achieved statistical significance using that figure, Dr. Scott's testimony illustrated the significance of the fact that the MORE trial had relatively few cases of breast cancer. As previously noted, in MORE there were 40 total cases of invasive breast cancer; this compares with 264 cases in the BCPT. Tr. at 322-23 (Lewis). Dr. Scott explained that, given the low number of overall breast cancer cases reported to date in the MORE trial, the addition of only five more cases on the raloxifene arm of the study--without a corresponding increase on the placebo arm--would render the result on which Eli Lilly now relies statistically insignificant. Tr. at 1147 (Scott). Dr. Scott testified to a number of hypothetical scenarios under which those five additional cancers on the raloxifene arm could occur. Tr. at 1146-48 (Scott).

92. Dr. Scott's conclusion is that the MORE data "are intriguing but they are not the stuff of proof." Tr. at 1167 (Scott).

93. Under these circumstances, the Court credits Dr. Scott's testimony that, because of the large number of analyses performed[*74] by Eli Lilly on the MORE data and the small overall number of breast cancer cases observed in the trial, the p value in the MORE study is insufficient to show that the MORE study proves that raloxifene reduces the risk of breast cancer.

F. Eli Lilly's rebuttal

94. Eli Lilly maintains that Evista has been proven to reduce the risk of breast cancer. In support of its position, Eli Lilly cites (i) its own interpretation of what the FDA has communicated to Eli Lilly with respect to the MORE data, (ii) the testimony of three witnesses, all of whom are involved with the MORE study, and (iii) the peer-reviewed article about the MORE results recently published in JAMA. As set forth below, these materials fail to rebut Zeneca's showing on the merits.

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

1. The dialogue between Eli Lilly and FDA

95. First, Eli Lilly maintains that the FDA has declined to approve a breast cancer risk reduction claim on the basis of the MORE data not because it considered the MORE study to be flawed, but merely because the FDA requires two well-controlled clinical trials before approving a drug as safe and effective. In light of the FDA correspondence described above, Eli Lilly's position is not tenable. [*75] The approval of a risk reduction indication for tamoxifen on the basis of the BCPT and supporting evidence makes clear that FDA will approve drugs on the basis of one large-scale clinical study with supporting evidence. Tr. at 315-16 (Lewis); Tr. at 1151 (Scott). Indeed, Congress has made clear, and the FDA has acknowledged, that the FDA may base a finding of efficacy on one adequate and well-controlled clinical investigation along with confirmatory evidence. See *21 U.S.C. § 355*(d); see also Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products ("Guidance for Industry"), U.S. Dep't of Health & Human Services, Food & Drug Administration, May 1998, at 12-13.

96. Eli Lilly also contends that the statement the FDA required it to put on the label--"the effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established"--is FDA's way of communicating that Evista has been proven efficacious but is not yet indicated for breast cancer risk reduction. Tr. at 216, 850 (Torres); Tr. at 917 (Eckert); 1004-05 (Harenberg). This argument ignores the plain meaning of the word "established" [*76] and is also at odds with some of the testimony of Eli Lilly's own witnesses. For example, Dr. Cummings conceded that the statement means, at a minimum, that the efficacy of Evista in reducing the risk of breast cancer has not yet been proven to the satisfaction of the FDA. Tr. at 631-32, 638-39 (Cummings). Moreover, Eli Lilly's interpretation is contrary to the plain meaning of the FDA documents. Eli Lilly's witnesses simply disagree with the FDA or with the statement. Lippman Dep. Tr. at 158; Tr. at 1097-98 (Dere). n8

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - - -

n8 One Eli Lilly executive, who has attended meetings of Eli Lilly's Raloxifene Advisory Board, which is composed of Eli Lilly and non-Eli Lilly scientists, conceded at his deposition that he understood Eli Lilly cannot make a breast cancer risk reduction claim for the drug because "it's not a proven claim." Tr. at 238 (Harenberg). The executive's attempts at trial to explain away his prior deposition testimony were unconvincing, especially since he agreed at trial that Eli Lilly cannot make claims that Evista prevents breast cancer. Tr. at 1004-08 (Harenberg).

- - - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - -

[*77]

97. Eli Lilly also suggests that the dialogue with the FDA is still ongoing and that the findings and opinions set forth in the January 1999 minutes with respect to MORE, and the May 1999 minutes with respect to MORE and CORE, do not reflect the agency's last word on the subject or are an incorrect recitation of the FDA's position. This argument is contradicted by the FDA's repeated statements over a two-year period. And whether or not the dialogue is ongoing, the FDA has made abundantly clear that MORE--either alone or in conjunction with CORE--does not and cannot prove that Evista reduces the risk of breast cancer. That is why Evista's label states that the effectiveness of Evista in reducing the risk of breast cancer has not yet been established and why the FDA will require Eli Lilly to rely on data generated by STAR, RUTH, or both in any application for a breast cancer risk reduction indication for Evista.

2. Eli Lilly's expert witnesses

98. Eli Lilly also offered the testimony of three distinguished experts, all of whom, however, are directly associated with the MORE study and have an interest in demonstrating its scientific significance: Dr. Marc Lippman, head of[*78] the Lombardi Cancer Center at Georgetown University, Dr. Steven Cummings, Professor of Epidemiology and Biostatistics at the University of California, San Francisco, and Dr. Steven Eckert, an Eli Lilly statistician. Their testimony supports the promising nature of the MORE data with respect to breast cancer risk reduction. However, their testimony is insufficient to persuade the Court that Evista has been proven to reduce the risk of breast cancer.

99. Dr. Lippman is a distinguished oncologist who is a member of Eli Lilly's Oncology Advisory Board, a member of the breast cancer adjudication committee for the MORE study, and a co-author of the recently published JAMA article concerning raloxifene and breast cancer. Lippman Dep. Tr. at 13, 51-52, 54-56; Tr. at 1106-07 (Dere).

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 15 of 30

Page 25

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

100. Dr. Lippman opined only that a median of 40 months of treatment with raloxifene reduces the risk of newly diagnosed breast cancer in postmenopausal women with osteoporosis--a much narrower statement than the blanket risk reduction claim that has been made by Eli Lilly sales representatives and that Zeneca seeks to enjoin. Dr. Lippman conceded that, based on the existing data and given the patient[*79] population in the MORE study, one cannot draw the same conclusion with respect to the female population at large. Lippman Dep. Tr. at 74, 76-79. Notably, this testimony was confirmed by Eli Lilly's Dr. Will Dere, who acknowledged that the statement "Evista offers proven reduction of breast cancer" without any qualifiers "would not be right as a single sentence for Eli Lilly to state that." Tr. at 1108-09 (Dere). Dr. Dere also agreed that it would be an "overstatement" to say that Evista decreases breast cancer by 70 percent, without any qualifiers. Tr. at 1109-10 (Dere).

101. Dr. Lippman also candidly acknowledged that although he is convinced that the MORE data is accurate and proves to a reasonable degree of medical certainty that raloxifene reduces the risk of breast cancer among postmenopausal osteoporotic women, other physicians could look at the data from the MORE study and conclude that the data are not sufficient to prove that raloxifene reduces the risk of breast cancer. Lippman Dep. Tr. at 62-63, 168-72. As Dr. Lippman explained:

I believe that it is perfectly appropriate, as happens every single day in the verification of new agents, that some physicians become[*80] convinced of something before others do. . . . I think that right-minded physicians based on data can come to conclusions at a different rate. And I would not--this is important to me. I would not dispute that another physician could look at these data and say they are interesting, but I am not persuaded yet. I would not myself change my practice. I think that's absolutely the way medicine changes over time.

Lippman Dep. Tr. at 62-63.

102. Dr. Cummings is the primary investigator for the MORE trial, as well as a member of Eli Lilly's Raloxifene Advisory Board. Tr. at 598, 682-84, 690-92 (Cummings).

103. Dr. Cummings opined that raloxifene reduces the incidence of breast cancer only in postmenopausal women, a narrower claim than that at issue here. Tr. at 712-13. Dr. Cummings' testimony also indicated that the participants in the MORE study may have been at lower risk for breast cancer than the participants in the BCPT

trial based on the relative bone density of the two groups. Tr. at 720-21, 739 (Cummings).

104. While Dr. Cummings was plainly convinced of the significance of the results of the MORE study as it relates to the reduction of the risk of breast cancer, [*81] he is interested in that conclusion and his views are not shared by the FDA or other disinterested organizations.

105. Eli Lilly also relied on the testimony of Dr. Stephen Eckert, a senior Eli Lilly statistician, who opined that Evista "has clearly been statistically proven in the MORE trial to reduce the incidence of breast cancer." Tr. at 932 (Eckert). He agreed, however, that, given the small number of breast cancer events in the study, a small shift in the number of cases would have an enormous impact on the p value and could undercut the statistical significance of the interim results. Tr. at 975-76 (Eckert).

