Christopher A. Selzer

Associate, Business Litigation Group

302.984.6300
302.984.6399 (Fax)
cselzer@mccarter.com

McCarter & English, LLP
Suite 1800
919 N. Market Street
P.O. Box 111
Wilmington, DE 19899
tel 302.984.6300
fax 302.984.6399
www.mccarter.com



**McCARTER ENGLISH**

ATTORNEYS AT LAW

September 15, 2006

**VIA E-FILE AND HAND DELIVERY**

The Honorable Joseph J. Farnan, Jr.
United States District Court
for the District of Delaware
844 North King Street
Wilmington, DE  19801

Re:  Philip Messina and George Demetriou, individually and on behalf
of all others similarly situated, and derivatively on behalf of
American Society of Law Enforcement Trainers, Inc. v.
Frank A. Hackett, Jr., Andrew Casavant, Greg Meyer, Gary T. Klugiewicz,
Timothy Dees, Lisa Konrath, Mary Gifford, David Smith, David Grossi,
Julie Linkins, William Westfall, Daniel Watson, Glenn Young, and
John Does 1-10, D. Del., C.A. No. 05-344-JJF

Dear Judge Farnan:

Pursuant to the Court's Order of August 23, 2006 (D.I. 82), defendants hereby renew
their motion to dismiss (D.I. 63) and will file a supplemental letter brief in support thereof no
later than September 29, 2006.

Respectfully submitted,

/s/ Christopher A. Selzer

Christopher A. Selzer
(DE Bar ID #4305

CAS/tmp
Enclosure
cc:  Robert D. Goldberg, Esq. (via e-file)
David L. Finger, Esq. (via e-file)
James J. Freebery, Esquire

A1

ME1\5839813.1



**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

CV-04 0170

05-344

PHILIP MESSINA, )
GEORGE DEMTRIOU, individually and )
on behalf of all others similarly situated, )
and derivatively on behalf of )
AMERICAN SOCIETY OF LAW )
ENFORCEMENT TRAINERS, INC., )
Plaintiffs, )
(S.I) )
)
)
)
v. )
)
)
)
FRANK A. HACKETT, JR., )
ANDREW CASAVANT, )
GREG MEYER, )
GARY T. KLUGIEWICZ, )
TIMOTHY DEES, )
LISA KONRATH, )
MARY GIFFORD, )
DAVID SMITH, )
DAVID GROSSI, )
JULIE LINKINS )
WILLIAM WESTFALL )
DANIEL WATSON )
GLENN YOUNG, )
JOHN DOES 1-10, )
Defendants, )
)
and AMERICAN SOCIETY OF LAW )
ENFORCEMENT TRAINERS, INC., )
Nominal Defendant. )

Civil Action No.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JAN 16 2004 ★
1/26/04 · mm

**COMPLAINT**   LONG ISLAND OFFICE
**FOR DAMAGES**
**and EQUITABLE RELIEF**

**JURY TRIAL DEMANDED** PLATT, J.

LINDSAY, M.



2005 MAY 31 AM 11: 56
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE
FILED

## INTRODUCTION

1.    This is an action brought by law enforcement officers and trainers for substantive

racketeering and racketeering conspiracy, fraud, corporate waste, and breach of the duty of

loyalty.

A2

 

2.   The Plaintiffs are members of American Society of Law Enforcement Trainers, Inc. which, until recently, was a non-profit organization comprised of police trainers solely dedicated to educating law enforcement officers on safe and effective police tactics and techniques ("ASLET" or the "corporation").

3.   Since 1999, ASLET has been mismanaged, through a pattern of fraudulent acts and material omissions, with the Executive Board turning a blind eye. If any member or corporate director raises serious concerns regarding the state of the corporation or its finances, the Executive Board takes whatever steps they can including generating fraudulent public statements, destroying or concealing corporate records, hindering the communication to federal law enforcement officers of information regarding the fraudulent activities, and retaliating against witnesses who provide truthful information regarding the commission of possible federal offenses to federal law enforcement officers.

4.   In order to compensate for the revenues lost through mismanagement and fraudulent activities, ASLET Executive Director Frank Hackett softened the requirements (contained in the ASLET bylaws) to become an ASLET member with full privileges ("regular" member). ASLET's corporate bylaws require that in order to be a regular ASLET member, an individual is required to show that he or she is a legitimate law enforcement trainer or active officer. For those individuals who were not law enforcement officers and/or not active in law enforcement training, there is a second tier of membership called "associate member". Associate members are allowed to participate in ASLET training events and receive the ASLET magazine, but do not receive voting privileges, and cannot hold elective corporate office. For the protection of ASLET members, and the federal and local agencies that provide training to those members at

A3

ASLET seminars, ASLET bylaws require that a regular member in good standing sponsor associate members.

5.    In response to a pending fiscal crisis caused by Hackett's pattern of fraudulent activities and incompetence, Hackett arbitrarily, and without Board approval, created a new tier of membership (student) and arbitrarily converted associate members to full members (thus giving them full voting rights).

6.    Finally, in a nearly incomprehensible act in this post-9/11 world, where law enforcement must be vigilant about who they train and information they share (as intelligence reports indicate that terrorist organizations study U.S. law enforcement and military techniques and responses carefully), Hackett opened the doors to anyone willing to pay the $45 membership fee. Documents obtained by Plaintiffs clearly show that Hackett misled the ASLET membership into believing that there would be a basic screening of associate members, when, in fact, Hackett has provided wide-open doors for any and all applicants. Furthermore, Hackett's creation of "student" memberships, contrary to the ASLET bylaws, fraudulently attempted to deceive members and law enforcement agencies that their fellow members and seminar attendees were enlisted by law enforcement member "sponsors", creating a gaping security breach that has exposed federal, state and law enforcement officers to significant personal and intelligence threats.

7.    Plaintiff Messina, an ASLET Board Member, vehemently objected to this new class of membership, and insisted that ASLET implement adequate and proper security screening and protocols. Defendant Hackett, and the other members of the Executive Board rejected Messina's proposal as too costly and unwieldy, while, at the same instant, continuing to provide Hackett with a compensation package obtained through fraudulent misrepresentations and *quid pro quo*

A4

3



agreements designed to conceal previous acts of fraud and deceit.