### 3. The JAMA article

106. Finally, Eli Lilly relies heavily on the fact that a peer-reviewed article concerning the MORE study breast cancer results was published in the June 16, 1999 issue of JAMA. The JAMA article, which is co-authored by Drs. Cummings, Eckert, and Lippman, among others, sets forth the authors' narrow conclusion that "a median of 40 months of treatment with raloxifene decreases the risk of newly diagnosed breast cancer in postmenopausal women who have osteoporosis and who have no prior history of breast cancer." Tr. at 712 (Cummings); Def. [*82]'s Exh. L-9 at 2196. Again, this is a narrower claim than the blanket statement being made by Eli Lilly sales representatives.

107. The article does not state that raloxifene has been or even may be proven to reduce the risk of breast cancer in any other segment of the female population. Nor does it definitively conclude that Evista has been proven to reduce the risk of breast cancer in the population that was tested. To the contrary, the authors concede that there is no data that confirms whether the existing results will continue to be seen and that "the MORE trial is continuing to assess the effectiveness and safety of longer term use of raloxifene" in postmenopausal osteoporotic women. Def.'s Exh. L-9 at 2196; Tr. at 664 (Cummings); Lippman Dep. Tr. at 66-67, 75.

108. Given Eli Lilly's reliance on this publication, there was extensive testimony about the significance of the peer review process and whether that process, in and of itself, signifies some form of scientific "proof." It is plain that it does not. Both parties' experts explained that peer reviewers as a rule are given only the manuscript of the article and nothing else. Eli Lilly's own experts conceded that[*83] this was true in the case of the JAMA article.

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 16 of 30

Page 26

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

Tr. at 393-94 (Carlson); Tr. at 765 (Cummings); Lippman Dep. Tr. at 79-81.

109. The peer reviewers at JAMA were not given the MORE protocol and thus were not in a position to assess the flaws in the MORE study design as a breast cancer trial. Nor were they given the results of the nine other Evista trials which failed to demonstrate that Evista reduces the risk of breast cancer. Finally, the peer reviewers were not given the FDA's comments concerning the inadequacies of the MORE results. Tr. at 765-66 (Cummings); Tr. at 990-91 (Eckert).

110. In any event, the mere fact of publication of a peer-reviewed article does not prove that the claim in question is true. Indeed, the FDA has stated that "there are . . . reasons to be skeptical of the conclusions of published reports of studies. Experience has shown that such study reports do not always contain a complete, or entirely accurate, representation of study plans, conduct and outcomes. . . . Incompleteness, lack of clarity, unmentioned deviation from prospectively planned analyses, or an inadequate description of how critical endpoint judgments or assessments were made are common[*84] flaws. Typically, journal article peer reviewers only have access to a limited data set and analyses, do not see the original protocol and amendments, may not know what happened to study subjects that investigators determined to be non-evaluable, and thus may lack sufficient information to detect critical omissions and problems." Guidance for Industry at 17.

111. In sum, though the MORE data are promising and may in the future be proven to measure accurately the efficacy of raloxifene in reducing the incidence of breast cancer in some segment of the population, Evista has not yet been proven to reduce the risk of breast cancer. Based on all of the evidence, the two claims that Eli Lilly has been making for Evista--that it has been established that Evista reduces the risk of breast cancer and that Evista has been proven comparable or superior to tamoxifen for reduction of the risk of breast cancer--are literally false.

G. The harm to Zeneca, Barr, and the public

112. Zeneca's witnesses testified to the substantial negative impact of Eli Lilly's actions on Zeneca. Ms. Anson testified credibly that "Zeneca has invested an enormous amount in tamoxifen over the last 20 years[*85] in research and development," and that this investment has been jeopardized by Eli Lilly, as has Zeneca's reputation and goodwill with physicians. Tr. at 68 (Anson). Ms. Anson also highlighted the fact that because the breast cancer prevention market is just now

being created by Zeneca, Eli Lilly's actions have had a pernicious effect on Zeneca's launch and the marketplace itself, if not immediately then as a long term matter. Tr. at 100 (Anson). These are, according to the uncontradicted testimony of Ms. Anson, damages that Zeneca cannot quantify. Tr. at 70 (Anson).

113. Market research conducted by Reed/Haldy/McIntosh, a reputable market research firm in the prescription drug field, likewise highlighted the effect of Eli Lilly's actions on Zeneca and Barr, the only two distributors of tamoxifen. The survey concluded that of the physicians surveyed 11 percent of their prescriptions for Evista are being written primarily for breast cancer prevention, as opposed to either for osteoporosis or for osteoporosis plus breast cancer, and that 35 percent of physicians have written at least some of their Evista prescriptions for the primary purpose of breast cancer prevention. Pl.'s Exh. [*86] 72 (Nolvadex Breast Cancer Prevention: Awareness, Trial and Usage Study by Reed/Haldy/McIntosh & Assocs. dated Feb. 15, 1999) at 31, 32; Pl.'s Exh. 80; Tr. at 477-79, 487-89 (McIntosh). This study does not, however, indicate that these prescribing patterns of physicians are the result of statement made by Eli Lilly, although the study is evidence that Evista competes with tamoxifen in the marketplace.

114. With respect to the impact of Eli Lilly's actions on the public at large, Dr. Lewis testified credibly that Eli Lilly's claims pose "a grave public health risk." Tr. at 345 (Lewis). Women at high risk of developing breast cancer may be placed on raloxifene, which has not yet been proven to reduce the risk of breast cancer, instead of on tamoxifen. Indeed, Eli Lilly's own witnesses have conceded that it would be dangerous if physicians relied on inaccurate information about prescription drugs conveyed by sales representatives. Tr. at 546-47 (Nicholson); Tr. at 858-59 (Torres).

II.

CONCLUSIONS OF LAW

1. [HN4] This Court has jurisdiction over this action alleging violations of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), pursuant to 15 U.S.C. § 1 [*87] (a) and 28 U.S.C. §§ 1331 and 1338(a). n9

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - - -

n9 While the complaint asserted claims under the New York common law preventing unfair

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

competition and *New York General Business Law §§ 349* and *350* preventing deceptive trade practices, those claims are not asserted as a basis for preliminary relief.

- - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - -

2. Venue is proper in this District pursuant to *28 U.S.C. § 1391.*

3. [HN5] A party seeking a preliminary injunction bears the burden in Lanham Act cases, as in all others, of demonstrating (1) that it will suffer irreparable harm if the preliminary injunction is denied and (2) either (a) a likelihood of success on the merits, or (b) serious questions going to the merits to make them a fair ground for litigation and a balance of the equities tipping decidedly in the movant's favor. See *Castrol, Inc. v. Quaker State Corp., 977 F.2d 57, 62 (2d Cir. 1992).* Zeneca and Barr have met this standard.

A. Zeneca and Barr are likely to succeed on the merits

1. The governing [*88] Lanham Act standards

4. [HN6] Section 43(a) of the Lanham Act provides a civil remedy to those damaged by one who makes a "false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics [or] qualities . . . of his or her or another person's goods, services or commercial activities." *15 U.S.C. § 1125*(a)(1)(B). Because Section 43(a) is a "remedial statute," it is "broadly construed." *Gordon & Breach Science Publishers S.A. v. American Inst. of Physics, 859 F. Supp. 1521, 1532 (S.D.N.Y. 1994).*

5. Courts have consistently held that [HN7] oral statements by a company's sales representative concerning a product constitute "commercial advertising or promotion" under the Lanham Act. See, e.g., *Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 10 (7th Cir. 1992); Avon Prods., Inc. v. S.C. Johnson & Son, Inc., 984 F. Supp. 768, 772, 796 (S.D.N.Y. 1997); Pfizer, Inc. v. Miles, Inc., 868 F. Supp. 437, 449 (D. Conn. 1994).*

6. [HN8] The burden of proving "literal falsity" varies depending on the nature of the challenged claim. When a defendant[*89] makes no mention of scientific tests or studies, the plaintiff must affirmatively prove that the statement is false. See, e.g., *Castrol, Inc., 977 F.2d at 63;*

*Glaxo Warner-Lambert OTC G.P. v. Johnson & Johnson Merck Consumer Pharmaceuticals Co., 935 F. Supp. 327, 329 (S.D.N.Y. 1996).* However, when a defendant's promotion implicitly or explicitly refers to tests or data--a so-called "establishment claim"--a plaintiff can satisfy its burden of proving literal falsity by demonstrating "that such tests are 'not sufficiently reliable to permit one to conclude with reasonable certainty that they established' the claim made." *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir. 1991)* (citation omitted); see also *Castrol, Inc., 977 F.2d at 62.* This standard of proof applies "when the ad relies on scientific studies, whether implicitly by making a claim while showing a graph or diagram, or explicitly, by stating, for example, 'that studies show.'" *Glaxo Warner-Lambert OTC G.P., 935 F. Supp. at 329;* see also *Castrol, Inc., 977 F.2d at 63* (when defendant's advertisement [*90]"explicitly or implicitly represents that tests or studies prove its product superior, plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited").