8.      Suspecting far-reaching corporate wrongdoing, Plaintiff Messina formally demanded

access to ASLET corporate books and records. Upon denial of his request, Plaintiff Messina

brought a successful civil action to obtain records, pursuant to Section 220(e) of the Delaware

General Corporate Law ("DGCL") in the Court of Chancery of the State of Delaware. Messina,

along with an experienced fraud investigator and a Certified Public Accountant working

alongside him, discovered that ASLET was concealing corporate bills and had been misleading

the Internal Revenue Service, corporate donors, and members as to the true state of the

corporation's health.

9.      After examination of records so obtained, and interviews with sources inside and outside

the corporation, believed by Plaintiffs to be highly reliable, and unsuccessful attempts to mitigate

the fraud perpetrated against the members and government agencies, Plaintiffs bring this action.

10.    This is an action to recover from Defendants monetary losses suffered by the membership

as a result of Defendants' scheme perpetrated against the membership of ASLET (Class Action

Claims), for monetary losses to the corporation (Derivative Claims), and for monetary losses

suffered by Plaintiff Messina in his individual role as a corporate director investigating and

uncovering the pattern of racketeering activity directed at Plaintiffs and at the ASLET

membership (Messina's Individual Claim). This action is brought pursuant to the civil

provisions of Chapter 96 of Title 18, United States Code, codified at 18 U.S.C. §§ 1961, *et seq.*,

(Counts One, Two and Three), and pursuant to the common law (Counts Four, Five, Six and

Seven).

A5

4

 

## I.                          <u>JURISDICTION AND VENUE</u>

11.    Jurisdiction in this action is predicated upon 28 U.S.C. § 1331 and 18 U.S.C. §§ 1964 (a) and (c).

12.    Venue for this action is predicated upon 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b), (c) and (e). Plaintiffs invoke the expanded service of process provisions of 18 U.S.C. § 1965(b). The Defendant corporation has maintained agents to market memberships and solicit donations, and has held seminars in the State of New York and elsewhere from at least 1987 to the present. In addition, the Defendants have specifically targeted, and caused racketeering injuries to, Plaintiff Messina, a resident of the Eastern District of New York ("EDNY"), via numerous mailings and interstate wires sent into this district. Furthermore, Defendant Glenn A. Young, upon information and belief, is an employee of an agency of the United States, who, acting under color of legal authority (his employment is with the National Imagery and Mapping Agency ("NIMA"), an intelligence agency of the United States) violated 18 U.S.C. § 1962(c) (not involving real estate), and conspired with others known and unknown to Defendants, to violate 18 U.S.C. §§ 1962(b) and 1962(c), and, in doing so, specifically targeted Plaintiff Messina, a resident of the EDNY.

13.    This Court also has diversity jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. § 1332, as there is complete diversity between the named Plaintiffs and Defendants, and the amount in controversy exceeds $75,000.

14.    This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## II.                          <u>PLAINTIFFS</u>

15.    Plaintiff Messina was elected, by ASLET's members, to a four-year term on the ASLET Executive Board in February of 2001. Messina, a resident of Lindenhurst, New York, is a highly decorated retired New York City Police Sergeant, and respected law enforcement trainer, who




has successfully served as an expert witness and/or use-of-force consultant in several important criminal and civil cases. Messina was the recipient of the National Institute of Ethics "Award For Moral Courage" in 2000.

16.     Plaintiff George Demetriou, is a seventeen-year veteran of a large municipal police department, holding the rank of Detective, and currently serves as a member of a highly respected Task Force. Demetriou is a resident of New York.

**III.                 CLASS ACTION ALLEGATIONS**

17.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated, as members of the proposed Plaintiff Class. The proposed Plaintiff Class (the "Class") which Plaintiffs seek to represent is defined as follows:

> All present and former ASLET members, Certified Law Enforcement Trainer
> ("CLET") certificate holders, and Seal of Approval members on or after
> September 1, 1999 through the date of the filing of this Complaint.

18.     This action has been brought and may properly be maintained and brought pursuant to the provisions of FRCP 23(a), 23(b)(1)(A) and/or 23(B)(1)(B). It satisfies the numerosity, commonality, typicality, and adequacy requirements. Absent unitary class adjudication pursuant to FRCP 23(b)(1), inconsistent adjudications will result, which will both impair class members' rights and establish incompatible standards of conduct for the defendants.

19.     There are approximately 5,000 members of this Class, who are so numerous that their individual joinder herein is impracticable. Class members may be notified of the pendency of this action by mail, or by electronic mail.

20.     Common questions of law and fact exist as to all of the members of the Class, which questions must be resolved on a unitary basis in order to protect the class as a whole. These



common legal and factual questions include:

      a.    Whether Defendants defrauded the class members by marketing memberships to the Class members through a pattern of fraudulent misrepresentation and omissions, and concealed these misrepresentations and omissions during the course of their marketing efforts; and

      b.    Whether the Class has sustained damages which were proximately caused by the Defendants' wrongdoing;

21.    The claims of Plaintiffs are typical of the claims of the members of the Class because Plaintiffs were denied the promised value of the ASLET memberships sold to them. Furthermore, Plaintiffs and all members of the Class are entitled to punitive or exemplary damages for the fraud practiced against them, and/or treble damages under the Racketeer Influenced Corrupt Organization Act by reason of being injured in their property by the pattern of racketeering employed against them by Defendants.

22.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent, they have retained counsel competent and experienced in prosecuting actions involving fraud and other wrongful conduct, and he intends to prosecute this action vigorously. The interests of the members of the Class will be adequately protected by Plaintiffs and their counsel.

23.    The class action is necessary for the fair, efficient, and unified adjudication of the claims of Plaintiffs and members of the Class. The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent adjudication with respect to individual members of the Class, which, as a practical matter, would be dispositive of the interests of other members who are not parties to the adjudications, or substantially impair or impede their ability

A8



to protect their interests.

24.     In addition, individual adjudication could result in inconsistent adjudications and/or could establish incompatible standards of conduct for the Defendants. Class treatment of the fraud issues will ensure that all claims and claimants are before this Court for consistent adjudication and equitable distribution of any recovery.

**IV.**                    **DEFENDANTS**

25.     Defendant ASLET is a Delaware nonstock (membership) corporation, recognized as a 501(c)(3) tax-exempt charity by the United States Internal Revenue Service ("IRS").

26.     Defendant Frank A. Hackett, Jr., is the current Executive Director of ASLET, and is a resident of Maryland.

27.     Defendant Gary T. Klugiewicz is the former Executive Board Chair of ASLET, and is a resident of Wisconsin.

28.     Defendant Andrew Casavant is the current Executive Board Chair of ASLET, and is a resident of Illinois.

29.     Defendant Greg Meyer is the former ASLET Treasurer, and current ASLET Vice-Chair. Meyer is a resident of California.