7. [HN9] A Lanham Act plaintiff seeking to enjoin an establishment claim can meet its burden by showing either (i) "that the tests were not sufficiently reliable to permit [the] conclusion" for which they are cited or (ii) "that the tests, even if reliable, do not establish the proposition asserted by the defendant" and are thus "simply irrelevant." *Castrol, Inc., 977 F.2d at 63.* Once a plaintiff has exposed a defendant's tests as irrelevant and/or unreliable, "relief may be granted without reference to the advertisements' impact" on consumers. *Pfizer, 868 F. Supp. at 452* (quoting *Coca Cola Co. v. Tropicana Prods., Inc., 690 F.2d 312, 317 (2d Cir. 1982)).*

2. Eli Lilly is making two of the claims in question

8. As set forth in the Court's Findings of Fact, there is abundant evidence that Eli Lilly representatives are systematically making claims that Evista has been proven to reduce the risk of breast cancer and that Evista has[*91] been proven comparable or superior to tamoxifen for the reduction of the risk of breast cancer. This evidence includes (i) the November and December sales representative verbatim scripts, (ii) Eli Lilly's call notes, (iii) the testimony of Eli Lilly's executives, (iv) eyewitness testimony, and (v) Eli Lilly's Rich Day research.

9. Although Eli Lilly and its witnesses effectively conceded that the company's representatives are making the claim that Evista has been proven to reduce the risk of breast cancer, Eli Lilly denied that it is making any improper comparisons to tamoxifen. However, as detailed in the Findings of Fact, the credible evidence

ge 28

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

shows that Eli Lilly is making the comparability claim versus tamoxifen.

10. The doctors' affidavits submitted by Eli Lilly are not sufficient to undermine the substantial evidence that Eli Lilly's sales representatives have been making the two claims in question. As noted in the first section of this Opinion, the affidavits are necessarily of less weight than the testimony of witnesses who were subject to cross-examination. Moreover, the affidavits themselves are ambiguous about what Eli Lilly's sales representatives actually said to[*92] the doctors. Def.'s Exhs. T-4 through R-5.

11. The affidavits are also less reliable than the other evidence such as oral testimony and contemporaneous business records. The affidavits were made months after the fact of the visits and the visits themselves were quite short. Tr. at 798-99 (Torres).

12. The declarations are also narrowly written and ambiguously worded. Some declarations state that no comparison was made to tamoxifen or Nolvadex. See, e.g., Def.'s Exhs. Z-4 (Decl. of Dr. James William Jackson), A-5 (Decl. of Dr. Frank Davis Jones), N-5 (Decl. of Lawrence Silver), R-5 (Decl. of Dr. John Yacoub). Others state only that no "direct" comparisons were made. See, e.g., Def.'s Exhs. V-4 (Decl. of Dr. Donald Earle Courts), W-4 (Decl. of Dr. P. Timothy English), F-5 (Decl. of Dr. Francisco Munoz), I-5 (Decl. of Dr. P. Scott Pollack), L-5 (Decl. of Dr. Joanne M. Richards).

13. Finally, Eli Lilly could have had these doctors testify at the hearing on the preliminary injunction or taken their depositions, even by telephone, to provide the Court with the benefit of cross-examination. Eli Lilly failed to do so, however, and thus the affidavits of the doctors are entitled[*93] to less weight. n10

- - - - - - - - - - - - - - - - - Footnotes- - - - - - - - - - - - - - - - - -

n10 Eli Lilly also maintains that the number of call note entries cited by Zeneca with respect to the tamoxifen comparisons are too small to rise to the level of a Lanham Act violation. However, courts have found that statements by sales representatives on a smaller number of occasions than that cited by Zeneca would violate the Lanham Act if those statements were determined to be false. See, e.g., *Pfizer Inc. v. Miles, Inc.*, 868 F. Supp. 437, 460 (D. Conn. 1994).

- - - - - - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - - -

a. Admissibility of Richard Day survey evidenc

14. Eli Lilly challenged the admissibility o market research conducted on its behalf by Richard Day eneca offered that evidence, among other reas , to corroborate the call notes and to prove that r ifene and tamoxifen are competitors in the market.

15. The survey evidence will not be considere by the Court insofar as it is offered to corroborate the c notes. The defendant admitted at oral argument that sales representatives have been making [*94] "establishment" claim that Evista has been pr en to reduce the risk of breast cancer. (Tr. of June 24, 99 at 69, 74.) That admission, in addition to the ca notes, verbatims, and other evidence, make it unnec ry to consider the survey evidence with respect those claims. In addition, the evidence with respec to the alleged comparative claim that Evista is compa ble or superior to tamoxifen for reducing the risk o breast cancer is quite strong based on the evidence de led in the Findings of Fact, including the call notes d the verbatims. Thus there is no need to consider th urvey evidence with respect to those claims. Finally, re is simply insufficient evidence that the defendant been making the third claim--that Evista is indicate y the FDA for the prevention of breast cancer. Th urvey evidence in this case does not significantly sup this claim by Zeneca and Barr and thus the survey dence will not be considered with respect to tha laim. However, the survey evidence is relevant to the ue of whether raloxifene and tamoxifen are competito n the marketplace, as discussed below.

3. Eli Lilly's "establishment claim" that Evista been proven [*95] to reduce the risk of breast cancer i se

a. The claim is false

16. Based on all the evidence adduced, Ze a and Barr will likely succeed in proving that the MOR ial is "not sufficiently reliable to permit one to concl with reasonable certainty that [it] established the pr sition for which [it was] cited"--namely, that Evista been proven to reduce the risk of breast cancer. *P er & Gamble Co. v. Chesebrough-Pond's Inc.*, 747 F 114, 119 (2d Cir. 1984).

Case 1:05-cv-00344-JJF     Document 58-2     Filed 05/31/2005     Page 19 of 30

ge 29

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

17. The FDA, as well as numerous other experts in the field of clinical oncology, have reviewed the breast cancer data from the MORE trial and reached the nearly unanimous conclusion that it does not prove that Evista reduces the incidence of breast cancer. The reasons for the unanimity of these organizations are described at length in the Findings of Fact. Most notably, the MORE protocol was not designed to determine whether Evista could be efficacious in reducing the risk of breast cancer. Accordingly, women were not selected for enrollment and once enrolled were not randomized between the raloxifene and placebo arms based on their degree of breast cancer risk. The protocol also [*96]did not require annual mammograms or breast physical exams, among other diagnostic deficiencies. Because of these and other critical flaws, the risk factors may have been imbalanced, the incidence of breast cancer may have been underdiagnosed and the results may yet turn out--as the CORE extension goes forward--to be a "false positive." Given the small number of invasive breast cancers that were diagnosed, a small number of additional invasive breast cancers in the raloxifene arm would have seriously compromised the results of the study.

18. Courts in this Circuit and elsewhere routinely enjoin claims of proven therapeutic efficacy on the ground that the underlying tests are irrelevant and/or unreliable to support them. See, e.g., *Castrol, 977 F.2d at 63-64* (finding that tests "which proved faster oiling time, are irrelevant to [the] claim that [the defendant's] oil protects better" and thus the defendant's claim that tests proved that its product provided superior protection to engines was enjoined); *S.C. Johnson & Son, Inc. v. Clorox Co., 930 F. Supp. 753, 783 (E.D.N.Y. 1996)* (enjoining claim that "testing proves Combat SuperBait kills up to[*97] 98%" of household roaches because the tests were not reliable and did not measure what was being claimed because testing did not measure effectiveness of product in consumers' homes); *Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 906 F. Supp. 178, 182-83 (S.D.N.Y. 1995)* (enjoining claim that PEPCID AC controls acid "all day," in part because the defendant's studies related to night-time acid relief "[were] not relevant here" and because "there was . . . compelling evidence that [the defendant's studies] do not accurately measure acid control"), aff'd, *100 F.3d 943 (2d Cir. 1996); Pfizer, Inc., 868 F. Supp. at 457* (enjoining claim based on a study that lacked a written protocol and scientific controls and noting that there was no discussion of the experimental methodology and controls or lack thereof).

b. The FDA's findings are probative

19. Eli Lilly has attempted to exclude and   en to minimize the FDA's views on whether Evista    been proven to reduce the risk of breast cancer.    The FDA's views are not determinative and Zeneca    Barr are entitled to a preliminary[*98] injunction even   .thout the views of the FDA. Nevertheless, it is appro   ate to consider the views of the FDA on the highly r   ated issue of drug efficacy.

- - - - - - - - - - - - - - - - - -Footnotes- - - - - - - - - -    - - - -
- -

n11 The Court found in the first section   f this Opinion that the FDA documents concernin   vista are admissible.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - -
- - - -

20. The FDA is the agency responsible for det   ining the safety and efficacy of prescription drugs   this country. See *21 U.S.C. § 393;* Tr. at 740-41 (Cun   ngs); Tr. at 1102 (Dere); Lippman Dep. Tr. at 84. Both   .rties' experts testified that FDA is a recognized autho   y and has expertise in assessing the results of clinic   drug trials. Tr. at 427-29 (Carlson); Tr. at 740 (Cun   ngs); Tr. at 1102 (Dere); Lippman Dep. Tr. at 84.    .ving reviewed all of the breast cancer data from the   :ORE trial and having met repeatedly with Eli Lilly   study investigators and scientists, the FDA found that   ORE does not and cannot prove that Evista reduces th   sk of breast cancer.