30.     Defendant David Grossi is a current ASLET director, and the former ASLET Secretary. Grossi is a resident of Florida and Colorado.

31.     Defendant David Smith is a current ASLET director, the current ASLET Treasurer, and is a resident of Illinois.

32.     Defendant Timothy Dees is a current ASLET director and the current ASLET Secretary, and is a resident of Washington.

33.     Defendant Lisa Konrath is a current ASLET director and former ASLET Secretary, and is

A9

 

a resident of Arizona.

34.    Defendant Mary Gifford is a current ASLET director and a resident of Indiana.

35.    Defendant Glenn Young is, upon information and belief, a Security Guard for the National Geospatial-Intelligence Agency (formerly known, until 11/24/2003, as the National Imagery and Mapping Agency), an intelligence agency of the United States. Young is a resident of Missouri.

36.    Defendant Julie Linkins is, upon information and belief, employed as a civilian writing instructor at the FBI National Academy in Quantico, Virginia. Linkins is a resident of Virginia.

37.    Defendant William Westfall is, upon information and belief, a training consultant and a resident of Michigan.

38.    Defendant Daniel Watson, a retired LAPD Commander, is a police chief in a small California city, and a part-time author and trainer, publishing articles in, among other venues, the ASLET bi-monthly magazine. Watson is a resident of California.

## V.    **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

39.    Plaintiffs also bring this action derivatively in the right of and for the benefit of ASLET to redress injuries suffered, and to be suffered, by ASLET as a result of the pattern of racketeering activity, breaches of fiduciary duties, waste of corporate assets, and the aiding and abetting thereof, by Defendants. ASLET is named as a nominal defendant solely in a derivative capacity.

40.    Plaintiffs were members of the corporation at the time of the wrongdoing, Messina being a director during a portion of the wrongdoing (including as of the date of the filing of this Complaint), and, notwithstanding the efforts of Defendants to conceal their fraudulent activities

A10

 

and retaliate against Messina by claiming to have expelled Messina from membership through sham proceedings, Plaintiffs claim to be members of the corporation as of this date.

41. Plaintiffs will fairly and adequately represent the interests of ASLET and its members in enforcing and prosecuting ASLET's rights.

42. The current Executive Board of ASLET consists of the following individuals: Defendants Casavant, Meyer, Hackett, Grossi, Konrath, Smith, Dees, and Gifford, as well as Plaintiff Messina and Robert Bragg (not a party hereto).

43. As a result of the facts set forth herein, Plaintiffs have not made any demand on the Board to institute this action against Defendants.

44. In order to bring this suit, a majority of the Board would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

45. Each member of the Board, save Bragg, is alleged to have caused harm to ASLET and it would be futile for Plaintiffs to make demand upon these directors to cause ASLET to sue them to recover for their own wrongful injuries to ASLET.

46. The Defendants would not agree to permit ASLET to sue them, and even if they would so agree, because of their conflicted status, they should not be permitted to do so.

47. A demand, or any delay in awaiting a response to a demand, would endanger law enforcement officer members of ASLET, and cause irreparable harm to ASLET.

48. The Defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from ASLET's members (many of whom are law enforcement officers) and/or

A11




negligently disregarded the wrongs complained of herein, and therefore are not disinterested persons.

49.     The acts complained of constitute violations of fiduciary duties owed by ASLET's officers and directors and these acts are incapable of ratification.

50.     ASLET has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct and damages ASLET has suffered and will suffer thereby.

51.     Any suit by the Board to remedy these wrongs would likely expose the individual Defendants and ASLET to the possibility of self-incrimination, as the predicate acts that underlie the RICO claims made against the Defendants are all felony violations of Title 18 of the United States Code. This would result in Defendants making criminal allegations against themselves; thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

52.     Due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain certain provisions which eliminate coverage for any action brought by ASLET against these Defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves, there would be no insurance protection, they would face a large uninsured liability, thus, this is a further reason why they will not bring such a suit.

A12



## VI.                              DEFINITIONS

53.  As used in this Complaint, "mail," "mails," "mailed," "mailing", "or "letter" includes the use of these terms as used in 18 U.S.C. § 1341.

54.  As used in this Complaint, "wire," "wires," "wired," "wiring", ""wire communication" or "telephone" includes the use of these terms as used in 18 U.S.C. § 1343.

## VII.   THE SCHEME TO DEFRAUD

55.     ASLET was founded in 1987 as a non-profit, charitable corporation to lead and further the training of law enforcement officers worldwide.

56.     Beginning in or about 1994, Defendants and other Participants devised a scheme to defraud, corrupt, cheat, steal and conceal in violations of the laws of the United States ("the scheme"). The primary objective of the scheme was to realize illicit personal gains through misusing corporate positions at ASLET to obtain improper financial gain and improper competitive advantage over other members of the corporation in the solicitation of government and private contract awards. This scheme inflicted substantial injury upon Plaintiffs, by among other things, cheating Plaintiffs out of hundreds of thousands of dollars in membership dues through a pattern of false misrepresentations and omissions, and spending hundreds of thousands of dollars in support of Defendants' and Participants' racketeering acts and the concealment of those racketeering acts. The scheme also caused Plaintiffs additional injury, interfering with Plaintiffs' abilities to receive certain training and information security benefits owed to Plaintiffs by Defendants and other Participants. The scheme also resulted in Plaintiffs being cheated out of the honest right of legitimate elections of corporate directors, as Defendants and other Participants, through a pattern of fraud that utilized the mails and wires, tampered with ASLET elections in violation of Delaware law.

A13

 

57.     The scheme to defraud, corrupt, cheat, steal, obtain by fraud and convert property was in existence by at least 1994. As Defendants and Participants concealed their activities and delayed the discovery of the true nature of their activities through the alteration and destruction of documents, and through engaging in misleading conduct towards another person in order to hinder, delay and prevent the discovery of their offenses, and the communication of theses offenses to federal law enforcement officers, the scheme was allowed to continue, and continues to operate as of the date of the filing of this Complaint.