21. The fact that the FDA has not   pproved raloxifene[*99] for breast cancer risk reduction   es not conclusively demonstrate that the defendant's cl   n that raloxifene has been proven to reduce the risk   breast cancer is literally false under the Lanham Act    ause [HN10] "a Lanham Act plaintiff must prove    t the defendant's efficacy claims are literally false, no   mply that they fail to meet current federal licensing sta   rds." *Avon Prods., Inc., 984 F. Supp. at 797.* Howe   as a recognized expert in evaluating data from clinic   rials, the FDA's conclusion as reflected in the Evista l:   l and various FDA documents that "the effective   s of raloxifene in reducing the risk of breast cancer   ;s not yet been established" is persuasive evidence   t Eli Lilly's claims to the contrary are untrue. Othe   :ourts have also found [HN11] the FDA's expert concl   ns to be relevant evidence in determining whether   :arty

violated the Lanham Act. See, e.g., *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., Inc., 1996 U.S. Dist. LEXIS 7257, 95 Civ. 7011, 95 Civ. 7688, 1996 WL 280810*, at *13 (S.D.N.Y. May 24, 1996); see also *American Home Prods. v. Procter & Gamble, 871 F. Supp. 739, 754 (D.N.J. 1994)*[*100] (expert's conclusion concerning efficacy of analgesic is "bolstered by the FDA's formal findings" concerning the product).

4. Eli Lilly's "establishment claim" that Evista has been proven comparable or superior to tamoxifen is false

22. The cases and arguments set forth above apply with equal force to the second establishment claim--that Evista has been proven comparable or superior to tamoxifen for reducing the risk of breast cancer. Because Evista has not been proven to reduce the risk of breast cancer, it necessarily has not been proven comparable or superior to tamoxifen in that regard.

23. Even if this Court had concluded that the MORE study was relevant and reliable as support for Eli Lilly's first claim, this comparative claim still would have to be enjoined. The experts at trial agreed that it is a fundamental principle of clinical testing that one cannot infer efficacy comparisons between two products when, as here, those products have not been tested against one another in a well-controlled head-to-head clinical study. Eli Lilly's own witnesses have confirmed this principle. Tr. at 180-81, 207-09 (Crenshaw); Tr. at 740 (Cummings); Lippman Dep. Tr. at 34-36. Other federal[*101] courts have previously indicated support for this principle. See, e.g., *Thompson Medical Co. v. Ciba-Geigy Corp., 643 F. Supp. 1190, 1195 (S.D.N.Y. 1986)* (noting that the defendant was previously enjoined from making any comparative efficacy claims "unless and until [it] has at least one adequate and well-controlled comparative clinical study which demonstrates such therapeutic advantage or superiority").

24. Eli Lilly has no data--flawed or otherwise--to "establish" the proposition that Evista has been proven comparable or superior to tamoxifen for the reduction of the risk of breast cancer. As Eli Lilly itself recognizes, that is one of the primary objectives of the upcoming STAR trial. Unless and until the STAR trial has been completed and proves that hypothesis, it is a clear violation of the Lanham Act for Eli Lilly to continue making this comparative establishment claim.

5. There is insufficient evidence that Eli Lilly is making the claim that Evista is indicated for the prevention of breast cancer

25. The parties agree that Evista is not indic   d or approved by the FDA for reduction of the risk c  reast cancer. Indeed, Eli Lilly has not even   nally [*102]applied for such an indication. Zeneca a   Barr argue that Eli Lilly is nevertheless promoting I  ta as indicated by the FDA for the reduction of the  sk of breast cancer, but there is insufficient evidence to  pport that allegation. As stated in the Court's Findings   Fact, few sales representatives' call notes provide any c  lence that such a claim is being made. Moreov  , no eyewitnesses testified that they have hear  sales representatives making such a claim, no E  Lilly verbatims instruct sales representatives to make  ch a claim, and no Eli Lilly witnesses suppor   the proposition that such a claim was being made. "  re is insufficient evidence that this claim is being  nade. Therefore, the Court cannot conclude that Zen   and Barr are likely to succeed on this claim.

B. Zeneca and Barr have been irreparably harm

26. As set forth above, Eli Lilly is maki   both comparative and non-comparative false establ   ment claims concerning Evista. As to either type o   laim, Zeneca and Barr have demonstrated irrepar ab   harm sufficient to warrant an injunction.

27. [HN12] Once a plaintiff seeking to enjoi   false comparative claim demonstrates a likelih   l of prevailing on the merits, [*103] irreparable in   ry is presumed when the defendant's "literally fals   . . . comparative advertisement . . . mentions pl   ntiff's product by name." *Castrol, Inc., 977 F.2d   62.* Moreover, when, as here, "the false or mi   ding advertising claims create a danger to public he   the presumption of irreparable harm is par   llarly appropriate." *McNeilab, Inc. v. American Hom   rods. Corp., 675 F. Supp. 819, 826 (S.D.N.Y. 1987), a   848 F.2d 34 (2d Cir. 1988).* Zeneca and Barr have   sfied the irreparable harm requirement with respec   Eli Lilly's false comparative claim that Evista h   been proven comparable or superior to tamoxifen.

28. [HN13] In the case of non-comparat   false claims, the Lanham Act requires "only proof pro   ng a reasonable basis for the belief that the plaintiff is   ly to be damaged as a result of the false advertising."   nson & Johnson v. Carter-Wallace, Inc., 631 F.2d i   190 (2d Cir. 1980); see also *Ortho Pharmaceutical t   p. v. Cosprophar, Inc., 32 F.3d 690, 694 (2d Ci   994)* (noting that while a plaintiff in a Lanham Act c   nder § 1125(a) "must show more than[*104] a st   tive belief that it will be damaged [by a false adv   ising claim], it need not demonstrate that it is in   lirect competition with the defendant or that it has de   itely lost sales because of the defendant's advertisement   and

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

that although injury and causation will not be presumed, "the type and quantity of proof required to show injury and causation has varied from one case to another depending on the particular circumstance") (internal quotation marks and citations omitted); *Coca-Cola Co., 690 F.2d at 316* (noting that a plaintiff in a Lanham Act case "must . . . offer something more than a mere subjective belief that he is likely to be injured as a result of the false advertising . . . he must submit proof which provides a reasonable basis for that belief") (internal citation omitted). To obtain injunctive relief, a Lanham Act plaintiff "need not even point to an actual loss or diversion of sales." *Coca-Cola Co., 690 F.2d at 316.* Instead the plaintiff must show two things: (i) that the parties are competitors in the relevant market, and (ii) that there is a "logical causal connection between the alleged false advertising and its own sales[*105] position." *Johnson & Johnson, 631 F.2d at 190-91.* Zeneca and Barr have demonstrated both.

1. Zeneca and Barr are competitors of Eli Lilly

29. Eli Lilly maintains that even if it is making breast cancer reduction claims, it is not in competition with Zeneca or Barr because any Evista prescriptions written as a result of its breast cancer prevention claims are not coming at the expense of Zeneca or Barr; according to Eli Lilly, those prescriptions are likely written primarily for osteoporosis. This argument fails. It is clear that the parties are competitors.

30. First, by making claims that Evista has been proven or shown to reduce the risk of breast cancer, Eli Lilly has injected Evista into the emerging breast cancer prevention market. Since the only other product in that market is tamoxifen, Evista is clearly positioned by Eli Lilly in competition with tamoxifen, which is manufactured by Zeneca and distributed by Zeneca and Barr. See *Avon Prods., 984 F. Supp. at 775-78.*

31. The call notes underscore this point. The notes show that Eli Lilly is making blanket and categorical claims of breast cancer risk reduction, not merely claims directed[*106] to osteoporosis patients or coupled with osteoporosis claims. See, e.g., Pl.'s Exh. 25, Entry 11/11/98-722809052 ("You can be assured Evista will not increase the risk [of breast cancer] and in every study showed there was a dcreased [sic] risk"); Entry 1/18/99-246801181 ("went into ev b. cancer data, told md he could let his women know they will be greater than 55% protected against b. cancer with evista"); Entry 1/26/99-848801056 ("I told him now he can actually say with confidence that Evista actually reduces the incidence of breast cancer"); Entry 2/8/99-240003187 ("point out the fact that there's no 'up-in-the-air' w/Evista, because we know it reduces breast cancer").

32. These entries are echoed by the testimony of Denice Torres, who, as noted above, testified that in response to unsolicited questions, Eli Lilly representatives can tell physicians that "Evista [has] been demonstrated to reduce the incidence of breast cancer" and that in studies up to three years, Evista reduces the risk of breast cancer by greater than 50 percent. Moreover, Ms. Torres testified that when an Eli Lilly representative states that Evista has been shown to reduce the incidence of breast[*107] cancer, the representative need not communicate any drawbacks or limitations, other than that Evista is not indicated for breast cancer risk reduction. Tr. at 217, 225-229, 859-64 (Torres).