58.     Defendants, who control the Executive Board ("Board of Directors" or "Board") of ASLET, and their co-conspirators, have for many years schemed to deceive the membership of the corporation ("membership" or "members"), law enforcement agencies, the IRS, and charitable donors about the financial management of the corporation. Defendants have repeatedly and consistently denied that financial irregularities exist, while being aware that substantial misrepresentations were being made about financial practices. Defendants have repeatedly and consistently led members and prospective members to believe that the corporation was operating "in the black" and its salaries and expenses were appropriate for a Section 501(c)(3) charity, when, in fact, Defendants were, year after year, sending hundreds of thousands of dollars down a "black hole" that enriched and aided a select few who have obtained Plaintiffs' money and property through patterns of racketeering activity.

59.     Defendants and their co-conspirators have for many years schemed to deceive the membership, law enforcement administrators (federal, state and local), and other individual officers and trainers regarding (non-existent) security procedures that (falsely) led those paying monies to the corporation to believe that the corporation actually screened prospective members who had physical access to other members and sensitive law enforcement training. Defendants

A14

13

 

have repeatedly and consistently denied that security holes existed within the corporation, even though they have known since 2001, at the latest, that mailings and electronic communications to members stating that all associate members must have sponsors are false, increasing the risk of danger to law enforcement officer members. Defendants have repeatedly and consistently used advertising and marketing techniques to lead members and prospective members to believe that certain basic checks would be performed before associate members were admitted to membership (and, accordingly, to ASLET seminars and functions), making ASLET less attractive to criminals and terrorists seeking intelligence on United States law enforcement training techniques and operation tactics. Even though Defendants have long understood the hazards caused by their misrepresentations and could have developed and provided quick and secure checks to provide the protections that they had misled members into believing they were receiving for their membership dollars, Defendants chose and conspired not to do so. Instead, they have knowingly marketed memberships to law enforcement officers, many of whom count on their peer associations to provide them a safe environment to protect them and to protect the confidentiality of their training materials they may provide at ASLET seminars. Defendants have knowingly misled federal law enforcement agencies, such as the Federal Bureau of Investigation and the United States Secret Service, into providing federal law enforcement officers to teach at ASLET seminars under the (false) assumption that the materials they were teaching were being delivered to a screened audience.

60.     The Defendants have also created the misleading and false impression that respected institutions were still sponsors, contributors or "Seal of Approval" members long after those institutions severed their relationships with ASLET. This fraudulent behavior caused prospective members and contributors to falsely believe that those institutions were still supporting ASLET.

A15

14

 

Defendants used several of those institutional corporate names or product names as internet "meta tags" in an attempt to sell memberships and obtain money and property through falsely representing an association with the victimized institutions' intellectual properties, without ever acquiring permission or authorization from those institutions.

61. In all relevant respects, Defendants acted in concert with each other in order to further their fraudulent scheme. Beginning not later than 1992, Defendants, their various agents and employees, and their co-conspirators, formed an "enterprise" (the "Enterprise") as that term is defined in 18 U.S.C. § 1961(4). That Enterprise has functioned as an organized association-in-fact for more than ten (10) years to achieve, through illegal means, the shared goals of maximizing their control over the corporation, maximizing personal benefits and profits to leaders of the enterprise, and avoiding the consequences of their actions. Each Defendant has participated in the operation and management of the Enterprise, and has committed numerous acts to maintain and expand the Enterprise.

62. In order to avoid discovery of their fraudulent conduct and the possibility that they might be called to account for their conduct, Defendants engaged in a widespread scheme to frustrate public scrutiny by making false and deceptive statements and by concealing and destroying documents and research that they knew would have exposed their public campaign of deceit. This scheme included making false and deceptive statements to the public and in judicial proceedings, preventing a corporate director from accessing documents detailing financial improprieties that could be forwarded to federal civil investigators and/or law enforcement officers, and engaging in a separate pattern of racketeering activity directed at a corporate director to prevent him from exposing the Defendants' actions, and to retaliate against him for providing truthful information to federal law enforcement officers. Defendants also aided and

A16

 

abetted the violation of Department of Defense ("DOD") intelligence agency directives prohibiting the private use of government property and the dissemination of information about United States citizens by employees of NIMA, an intelligence agency of the United States.

63.    The scheme has been successful. Defendants and Participants obtained control over the Enterprise, conducted the Enterprise's business through a pattern of fraud, obstruction and retaliation, reaped hundreds of thousands of dollars in salaries, bonuses and reimbursed expenses, and gained substantial advantage over certain Plaintiffs in the solicitation of government and private law enforcement training contracts. ASLET, under the control of its original Executive Director had, enjoyed legitimate net operating surpluses. By 2003, the fraudulent activities of Defendants and Participants moved ASLET's net revenues from a high of $115,343 to net losses of $126,845 with zero dollars being spent on any charitable functions (such as training scholarships or membership benefits) according to IRS records. A recent site inspection audit by a CPA accompanying Messina appears to show the corporation with a net operating deficit of over $50,000 for fiscal year 2003, and documents recently obtained by Messina show an accumulated operating deficit of over $ 126,000 for the fiscal period April 1-November 30, 2003.

64.    Defendants' tortious and unlawful course of conduct has caused the members and Director Messina to suffer racketeering and other financial injuries. As a consequence of Defendants' tortious and unlawful conduct, federal government law enforcement agencies have spent federal funds, and authorized federal agents and instructors to attend and teach at seminars hosted by the corporation, relying upon the fraudulent misrepresentation of the Defendants that members and seminar attendees have been screened and are suitable to receive law enforcement sensitive information. As a consequence of Defendants' tortious and unlawful conduct, law

A17

 

enforcement officers and law enforcement trainers have spent hundreds of thousands of dollars

of their personal funds, and, in some cases, their agency's funds, to purchase memberships and

"certification' credentials, and to attend seminars, from a "peer" organization that they were

falsely led to believe would be an asset to their law enforcement careers, their agencies, or their

private training businesses; more specifically, Plaintiffs relied upon the fraudulent

misrepresentations of the Defendants that they were purchasing memberships in the nation's

largest law enforcement training organization, with 7,000 members representing 18,000 agencies

(falsely claimed as of December 30, 2003), which would allow them to network with a

substantive peer group, the majority of which had command and purchasing authority. The effect

of Defendants' fraudulent scheme and wrongful conduct continues to this day; Defendants are

continuing to prosper and profit from their unlawful and tortious conduct; and, unless held liable

by this Court, Defendants are likely to continue their unlawful activities into the future.