33. Second, the call notes show that Eli Lilly representatives are making direct comparisons to tamoxifen and, beyond that, are urging physicians to prescribe Evista instead of tamoxifen, thus squarely putting the two drugs in direct competition for the same prescriptions. See, e.g., Pl.'s Exh. 23, Entry 5/98-578403397 ("evista 3 way - wanted to know re breast cancer data - told him the 60-80% reduction - said what about tamox - said evista's data is better and doesn't increase risk for endometrium either."); Entry 12/98-169801604 ("he actually came over to me to talk about golf outing. . . .wow. . . . chatted a bit. . . . said t main thing that he learned was switching patient from tamoxifen to evista. . . great. . . ."); Entry 3/98-244001904 ("he asked right away about BC, went into MORE and compared with Tamoxifen, we agreed that Evista is a much better choice"); Entry 6/98-422406095 ("He then wanted to know if I was trying-replace Tamoxifen with Evista. I said well, [*18] no FDA approval, but most of the doctors are already doing that, what will you do? He said Tamoxifen rep ready came to detail him. I said, so far what you have study on Tamox vs. placebo and Evista vs. placebo, so ough you can't really compare, Evista looks better and about the endo effects"); Entry 1/12/99-281202408 ("evista first line ahead of tamox. for prevention"); Entry 2/17/99-360201058 ("Nolvadex rep had just left....listened to her give entire tamox detail....we in and asked him... Dr. Bill, why and where would you ever use Tamox over Evista?"). These call notes are consistent with Eli Lilly's November 1998 Vantim, which instructed sales representatives to respond to doctors' questions by stating "these results [with respect to Evista's efficacy in reducing the risk of breast cancer] are similar to those for tamoxifen in women at risk of breast cancer" and to make a favorable comparison to tamoxifen with respect to the safety profile of the drugs. Pl.'s Exh. 15 at EV 2609 327-28.

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

34. Third, and as Eli Lilly's Ms. Torres admitted, several internal Eli Lilly documents identify Zeneca as an Eli Lilly competitor. For example, a December 2, 1998 memorandum[*109] prepared by Ms. Torres captioned, "Maximizing the Breast Cancer Label Change," refers to an anticipated "competitive response," which Ms. Torres acknowledged was a reference to Zeneca, and goes on to note that "we proactively and assertively position the P.I. change. . . not our competition." Pl.'s Exh. 16 at EV 2264 401-02; Tr. at 227-28 (Torres). Ms. Torres similarly wrote in a February 18, 1999 memorandum that "there has been disturbing competitive activity involving misrepresentation of our NOV [notice of violation issued to Eli Lilly by FDA]. We are also planning on sharing competitive NOVs (Zeneca, Wyeth) with the Field to assure them we are also monitoring competitive activity . . . ." Pl.'s Exh. 49.

35. Fourth, Barr is plainly a competitor of Eli Lilly's. Not only does Barr distribute tamoxifen, with which Evista has been positioned to compete, but Barr also manufactures two products--estradiol and estropipate--that compete against Evista in the osteoporosis market. Tr. at 553 (Sawyer). Barr's products in the osteoporosis market give Barr an additional interest in being protected against false promotion of Evista for breast cancer risk reduction because such false promotion[*110] is reasonably likely to influence doctors' choices when prescribing a drug for the prevention of osteoporosis.

2. Zeneca and Barr have shown the requisite "causal connection"

36. Zeneca and Barr have likewise shown the requisite causal connection between Eli Lilly's conduct and resulting harm to Zeneca and Barr.

37. There is no dispute that tamoxifen is the only drug approved for reduction of the risk of breast cancer. Ms. Anson confirmed that Zeneca is the only manufacturer of tamoxifen in the United States and "for every sale of a tamoxifen tablet in the market, Zeneca is therefore a beneficiary . . . ." Tr. at 53 (Anson). Barr distributes tamoxifen in its generic form. Thus, if doctors believe Eli Lilly's claim that Evista reduces the risk of breast cancer, Zeneca's and Barr's sales necessarily will be affected; any sale of Evista for breast cancer prevention or risk reduction is a lost sale of Zeneca's and may be a lost sale of Barr's.

38. Although it was not required to do so, Zeneca also presented survey evidence bolstering this point. A market research study conducted by Reed/Haldy/McIntosh, a reputable market research firm in the prescription drug field, concluded that[*111] of physicians surveyed, 11 percent of prescriptions for Evista are being written

primarily for breast cancer prevention, as opp    l to either for osteoporosis or for osteoporosis plu    cast cancer, and that 35 percent of physicians have w    n at least some of their Evista prescriptions prim    y for breast cancer prevention. Pl.'s Exhs. 72 & 80; T    477- 79, 487-89 (McIntosh). The study does not pr    that these prescriptions are being written beca    of statements made by Eli Lilly representatives. B    since Eli Lilly executives acknowledge that the pur    of detailing these physicians is to persuade t    to prescribe Eli Lilly's products, it is reasonable to c    lude that at least some of these prescriptions resulted    n Eli Lilly's false claims. See Johnson & Johnson, 631    d at 190 ("The correct standard is whether it is li    that [defendant's] advertising has caused or will cau    loss of [plaintiff's] sales, not whether [plaintiff] h    ome forward with specific evidence that [defenda    ads actually resulted in some definite loss of sales.").

39. The unique nature of the market in questio    also relevant to the issue of whether Zeneca[*112] a    Barr have demonstrated a causal connection betw    Eli Lilly's false claims about Evista and injury to Ze    and Barr. See Telebrands Corp. v. Wilton Indus., Inc    8 F. Supp. 471, 475 (S.D.N.Y. 1997) (irreparable h    will result from false advertising if "the materialit    f the false statement coupled with the unique natur    f the product" is likely to influence sales). Ms. Anson    ified that there are no other drugs anywhere in the w    !, let alone in the United States, approved to red    the incidence of breast cancer. Tr. at 47-49 (Ans    She also described this field as a "new marketplace    r. at 68-69 (Anson). Therefore, it would be eve    nore difficult to quantify Zeneca or Barr's potential l    les, particularly since tamoxifen sales cannot be bro    own between the prevention and treatment indicatio    r. at 100 (Anson). In Novo Nordisk A/S v. Becton L    rson & Co., 997 F. Supp. 470, 473 (S.D.N.Y. 1998),    ourt noted that a new entrant into an established mark    uld have "a particularly difficult time proving    ney damages." Here, there is not only a new produ    it a new market itself, an even more complex s    ion. [*113]

3. Zeneca's reputation and goodwill are jeopar

40. Injury to Zeneca's goodwill and reput    also supports the showing of irreparable harm. Cou    this Circuit have long held "the likelihood of    mer confusion, impairment of plaintiff's reputation a    ood will and probable diversion of customers, comb    with the difficulty of proving actual monetary damag    sing from Lanham Act injuries, justifies a presum    of irreparable injury once the violation ha    een established." Upjohn Co. v. American Home Pr    598 F. Supp. 550, 555 (S.D.N.Y. 1984). Ms. Anson c    med

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 23 of 30

·e 33

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

that there would be a "certain amount of loss of good will or injury to [Zeneca's] reputation from physicians as a result of [Eli Lilly's actions]." Tr. at 68-69 (Anson).

4. Eli Lilly's claim that Zeneca unreasonably delayed is not meritorious

41. As a final defense, Eli Lilly asserts that an injunction should not issue because Zeneca purportedly waited nearly nine months to commence this action. The Court rejects this argument.

42. [HN14] Because of the public's overriding interest in preventing misleading advertising, the defense of laches is "sparingly applied" in Lanham [*114]Act cases. *American Home Prods. Corp. v. Johnson & Johnson, 654 F. Supp. 568, 590-91 (S.D.N.Y. 1987).* This is particularly true when public health issues are implicated, as they are here. See *American Cyanamid Corp. v. Connaught Labs., 800 F.2d 306, 310 (2d Cir. 1986)* (noting in a trademark infringement case that "the potential consequences of confusion over medicinal products may be far more dire than of confusion over ordinary consumer products"); *Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 194 (2d Cir. 1996)* (noting in a Lanham Act case that "the public's interest is especially significant when health and safety concerns are implicated" and that "public health and safety considerations may well overwhelm other considerations in the application of laches").

43. Here, there is no question that Zeneca has been vigilant in asserting its rights. Zeneca could not have filed this action before early November even if it had had sufficient evidence of Eli Lilly's misconduct by then. The FDA did not allow Zeneca to market tamoxifen for breast cancer risk reduction until late October 1998. It was not until early November, when Zeneca's marketing[*115] efforts began in earnest, that Zeneca and Eli Lilly became "competitors" in the breast cancer risk reduction market. Only then did Zeneca first have standing to sue under the Lanham Act. See *Johnson & Johnson, 631 F.2d at 189* (only competitors, either direct or indirect, have standing to sue for Lanham Act violations).