**VIII.**          **FACTS COMMON TO ALL CLAIMS**

**A.    ASLET DIRECTOR BRUCE SIDDLE**
**ASKS QUESTIONS AND IS ATTACKED**

65.        In or about April of 1994, Bruce Siddle, then a corporate director of ASLET, started to

make inquiries regarding the management, financial and ethical practices of ASLET's (then)

Chairman, Gary Klugiewicz; (then) Executive Director Steven Bunting; and (then) Director,

Corporate Treasurer and Legal Counsel, Mildred O'Linn.  Almost immediately, in an attempt to

protect themselves from investigation for financial and ethical violations, the three corporate

officers embarked on a campaign to destroy Siddle financially, and to discredit him until he

resigned from the board. These actions included, but were not limited to, the covert and unlawful

audio taping of his telephone calls to and from the ASLET office in Lewes, Delaware (including

calls initiated by Steven Bunting), the transcribing of those tapes, and the personal delivery of

A18




those transcripts to Mr. Siddle's largest and most prestigious government training contract client,

The Federal Law Enforcement Training Center in Brunswick, Georgia. This was not only an

attempt to retaliate against him and discredit him for questions he had raised regarding the

propriety of several of Ms. O'Linn's actions, but also was designed to financially benefit

Klugiewicz, who was a chief competitor with Siddle for these training contracts.

**B.   ALLEGATIONS SURFACE OF "DOUBLE DIPPING" AND UNCONTROLLED
SPENDING AT THE ASLET OFFICE IN LEWES, DELAWARE. MESSINA IS
ASSIGNED TO INVESTIGATE ALLEGATIONS AND IS ATTACKED**

66.    In or about January of 1995, Messina was assigned as a member of the Ethics Committee

to investigate complaints (made by members and employees of the corporation) of improprieties

allegedly committed by (then) ASLET Executive Director Steven Bunting. These complaints

included, but were not limited to, office staff being forced to work for the University of

Delaware while their salaries were being paid by ASLET, and the improper sub-contracting of

the ASLET Seminar Coordinator's position to Bunting's (then) live in girlfriend, Linda Fleming.

67.    Klugiewicz, shortly thereafter, at the request of Bunting who had created the Chairman's

position for Klugiewicz, began actively obstructing the efforts of Messina, and others, to

investigate the multitude of complaints alleging that Bunting was working several jobs during

the same hours, while being in the full time employ of ASLET. Klugiewicz, acting as ASLET's

Chairman, gave directives to other corporate directors not to cooperate in Messina's

investigations and used every opportunity to attempt to retaliate against Messina, through

convening unsuccessful parallel "mock investigations" against Messina, and by claiming that

Messina's allegations against Bunting had been fully investigated and found to be false, although

no investigation actually ever took place.

68.    The Fleming portion of the investigation was eventually turned over to another

A19

18

 

investigator, but became a moot point, for as soon as Ms. Fleming moved out of Mr. Bunting's house, her services as Seminar Coordinator were terminated. Being totally frustrated in his attempts to get records and cooperation from the Board, Messina resigned from the Ethics Committee to run for the Board in January 1996, and was elected by the membership.

69.     In December of 1996, Klugiewicz and the Board stated for the record, in an electronic mail message, that they agreed with the Ethics Committee findings that double dipping had in fact occurred and would enforce the Recommendation that Bunting make a choice between working for the University of Delaware or ASLET.

70.     With statutory fiduciary responsibilities mandated by the DGCL, Messina continued looking into the activities at the ASLET office. He was, once again, continuously obstructed, and retaliated against, by Klugiewicz in an attempt to frustrate his investigation. Mr. Messina, an elected corporate director, was directed by Klugiewicz not to investigate any allegations of wrongdoing, in clear violation of the statutory and decisional law of ASLET's state of incorporation (Delaware). Other board members were again directed not to cooperate with Messina's inquiries.

71.     Although the Board, in internal documents, agreed with the Ethics Committee findings that Bunting was in fact working for ASLET and the University of Delaware during the same hours, and although (then) ASLET employees testified that they were made to conduct University business via a remotely forwarded phone line, allowing Bunting to pretend to be at his office at the University and the ASLET Office (which were in Newark, Delaware and Lewes, Delaware, respectively) at the same time, Klugiewicz intensified his efforts to protect Bunting and to retaliate against Messina.

72.     Messina's access to corporate books and records only diminished (in violation of Title 8,

A20

19



Section 220 of DGCL), causing Messina to resign from the Board in 1998 to allow him to more fully investigate the continuing reports of wrongdoing without interference from Klugiewicz and other Defendants and Participants.

73.    Publicly, however, Klugiewicz intensified his efforts to defraud the members, and cover-up allegations of Bunting's continued double dipping. When additional allegations arose, Klugiewicz, in March of 1998, published an article in ASLET'S bi-monthly magazine stating that all the complaints had been found to be unsubstantiated, when internal ASLET documents clearly indicated otherwise.

## C.    HACKETT OBTAINS ASLET's EXECUTIVE DIRECTOR POSITION THROUGH FRAUDULENT MISREPRESENTATIONS.

74.    In or about the summer of 1999, while seeking employment with ASLET, Hackett presented ASLET officials with documentation claiming that he possessed a "Doctorate in Education." This constituted a representation that he had higher educational qualifications than all but seven (7) of the seventy-five (75) candidates competing for the position of salaried corporate Executive Director. Through this documentation, Hackett claimed to have the academic training and expertise needed to run a large national non-profit corporation, when, in fact, Hackett knew that his "Doctorate" was a sham.

75.    This "Doctorate" was, in fact, a piece of paper obtained from what an attorney for the United States Department of Justice ("DOJ") described as the nation's "largest diploma-mill," whose principals were imprisoned after being indicted by a federal grand jury on charges that included mail fraud, wire fraud and money laundering.

76.  ASLET reasonably and justifiably relied upon Hackett's representation that he possessed a Doctorate in Education and had, therefore significantly greater education and training than almost all of the other applicants for the Executive Director position. Had ASLET known about

A21




Hackett's use of a "Diploma-mill" degree, it would not have permitted Hackett to be considered above the other candidates. The facts concealed and misrepresented by Hackett were material to ASLET's decision.

77.    In or about the summer of 1999, Hackett represented to an ASLET Search Committee, that he would need a salary and benefits package of at least $125,000 per annum, which would still result in his taking a "pay cut" in order to join the organization. Hackett's statement to that effect, made to former director Kathleen Kelley, was later published in an article in ASLET's "The Trainer" magazine. Upon information and belief, Plaintiffs are informed that Hackett's previous compensation package, at the Oklahoma state chapter of Volunteers of America, did not approach that pay level.