44. Moreover, when Zeneca first received anecdotal evidence of Eli Lilly's misconduct last May, the Chief Executive Officer of Zeneca wrote to Eli Lilly's President complaining about what the sales representatives were saying about Evista. Pl.'s Exh. 1. Eli Lilly's President assured Zeneca at that time not only that Eli Lilly representatives would not make breast cancer prevention claims, but that any representatives who did so would be punished. Pl.'s Exh. 2. Zeneca cannot be faulted for relying on the word of Eli Lilly's president. Moreover, as Ms. Anson testified, the evidence of false claims began to

escalate noticeably in November, after Zen_ was approved for breast cancer risk reduction, 1 in December, after the Evista label change. Tr. _ 3-64 (Anson). Most of Eli Lilly's false statements d_ rom late 1998, when, as the evidence shows, [*116]l _illy representatives began to implement the _ised November and December detailing scripts. Ms_ son also explained that Zeneca acted on its suspici_ and altered questions in its survey research to try to _firm the anecdotal proof it had gathered. Tr. at 64-65 (_on). Zeneca obtained the results of the Reed/Haldy/N atosh survey in January, and then promptly cont__ its attorneys and filed this action shortly there__ r in February. Tr. at 65-66, 68 (Anson). See *Warner _ bert v. McCrory's, 718 F. Supp. 389, 394-95 (D.N_ )89)* ("good faith preparation for litigation," i_ ding "commission [of] a study of possible c__ mer confusion," "should not be used to subseque_ bar plaintiff from obtaining injunctive relief"). Thus_ neca did not delay unreasonably in bringing the _rent lawsuit.

45. The cases offered by Eli Lilly on the issue _ !elay confirm that delay in filing suit is not a bar to i__ ctive relief when, as here, "the plaintiff was making g_ aith efforts to investigate" the basis for its claims. _ _ger *Int'l. Inc. v. Nightingale Inc., 915 F. Supp. _ 613 (S.D.N.Y. 1996).* Unlike a typical false advertis_ ase, [*117] where there is no dispute about what a c_ _lant is claiming in television or radio commercials o_ _rint advertisements, Zeneca faced the formidable l_ _ e of proving what a competitor's sales representati_ were saying during in-person detail visits with d_ _s--a hurdle Zeneca has now cleared. In short, base_ _oth the law and the facts, Zeneca did not unreasona_ _lay in bringing this action.

46. Moreover, there is no question that Bar__ _ not unreasonably delay in this case. Barr first read i _rade publication that Eli Lilly was making claims th _'ista reduces the risk of breast cancer in January 199 _hen learned in February 1999 that Zeneca had f__ suit against Eli Lilly. Barr moved in March 1999 to i _ene in this action. Tr. at 551-52 (Sawyer). Und_ _ese circumstances, there is no credible argument tl _ _rr's claims against Eli Lilly are precluded by the d_ _ e of laches.

C. The equities weigh decisively in fav_ _f an injunction

47. Since Zeneca and Barr have shown _ _ong likelihood of prevailing on the merits, it is unnec_ _y to reach the balance of equities. However, a pr_ _ary injunction would be warranted under this stand_ _lso. [*118] Zeneca and Barr have plainly raised su_ _ntly

serious questions going to the merits to make them fair ground for litigation. Equally clear, the balance of equities in this case tips decidedly in favor of granting an injunction.

48. As a result of more than two decades of research and testing by Zeneca as well as the investment of millions of dollars in research and development, tamoxifen is the only drug approved in the United States for the reduction of the risk of breast cancer. Tr. at 47-48, 68 (Anson). The evidence demonstrates that Eli Lilly's conduct threatens to erode the sales, goodwill, and physician and consumer confidence that Zeneca has developed over the years.

49. In contrast to the serious injury that will continue to befall Zeneca and Barr in the absence of an injunction, the comparative harm to Eli Lilly from an injunction is not great. Eli Lilly will merely be relegated to promoting Evista for its only approved use, prevention of osteoporosis. Eli Lilly can "assert no equitable interest in the perpetuation of an advertising campaign that is literally false." *Castrol, Inc. v. Pennzoil Co., 799 F. Supp. 424, 440 (D.N.J. 1992),* aff'd, *987 F.2d 939 (3d Cir. 1993).*[*119] Eli Lilly can continue, without violating the Lanham Act, to disseminate truthful information about Evista, including the results of the MORE study, and the existence of ongoing studies, so long as this information is in fact truthful.

50. The public interest also requires that an injunction issue. When an allegedly false claim pertains to a prescription drug, the public interest in receiving truthful information is particularly acute. Dr. Jerry Lewis testified that by telling physicians that Evista has been proven to reduce the risk of breast cancer Eli Lilly has created a "grave public health risk." Tr. at 345-46 (Lewis). And Eli Lilly's own witnesses have confirmed the obvious: it could be dangerous if a physician prescribes a drug erroneously believing that the drug could prevent cancer. Tr. at 247 (Nicholson). The evidence shows that doctors are prescribing Evista for the reduction of the risk of breast cancer. Although off-label prescribing--prescribing drugs for uses for which they are not indicated by the FDA--is not uncommon among physicians, Ans. P 1, it would be dangerous if physicians off-label prescribed Evista for breast cancer prevention based on false information about[*120] whether Evista has been proven to reduce the risk of breast cancer. It is important to the public interest and to the patients involved that truthful information be provided.

D. The relief granted by the Court

51. [HN15] "Courts retain a great deal of flexibility when fashioning preliminary relief . . . ." *Abbott Labs.,*

*971 F.2d at 23.* The Court of Appeals for the cond Circuit has held that "the essence of equity juri ction has been the power to grant relief no broad than necessary to cure the effects of the harm caused the violation." *Forschner Group, Inc. v. Arrow Trad Co., 124 F.3d 402, 406 (2d Cir. 1997).* Thus althou "[a] district court has a wide discretion in fram an injunction in terms it deems reasonable to vent wrongful conduct," *Forschner Group, Inc., 124 d at 406* (internal quotation marks and citation omitt ), the injunction framed by the district court must be "n owly tailored to fit specific legal violations . . . [and uld not impose unnecessary burdens on lawful a ity." *Waldman Publ. Corp. v. Landoll, Inc., 43 F.3d 785 (2d Cir. 1994).* Finally, a court's order of pre nary [*121]injunctive relief be explicit and so that "those who must obey [it] will know what th ourt intends to forbid." *EFS Marketing, Inc. v. Russ L e & Co., 76 F.3d 487, 493 (2d Cir. 1996)* (internal ons and quotation marks omitted).

52. Applying the above standards to th urt's Findings of Fact and Conclusions of Law, ti urt hereby preliminarily enjoins Eli Lilly from stati its advertising or promotional activities that (i) E has been proven, shown, or demonstrated to reduce risk of breast cancer, or that (ii) Evista has been ven comparable or superior to tamoxifen for the red n of the risk of breast cancer. The Court will not ct Eli Lilly from stating that Evista has been approve the FDA for the reduction of the risk of breast ncer because, although the claim is plainly false, e is insufficient evidence for the Court to conclud this stage that Eli Lilly has been making such a c and therefore Zeneca and Barr have failed to estab that they are entitled to a preliminary injunction on th im.

53. The Court will not order the corrective ad sing sought by Zeneca and Barr, although the Cou 22] recognizes that it has the discretion to order su lief. See, e.g., *Linotype Co. v. Varityper, Inc., 1989 l ist. LEXIS 9105, 89 Civ. 4747, 1989 WL 9433 *3 (S.D.N.Y. Aug. 4, 1989)* (ordering corrective adv ng, in non-establishment case, "to counteract lse impression that may have been placed the [defendant's] ad in consumer's minds") (citation d). Such relief would be unnecessarily broad. 'I lse information that Eli Lilly sales representativ ave disseminated to physicians concerning raloxifer l be corrected by the revised detailing th les representatives do after completing the training ram ordered below.

54. The Court hereby orders defendant El y to design and implement a training program for Eli Lilly sales representatives who are respons for

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 25 of 30

e 35

1999 U.S. Dist. LEXIS 10852, *; 1999-2 Trade Cas. (CCH) P72

detailing physicians about Evista, as well as oncology sales representatives and any other sales representatives who may reasonably be expected to encounter questions from physicians about Evista and its efficacy in reducing the risk of breast cancer. The training program should be designed to ensure that Eli Lilly's sales representatives are made aware of and adhere to this Court's decision[*123] and order and do not make claims in the field that tamoxifen has been proven to reduce the risk of breast cancer or that it is comparable or superior to tamoxifen for the reduction of the risk of breast cancer. The training program should also explicitly inform sales representatives about the MORE data, the ongoing CORE and STAR trials, and the package insert statement that "the effectiveness of raloxifene in reducing the risk of breast cancer has not yet been established." See *Pfizer, 868 F. Supp. at 461* (in addition to granting a preliminary injunction, Court ordered Pfizer to hold training sessions with its sales representatives to make them aware of the Court's finding that Pfizer had violated the Lanham Act by making false establishment claims about Pfizer's drug); *Valu Eng'g, Inc. v. Nolu Plastics, Inc., 732 F. Supp. 1024, 1026-27 (N.D. Cal. 1990)* (ordering defendant to send a letter to its sales representatives instructing them to stop making false advertising claims).