78.    Having obtained a position for which he was not qualified through fraudulent misrepresentations, Hackett found himself in over his head, while assuring the Plaintiffs that he would increase revenue and build the corporation.

79.    As a result of his unsuitability and unfamiliarity with the position, the corporation's expenses began to outstrip the corporation's revenues. Hackett then hatched a scheme to defraud members, and donors, by falsely withholding bills owed to vendors, while falsely assuring those directors and donors who reviewed the Policy and Procedure Manual that the corporation utilized GAAP, when, in fact, the corporation was using CMA against the advice of its auditors. In this way, Hackett could justify salary increases granted to him by Klugiewicz, while giving a false sense of financial success to Plaintiffs and to donors to the corporation.

**D.    MESSINA RESIGNS FROM THE BOARD AND RUNS AGAIN**

80.    On or about January of 1998, after attempts by Defendant Klugiewicz to have the membership remove Messina from the board failed at the Annual Membership Meeting, Messina

A22

resigned from the board in disgust. In his resignation letter, he informed the membership of his disappointment in the Board's self serving goals. Messina and other members also continued to collect evidence of continued "double dipping" practices (without the interference of Klugiewicz and other Participants).

81.    A virtual mountain of evidence was collected.   For example, an eyewitness, while in the ASLET office, was introduced to Bunting.  This eyewitness went into an adjoining office, and called the University of Delaware's Newark, Delaware Public Safety Office.  Bunting answered, pretending to be at the University (showing Bunting worked both jobs during the same hours). Mr. Bunting then filed suit against ASLET for "failing to protect him" from Messina's investigations. The Board promptly placed Bunting on administrative leave with orders to stay away from the ASLET Office until his contract ran out. The corporation did not renew his contract upon its expiration. The lawsuit, according to Counsel, was subsequently settled by the corporation's insurer, for an undisclosed amount, believed to be only a small portion of Bunting's last year of his employment contract. A recent, more thorough review of the activities of Klugiewicz and other Participants has provided Plaintiffs with articulable suspicion that Klugiewicz and other Participants schemed to defraud the insurer out of approximately $300,000 in connection with Bunting's lawsuit.

82.    In January of 2001 (after being awarded the National Institute of Ethics "Award for Moral Courage" for his efforts to halt the wrongdoing at ASLET) Messina was re-elected to the ASLET Board.

## E.    ALLEGATIONS SURFACE THAT CORPORATE
## DIRECTOR KATHLEEN   KELLEY HAS BEEN FROZEN OUT

83.    On or about January of 2002, Messina was informed that fellow director Kathleen Kelley, a sworn law enforcement officer of the State of Florida, had been effectively "exiled" from the

A23

22




Board. This was accomplished using (what was later found to be false) information provided to the directors (including Messina) by Hackett, Klugiewicz and (then) "Legal Counsel" Robert Thomas. The Defendants and other Participants had (falsely) stated that Ms. Kelley's attorney had directed (via a letter to the corporation) that no communication should be made to Ms. Kelley, except through his office, due to severe injury and illness.

84.    After months of requesting and not receiving the alleged letter, Messina finally contacted the attorney (a respected member of the Florida Bar and former Chief of Police) directly, only to find that he had never represented director Kelley in any ASLET matter, and had never sent any letter or verbal communication directing anyone not to communicate with Ms. Kelley. Messina subsequently received a sworn affidavit from Kelley corroborating the attorney's statements. Kelley also related to Messina that, after catching Hackett in several lies, she was "excommunicated" from the ASLET Board, so Hackett could take over her position as Magazine Editor.

## F.    KLUGIEWICZ IMPROPERLY EXTENDS HACKETT'S EMPLOYMENT CONTRACT

85.    On or about October of 2002, Messina discovered that Klugiewicz had renewed Defendant Hackett's original contract much earlier than was mandated by ASLET bylaws (after the second year of the contract), and had awarded Hackett raises and bonuses, despite the fact that the criteria for raises and bonuses outlined in the contract were not reached. Messina also discovered that Klugiewicz desired to renew Hackett's contract a year earlier than mandated by ASLET Bylaws, in order to remove the incoming Board's ability to evaluate and decide on the renewal of Hackett's contract. Messina strenuously objected to this, and to Klugiewicz's false statements that he had "conducted" a "review" of Hackett's performance, when he had conducted no such fiduciary examination. Klugiewicz, Smith, Meyer, Grossi, Konrath and other

A24



Participants voted to renew the contact on December 12, 2002, a month before the new Board was scheduled to take office.

## G. INFORMATION IS SOUGHT CONCERNING MISSING DIRECTOR

86.     On or about November of 2002, Messina, in his role as a corporate director, demanded ASLET records, pursuant to his statutory right under Section 220 (e) of the DGCL. Included in this demand were requests for records pertaining to Director Kelley's absence for almost two years. Defendants Hackett, Klugiewicz, Meyer, Smith, Konrath, and other Participants ignored Messina's requests, forcing Messina to file suit against Hackett and Klugiewicz, at his own expense, in the Court of Chancery of the state of Delaware, to obtain these records.

87.     At a January 3, 2003 scheduling conference in the Court of Chancery action, counsel representing Hackett and Klugiewicz admitted to the Honorable William B. Chandler III (the "Chancellor") that Counsel could not come up with any reason why the Defendants had not provided Messina the records (after being told by the Chancellor that "He is a Director and has a right to the records"). Shortly thereafter, Defendants' counsel told Messina to sign a Confidentiality Agreement. After doing so, he eventually received the records, which referred (via a handwritten note from Hackett) to the "communication" by Kelley's attorney. No such communication is included in the records production (as the attorney had already informed Messina that no such communication ever occurred). Kelley, contacted again by Messina, related that although she had attempted to renew her membership in the corporation, first by check and then by credit card, it had been allowed to expire, and she had not even received the ASLET magazine since April of 2002, when she informed the board via fax that she wanted to resume full duties as a director.

A25



## H.    MEMBERS COMPLAIN OF
## BEING FROZEN OUT OF ELECTION

88.    On or about November 11, 2002, Messina was directed by members to a notice sent by

Hackett via electronic mail to members stating that ASLET Members who joined after

September 30th would not be eligible to vote in the elections for the Board. Knowing that this

edict was not in the election rules approved by the Board, Messina complained to Defendants

Hackett, Klugiewicz, Meyer, Smith, Grossi, Konrath, and other Participants that ASLET

members who had been allowed to vote in the past, and should be allowed to vote, were now

disenfranchised.