Conclusion

At the present time, the evidence before the Court demonstrates that it is literally false for Eli Lilly to claim that raloxifene has been proven to reduce the[*1] risk of breast cancer or that raloxifene is comparable or superior to tamoxifen for that purpose. Such statements are false because, although the data from the MORE trial are promising, given the deficiencies in that trial the MORE data are insufficient to support such claims, thus requiring further study of raloxifene before such claims can be made.

For the reasons explained above, the Court grants the motion of Zeneca and Barr for a preliminary injunction with respect to the establishment and comparative establishment claims and denies it with respect to the indication claim. A separate Order will be issued containing the Preliminary Injunction set out above.

SO ORDERED.

Dated: New York, New York

July 15, 1999

John G. Koeltl

United States District Judge

LAWRENCE JOHNSON, 95-B-2484, JAMAL STEPHENSON, 95-A-4295,
TOM LYNCH, 98-A-1162, CHARLES WOODS, 82-A-5434, Plaintiffs,
-against- NEWPORT LORILLARD; PHILIP MORRIS, INC.; REPUBLIC
(TOP) TOBACCO, L.P.; GLEN GOORD, Commissioner NY DOCS;
CHARLES GREINER, Superintendent; G. ALERS, Registered Nurse;
LESTER N. WRIGHT, Chief Medical Officer; CARL KOENIGSMANN,
Facility Health Service Director; DR. STEVEN WEINSTEIN,
Physiatrist; DR. ECE SALEM, Physical Therapist; MARY K.
MADDOX WILLIAMS, n1 Assistant Physical Therapist; DR. SACH,
Interdisciplinary Coordinatory; DR. SILVER, M.D.; DEPARTMENT

OF CORRECTIONAL SERVICES, STATE OF NEW YORK, Defendants.

n1 The correct spelling of this defendant's name is

"MaryKate Maddock-Williams."

01 Civ. 9587 (SAS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2003 U.S. Dist. LEXIS 939

January 21, 2003, Decided
January 23, 2003, Filed

DISPOSITION: [*1] Plaintiffs' motion for preliminary injunction denied.

CORE TERMS: wheelchair, inmate, deliberate indifference, Eighth Amendment, preliminary injunction, prisoner, prison, tires, medical care, injunction, specialist, physical therapist, patient, injunctive relief, pro se, ill-fitting, measurements, pneumatic, medical malpractice, state of mind, subjective, mandatory, grievance, cruel, leg, constitutional violation, substantial likelihood, class certification, evidentiary hearing, infliction of pain

COUNSEL: Lawrence Johnson, Jamal Stephenson, Tom Lynch, Charles Woods, Plaintiffs, Pro se, Stormville, NY.

For Defendants: Susan M. Barbour, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, NY.

JUDGES: SHIRA A. SCHEINDLIN, U.S.D.J.

OPINIONBY: SHIRA A. SCHEINDLIN

OPINION: OPINION AND ORDER

SHIRA A. SCHEINDLIN, U.S.D.J.:

Plaintiffs, proceeding pro se, are four non-ambulatory inmates housed in the Unit for the Physically Disabled at the Green Haven Correctional Facility ("Green Haven"). Plaintiffs are suing the New York State Department of Correctional Services, its Commissioner, and various Green Haven medical personnel under section 1983 of Title 42, United States Code ("section 1983"). n2 Plaintiffs allege, inter alia, that defendants have deprived them of adequate medical care by refusing access to a wheelchair specialist, thereby forcing them to use ill-fitting wheelchairs. n3

    n2 The "Tobacco Defendants" consisting of Newport Lorillard, Philip Morris, Inc, and Republic (Top) Tobacco, L.P., were previously dismissed from this lawsuit for lack of state action. See *Johnson v. Newport Lorillard, 2002 U.S. Dist. LEXIS 9962, No. 01 Civ. 9587, 2002 WL 1203842,* at *3 (S.D.N.Y. June 3, 2002).

2003 U.S. Dist. LEXIS 939, *

[*2]

n3 Plaintiffs also allege that they are exposed to excessive secondhand smoke in violation of the Eighth Amendment. Plaintiffs have not, however, sought any injunctive relief with regard to this claim.

On February 10, 2002, plaintiffs filed a Motion for a Temporary Restraining Order ("TRO") restraining defendants from taking further wheelchair measurements. According to plaintiffs, a physical therapist, not a wheelchair specialist, directs other inmates to take their wheelchair measurements. See id. P 6. Then, disregarding the doctor's orders, the physical therapist allegedly orders a standard type wheelchair for all inmates. See id. Use of these ill-fitting wheelchairs results in lower back disorders, swelling of the legs and feet, and severe pain. See id. at PP 11, 13. In their TRO motion, plaintiffs requested that defendants provide them with properly medically-fitted wheelchairs, equipped with pneumatic (air) tires, after they see a wheelchair specialist. See id. P 14. Plaintiffs also requested class certification. n4 See id. P 1.

n4 Plaintiffs claim they represent a class of present and future inmates who are deprived of a smoke-free environment at Greenhaven and who suffer the effects of exposure to second-hand smoke. See Complaint P 52. While class actions are sometimes appropriate in section 1983 litigation, a class should not be certified where a pro se litigant will act as class representative. "It is plain error for a pro se inmate to represent other inmates in a class action." Fowler v. Lee, 18 Fed. Appx. 164, No. 01-6712, 2001 WL 1033312, at *1 (4th Cir. Sept. 10, 2001); Devlin v. Transportation Communications Int'l Union, 2002 U.S. Dist. LEXIS 4339, No. 95 Civ. 742, 2002 WL 413919, at *2 (S.D.N.Y. Mar. 14, 2002) ("Because a non-lawyer typically lacks the legal know-how essential to safeguard the interests of a proposed class, courts refuse to certify a class represented by a pro se litigant."). Plaintiffs' request for class certification is therefore summarily denied.

[*3]

At a conference held on June 11, 2002, I denied plaintiffs' motion for a TRO. See Transcript of 6/11/02 Conference at 10. I then converted the TRO motion to a Motion for Preliminary Injunction and ordered additional written submissions by the parties. See id. at 11. For the reasons set forth below, plaintiffs' motion for a preliminary injunction is denied. n5

n5 Because this motion can be resolved on the parties' submissions, no evidentiary hearing was held. An evidentiary hearing is not required when the disputed facts are amenable to complete resolution on a paper record. See Drywall Tapers and Pointers of Greater N.Y. v. Local 530 of Operative Plasterers and Cement Masons Int'l Ass'n, 954 F.2d 69, 76 (2d Cir. 1992) (holding that district court was justified in granting injunction without a hearing because affidavits provided basis for court's decision). "There is no doubt that a preliminary injunction may be denied without a hearing ... when the written evidence shows the lack of a right so clearly that receiving further evidence would be manifestly pointless.'" McKenna v. Wright, 2002 U.S. Dist. LEXIS 3489, No. 01 Civ. 6571, 2002 WL 338375, at *13 n.13 (S.D.N.Y. Mar. 4, 2002) (quoting Larouche v. Webster, 566 F. Supp. 415, 419 n.5 (S.D.N.Y. 1983)).

[*4]

I. DISCUSSION

A. Standard for Preliminary Injunction

"The purpose of a preliminary injunction is to prevent irreparable injury and preserve a court's ability to render a meaningful decision on the merits." Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc., 154 F. Supp. 2d 586, 597 (S.D.N.Y. 2001) (citing WarnerVision Entm't v. Empire of Carolina, Inc., 101 F.3d 259, 261-62 (2d Cir. 1996)). In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence. See Fisher v. Goord, 981 F. Supp. 140, 173 n.38 (W.D.N.Y. 1997) (citing Federal Sav. & Loan Ins. Corp. v. Dixon, 835 F.2d 554, 558 (5th Cir. 1987)). Although the decision whether to grant a preliminary injunction lies squarely within the court's discretion, "a preliminary injunction is an extraordinary measure that should not be routinely granted." Tactica, 154 F. Supp. 2d at 597 (citing Mazurek v. Armstrong, 520 U.S. 968, 972, 138 L. Ed. 2d 162, 117 S. Ct. 1865 (1997)).