## I.    MESSINA FINDS APPARENT SELF DEALING AND
## ENRICHMENT IN HACKETT'S DEALING(S) WITH VENDOR(S)

89.    On or about November 3, 2002, Messina informed the Board that he had become aware

of a secret, self-serving contract between Hackett and a vendor. A clause in the contract stated

that the vendor would only provide a prestigious event to ASLET if Hackett remained Executive

Director. The contract, however, left ASLET open to contingent liabilities if the event wasn't

held and the fault was ASLET's.  Messina strongly stated his belief that this was an unethical act,

and constituted a breach of fiduciary duty on the part of Hackett in entrenching himself and

putting additional pressure on the Board to renew his contract. No director responded to

Messina's message.

## J.    MESSINA TOLD OF WIDESPREAD VIOLATIONS
## OF DELAWARE LAW IN THE CONDUCT OF ELECTIONS

90.    On or about November 14, 2002, Messina consulted with an experienced fraud

investigator, who informed Messina of his belief that ASLET's elections had never complied

with Delaware Law in several ways. During an emergency Board meeting called for November

21, 2002, Messina suggested that the entire Board run, and advised the Board that the Certificate

A26





of Incorporation clearly states that the Board shall be elected at the annual meeting. Defendants Hackett, Klugiewicz, Meyer, Grossi, Smith and Konrath, and other Participants, ignored Messina's recommendation, agreed to claim "honest error" if challenged, and made no mention of it on the meeting minutes, which were subsequently published on the corporate website, and distributed via electronic mail, and via the U.S. Mail.

### K.   MESSINA DEMANDS ELECTION IRREGULARITIES BE CORRECTED

91.   On November 18, 2002, within hours of Messina making additional inquiries concerning election irregularities, and demanding that Delaware law be followed to the letter, Hackett and Klugiewicz directed (former) ASLET Legal Counsel Robert Thomas to call attorney Henry Hart (an associate of Hackett's from the American Society of Association Executives which had aided Hackett, a member of the Association, in obtaining his ASLET position) and seek advice on the "removal of a director".

### L.   MESSINA FINDS CORPORATE BUSINESS BEING CONDUCTED BY AN EXECUTIVE COMMITTTEE BEHIND HIS BACK, AND IN VIOLATION OF STATE LAW AND ASLET'S CERTIFICATE OF INCORPORATION

92.   In or about November of 2002, after requesting Board minutes dating back to Messina's first term as an elected director, Messina informed the Board that the "Executive Committee" which had made the majority of management decisions over the past several years, and was operated and financed with corporate funds, had never been legally created. The members of the Board refused to acknowledge his complaint.

### M.   DIRECTORS FALSELY TELL MEMBERS THAT THEY HAD "FOUND" MESSINA's CHARGES TO BE BASELESS

93.   Defendants Klugiewicz, Meyer, Hackett, Grossi, Konrath, Smith (the "Director Defendants"), and other Participants, falsely represented, on numerous occasions, that they had

A27

 

investigated Messina's charges of financial improprieties committed by the salaried Executive

Directors and found them to be baseless or without merit. As detailed more fully within this

Complaint, they falsely claimed, through meetings, letters, and electronic mail messages sent to

Plaintiffs, to have found no wrongdoing and to have found Messina's charges to be baseless. In

fact, they possessed corporate internal reports validating Messina's original charges of

improprieties, and they refused to even look into Messina's secondary findings, even while in

possession of evidence from corporate counsel and others that Messina's charges of corporate

violations of Delaware law in the conduct of the corporate elections were fully substantiated.

94. Before making these representations, the Director Defendants knew that the Executive

Directors had engaged in improper practices that violated state statutes, the corporate charter,

and the corporate bylaws.

95. The Director Defendants made their misrepresentations that the Executive Directors were

not involved in wrongdoing with the intent to cause Director Messina and other members to rely

on their misrepresentations and to refrain from further investigating the Executive Director and

the elected directors, and to hinder, delay and prevent Messina from forwarding evidence of

possible state and federal offenses to the Delaware Attorney General and to federal law

enforcement officers or judges.

96. Plaintiffs reasonably and justifiably relied upon the Defendants' representations that neither

the Executive Directors nor the elected directors were involved in scheming to defraud the

corporation and scheming to cover up said fraud. Had Plaintiffs known about the Defendants'

participation in the scheme, they, the majority being career law enforcement officers and law

enforcement trainers, would have directed additional resources at investigating the Defendants,

and would have refused to provide their own or their employers' funds (in the form of

A28

27




membership dues) to financially support the fraudulent practices. The facts concealed and

misrepresented by Defendants were material to Plaintiffs' decisions to remit membership dues to

the corporation.

## N. CORPORATE FUNDS ARE IMPROPERLY ADVANCED TO PAY LEGAL BILLS

97.    Greg Meyer, on or about December of 2002, and later, David Smith (on or about January,

2003), as ASLET's Treasurers, authorized corporate monies (in excess of $ 25,000) to be used to

pay the legal defense bills of Hackett and Klugiewicz, without first obtaining an "undertaking" to

pay said monies back to the corporation if Defendants were found to be at fault by the Court, as

required by Title 8, Section 145(e) of DGCL. Defendants Meyer and Smith advanced said

monies in support of the Enterprise's schemes to defraud and to conceal its activities, even after

being informed by Messina that this was both improper and unlawful under Delaware Law.

## O. MESSINA IS CENSURED AFTER DEMANDING RECORDS

98.    On December 12, 2002, Meyer, in a further attempt to protect the Enterprise by attacking

those who would not join in its scheme, submitted a prepared surprise resolution to "censure"

Messina without any prior notice on the meeting agenda (as required by Robert's Rules of Order,

which control the business of the ASLET Board pursuant to ASLET Bylaws). This censure

motion was submitted after Messina left the meeting, and after Messina's corporate resolution (to

direct Defendant Hackett and Klugiewicz to provide records Messina is entitled to under

Delaware law) was rejected by the Director Defendants and other Participants.

## P. SECRET VOTE TO EXPEL MESSINA FAILS, AND IS COVERED UP

99.    On December 19, 2002, as a follow up to the December 12th censure, and in an attempt to

hinder, delay and prevent Messina from providing truthful information (including documentary

A29



and testimonial evidence) to federal law enforcement officers, Meyer and Grossi put forth a motion to expel Messina from the corporation. This was done with no prior notice to Messina (whom they knew would not be attending the meeting). When the motion failed to carry, then "Legal Counsel" Robert Thomas resigned his position with a fusillade of vulgarities, and Corporate Secretary Grossi intentionally failed to enter the vote into the minutes of the meeting. This "secret" vote, omitted by Grossi from the minutes of the meeting (which minutes were later ratified by Defendants and Participants), was later confirmed by Defendants David Smith and Andrew Casavant, and was also confirmed by (then) ASLET Assistant Executive Director Ed Nowicki (who hung up in disgust when the voting began).