In order to obtain a preliminary injunction, plaintiffs must ordinarily demonstrate: [*5] (1) the possibility of irreparable harm; and (2) either (a) a likelihood of success on the merits, or (b) a sufficiently serious question going to the merits combined with a balance of hardships tipping decidedly in favor of the moving party. See SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc., 211 F.3d 21, 24 (2d Cir. 2000). A heightened standard applies where the injunction which plaintiffs seek is mandatory in nature. n6 McKenna, 2002 U.S. Dist. LEXIS 3489, 2002 WL 338375, at *4. Here,

Case 1:05-cv-00344-JJF    Document 58-2    Filed 05/31/2005    Page 28 of 30

Page 39
2003 U.S. Dist. LEXIS 939, *

plaintiffs ask this Court to order defendants to grant them access to a wheelchair specialist and provide them with custom fitted wheelchairs. Such mandatory injunctions should only issue if plaintiffs demonstrate that they have a clear or substantial likelihood of success on the merits. See id. (citing *Jolly v. Coughlin, 76 F.3d 468, 473-74 (2d Cir. 1996),* and *S.E.C. v. Unifund SAL, 910 F.2d 1028, 1040 (2d Cir. 1990)).*

n6 A mandatory injunction is one which would "'alter the status quo by commanding some positive act.'" *McKenna, 2002 U.S. Dist. LEXIS 3489, 2002 WL 338375,* at *4 (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995)).*

[*6]

B. Subject Matter Jurisdiction

Defendants in this action are state prison officials and medical personnel and a state agency, all of whom are generally immune from suit when sued in their official capacities. See U.S. Const. amend. XI. n7 However, the Eleventh Amendment is not a bar to a suit in equity against state officials who violate federal rights. See *Dube v. State Univ. of New York, 900 F.2d 587, 595 (2d Cir. 1990)* (holding that the Eleventh Amendment does not preclude a federal court from granting prospective injunctive relief against a state official sued in his or her official capacity). Here, plaintiffs seek injunctive relief for alleged violations of their Eighth Amendment right to be free from cruel and unusual punishment. Thus, there is no Eleventh Amendment bar to plaintiffs' request for injunctive relief.

n7 The Eleventh Amendment provides:

The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

[*7]

C. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs

The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners. In *Estelle v. Gamble, 429 U.S. 97, 104, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976),* the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." (quoting

*Gregg v. Georgia, 428 U.S. 153, 173, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976)).* See also *Farmer v. Brennan, 511 U.S. 825, 834, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994)* ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (internal quotation marks and citations omitted). Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state [*8] a claim under section 1983. *Estelle, 429 U.S. at 105-06.*

To sustain a claim of deliberate indifference to medical needs, plaintiffs must satisfy a two-part test. The objective component requires the alleged deprivation to be sufficiently serious. See *Hudson v. McMillian, 503 U.S. 1, 9, 117 L. Ed. 2d 156, 112 S. Ct. 995 (1992)* ("Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"). Accordingly, "only those deprivations denying 'the minimal civilized measure of life's necessities,' are sufficiently grave to form the basis of an Eighth Amendment violation. *Wilson v. Seiter, 501 U.S. 294, 298, 115 L. Ed. 2d 271, 111 S. Ct. 2321 (1991)* (quoting *Rhodes v. Chapman, 452 U.S. 337, 347, 69 L. Ed. 2d 59, 101 S. Ct. 2392 (1981)).* This standard contemplates a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990)* (Pratt, J., dissenting). A serious medical need arises where "the [*9] failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)* (internal quotation marks and citation omitted).

To satisfy the subjective prong of the test, prison officials must have acted with a sufficiently culpable state of mind, i.e., deliberate indifference. See *Farmer, 511 U.S. at 834.* Plaintiffs must therefore show that prison officials intentionally denied, delayed access to, or intentionally interfered with prescribed treatment. See *Estelle, 429 U.S. at 104-05.* See also *Farmer, 511 U.S. at 837* ("A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "The subjective element of deliberate indifference 'entails something more than mere

negligence ... [but] something [*10] less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin II, 99 F.3d 550, 553 (2d Cir. 1996)* (quoting *Farmer, 511 U.S. at 835).* Accordingly, subjective recklessness can satisfy the deliberate indifference standard where "the official has actual knowledge that the prisoner faced a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer, 511 U.S. at 847.* However, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle, 429 U.S. at 106.*

D. Application to Plaintiffs' Claims

"Prison officials have a duty to provide prisoners with the reasonably necessary medical care which would be available to him or her ... if not incarcerated." *Candeleria v. Coughlin, 1996 U.S. Dist. LEXIS 2298, No. 91 Civ. 2978, 1996 WL 88555,* at *7 (S.D.N.Y. Mar. 1, 1996) (quoting *Langley v. Coughlin, 888 F.2d 252, 254 (2d Cir. 1989)).* See also *Edmonds v. Greiner, 2002 U.S. Dist. LEXIS 3746, No. 99 Civ. 1681, 2002 WL 368446,* at *8 (S.D.N.Y. Mar. 7, 2002) [*11] ("A person who is incarcerated is entitled to receive adequate medical care."). However, a prison cannot be required to meet the same standard of medical care found in outside hospitals. See *Archer v. Dutcher, 733 F.2d 14, 17 (2d Cir. 1984).* Moreover, a prisoner has no right to the treatment of his choice. See *McKenna, 2002 U.S. Dist. LEXIS 3489, 2002 WL 338375,* at *7.

Disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.

*Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001)* (citing *Estelle, 429 U.S. at 97)* (emphasis added). See also *Candelaria, 1996 U.S. Dist. LEXIS 2298, 1996 WL 88555,* at *7 ("A difference of opinion between an inmate and medical professionals ... as to the appropriate course of treatment does not in and of itself constitute an Eighth Amendment violation.").

Here, defendants have submitted [*12] substantial evidence refuting plaintiffs' claim that inmates take wheelchair measurements which results in ill-fitting wheelchairs. According to MaryKate Maddock-Williams, assistant physical therapist at Green Haven, inmates do not measure, and have never measured, patients for wheelchairs. See Affidavit of MaryKate Maddock-Williams ("Williams Aff.") at P 15. Rather, such measurements are taken by the physical therapist. See id. at P 14 ("At Green Haven, the Physical Therapist, Salem Ece, is qualified to evaluate and measure patients for wheelchairs. The Physical Therapist is also qualified to measure a patient to determine what adjustments to the arm rests, leg rests or other moveable parts of the wheelchair are necessary.").

There is also evidence contradicting plaintiffs' claim that all inmates are issued the same standard wheelchair. The Purchase Request forms used by Green Haven include different specifications for each wheelchair ordered. For example, an "Ultra Light Invocare Action Patriot" wheelchair with an adjustable back and removable legs was ordered for Charles Woods on September 5, 2000. n3 See Purchase Request Form, Ex. B to Williams Aff., at 88. Special [*13] plastic-coated handrims were also ordered for Woods' wheelchair. See id. at 91. On October 13, 2000, a "Quickie Titanium" wheelchair was ordered for Tom Lynch. See id. at 100. Black nylon back upholstry and foam cushions were subsequently ordered for Lynch's wheelchair. See id. at 104. Other Purchase Request forms include specifications sufficiently detailed to refute plaintiffs' claim that all inmates are receiving generic, ill-fitting wheelchairs. See id. at 109, 129 and 130.

n8 Woods filed a grievance claiming he never received the ultra light wheelchair ordered on September 5, 2000. See 12/14/00 Grievance, Ex. A to Williams Aff., at 29. According to Woods, if Williams had looked carefully, she would have seen that the wheelchair actually delivered was not ultra light. See id. Woods' grievance states, at most, a claim of negligence which does not rise to the level of a constitutional violation. See *Estelle, 429 U.S. at 107.*

Plaintiffs have also requested that all wheelchairs [*14] be equipped with pneumatic (air) tires. As explained by Williams, pneumatic tires have an inflated inner tube surrounded by a hard rubber coating. See Williams Aff. P 29. Such tires are typically used on surfaces that are uneven, bumpy or grated. See id. There is no need for such tires at Green Haven because the flooring is made of cement. See id. In addition, when pneumatic tires were used at Green Haven, the inner tubes were often removed by inmates and used as weapons. See id. Given the lack of medical necessity and Green Haven's valid penological concerns, the decision to use solid tires does not constitute deliberate indifference.

Case 1:05-cv-00344-JJF     Document 58-2     Filed 05/31/2005     Page 30 of 30

Page 41
2003 U.S. Dist. LEXIS 939, *

Finally, there is substantial evidence that new wheelchairs are adjusted to the particular needs of the inmates. See Williams Aff. P 20 ("When a new wheelchair arrives, the patient is placed in the wheelchair and all necessary adjustments are made to ensure that the wheelchair is the proper size, and is comfortable for the patient."). These adjustments are borne out by the numerous Ambulatory Health Record and NYSDOCS Request & Report of Consultation forms attached to the Williams Affidavit. See Ex. B at 48-60, 64-87, 89-90, 92-99, 107-08, 110-128, 130-36. Such [*15] copious records of adjustments to, and evaluations of, wheelchairs negate a finding of deliberate indifference.

In sum, plaintiffs have not met the standard required for a preliminary injunction as they have not shown a substantial likelihood of success on the merits. Accordingly, their request for injunctive relief is denied.

II. CONCLUSION

For the foregoing reasons, plaintiffs' motion for a preliminary injunction is denied. The Clerk of the Court is directed to close this motion. A conference is scheduled for 3:00 p.m. on February 4, 2003 in Courtroom 12C at 500 Pearl Street.

SO ORDERED:

Shira A. Scheindlin

U.S.D.J.

Dated: January 21, 2003