100.    The following day, Meyer and Grossi, frantic to eliminate Messina's ability to obtain records concerning the Enterprise, lobbied the members who voted "no" or abstained, to change their vote. Meyer and Grossi then arranged for another Board meeting for the evening of January 2, 2003. This meeting was not included on the Board meeting schedule, and Messina was not invited to the meeting. The meeting was cancelled when Chancellor William B. Chandler III was made aware of it during a Scheduling Conference (in Messina's records demand case) that afternoon, and "suggested" to counsel for Hackett and Klugiewicz that he might have to "gear up" for a TRO hearing the next day if the meeting took place.

A30

 

## Q. PLOT TO PREVENT MESSINA FROM ATTENDING THE ANNUAL MEETING OF THE MEMBERS AND THE ASSOCIATED ANNUAL SEMINAR IS HATCHED.

101. On or about December 20, 2002, Meyer used interstate telephone wires to call Smith, Konrath, and other Participants, in an attempt to convince them to change their vote of December 19, and to vote yes to the expulsion of Messina at the secret meeting planned for January 2, 2003.

102. Meyer told Smith that if the vote carried, he would use his influence as a Captain in the Los Angeles Police Department to have Messina escorted out of the seminar (by either San Bernardino County Sheriffs' Deputies or officers of the City of Ontario Police Department) in full view of the membership, when Messina arrived for the Board meeting. Smith later divulged this plot at the Ontario, California seminar, in front of several witnesses. It is later confirmed by the current Chair, Casavant, who had asked Smith to confirm it, and who himself relayed Smith's confirmation to Messina in the presence of another ASLET member.

## R. SCHEME TO TAMPER WITH THE NEW ELECTION

103. On or about December 27, 2002, Meyer secretly obtained three exclusive ASLET membership lists from Hackett, which had been denied to Messina and then Board candidate Robert Bragg (in violation of Section 220 of The DGCL). Meyer used these lists to selectively solicit votes in regions of the country that were less likely to vote for candidate (and Plaintiff) George Demetriou, who is a member of a highly respected Task Force, a training associate of Plaintiff Messina, and had also openly and frequently raised many concerns about ASLET's security and financial practices.

104. Corporate books and records, obtained through the Court of Chancery action, later showed that Mr. Demetriou had won the original election, recalled by the Board (in which

A31

 

almost twice as many members voted) by a comfortable margin, yet lost the second election,

which was manipulated by Hackett and Meyer in hopes of protecting the Enterprise.

105.  The Director Defendants and other Participants planned to select Meyer to succeed

Klugiewicz as Chairman, and then insure Messina's removal as a director. This election plot

almost succeeded, as all but one of Meyer's selected candidates won the second election, and

Meyer missed being elected Chairman by one vote. Many ASLET members have stated that they

did not open the ballots for the second election, because they knew they had already voted, and

thought it was sent in error (as no previous notice was mailed to them regarding the second

election).

### S.  MEYER USES HIS POSITION AS ASLET TREASURER TO UTILIZE ASLET FUNDS TO OUST MESSINA, (A RIVAL OF MEYER'S IN THE EXPERT WITNESS, CONSULTATION AND TRAINING FIELDS.)

106.  On December 31, 2002, Messina sent a message to Meyer advising him that if he

authorized ASLET funds to be used to finance the seminar trip for Robert Thomas, the recently

resigned "Legal Counsel" (as had been done in the past), that he (Messina) would institute legal

action on behalf of the members. According to legal billing records obtained by Messina via the

Court of Chancery action, Meyer immediately contacted attorney Henry Hart, and discussed

"removal of a director".

### T.  HACKETT ARBITRARILY CHANGES AND CREATES NEW BYLAWS, WITHOUT BOARD AUTHORITY, OR MEMBERSHIP RATIFICATION

107.  On January 7, 2003, Hackett, after being directed (by a unanimous January 6th vote of

the Board) not to take any action regarding proposed bylaws changes that were not ratified by the

membership, arbitrarily changed the corporate bylaws to his own benefit (by reducing the

authority of the Board, his potential successor, and the membership, and increasing his own



authority). Hackett posted these purported bylaws on the ASLET website, dated January 7, 2003.

## U. MESSINA IMPROPERLY SUSPENDED AS A DIRECTOR, IN AN ATTEMPT TO FORESTALL HIS DEMANDS FOR CORPORATE RECORDS, AND AMIDST NUMEROUS INQUIRIES ABOUT ASLET ACCOUNTING PRACTICES

108.    On June 10, 2003, Messina received notice that a "Resolution" to suspend him from

membership was scheduled for vote at the Board meeting of June 20th. This was less than one

week after Messina had insisted on attending the Finance Committee Meeting of June 4, 2003, at

which time he made known his objections to the proposed budget for fiscal year 2004, informed

the attendees of his suspicions of the misuse of accounting practices, and also advised the

attendees that he was aware that fraudulent statements had been made and published by Hackett,

Meyer, Grossi and Smith regarding the recommendations of the auditor to change the current

accounting practices.

## V. UNLAWFUL PURPORTED SUSPENSION OF MESSINA, AS BOTH A MEMBER AND DIRECTOR, ATTEMPTS TO PREVENT HIM FROM OBTAINING DEMANDED RECORDS.

109.    On June 20, 2003, in a further attempt to prevent Messina from accessing records of the

Enterprise's activities, Defendants and other Participants purported to suspend Messina as both a

member and a director, without a hearing agreed to on January 6, 2003 (and outlined in a letter to

Chancellor William B. Chandler subsequent to the Scheduling Conference of January 2, 2003).

110.    The resolution was based on a never-used emergency clause in the bylaws (authored by

Mr. Messina) providing for the temporary suspension of membership "privileges", pending a

hearing to determine membership "status". The section was written to curtail dangerous and/or

violent activity at an ASLET Seminar, pending a hearing. As the bylaws do not require a director

to be a member and several past directors have not been members, the actions of the Defendants

and other Participants had no effect under Delaware law, on Messina's director's status. Directly

A33

32